**Gerald M. Needham, OSB #963746**
**Assistant Federal Public Defender**
**Email: jerry_needham@fd.org**
**Stephen R. Sady, OSB #81099**
**Chief Deputy Federal Defender**
**Email: steve_sady@fd.org**
**101 SW Main Street, Suite 1700**
**Portland, OR 97204**
**Tel: (503) 326-2123**

**Attorneys for Defendant**

<br>

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF OREGON

<br>

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Case No. 3:20-cr-00465-JO** |
| **Plaintiff,** | |
| **v.** | **MOTION TO DISMISS INDICTMENT** |
| **KEVIN PHOMMA,** | **Oral Argument Requested** |
| **Defendant.** | |

## TABLE OF CONTENTS

Page

Table of Authorities .................................................................................................... iii

Introduction ................................................................................................................. 1

Relevant Statutory History and Factual Background .................................................. 2

    A.    The Primary Proponent Of The Civil Obedience Act of 1968 Intended It To Neutralize Specific Civil Rights Leaders And Silence Civil Rights Advocacy. ............................................................................................. 2

    B.    The Government Brought The Present Charge Under § 231(a)(3) In The Context Of A Summer Of Black Lives Matter Protests. ........................................ 8

Argument .................................................................................................................... 11

I.    Section 231(a)(3) Unconstitutionally Intrudes Into The States' General Responsibility For Enforcing Criminal Laws And Exceeds Congress's Commerce Clause Power Because It Criminalizes Intrastate Activity That Lacks A Substantial Nexus To Interstate Commerce. ...................................................................... 11

    A.    The Supreme Court's Commerce Clause Jurisprudence Protects The Federal-State Balance By Prohibiting Regulation Of Intrastate Activity That Does Not "Substantially Affect" Intrastate Commerce. ...................................... 11

    B.    Section 231(a)(3) Regulates Intrastate Activities That Do Not Substantially Affect Interstate Commerce For Purposes Of The Third *Lopez* Category. .......... 13

        1.    Section 231(a)(3) Does Not Regulate Economic Activity And Does Not Support Any Larger Scheme Of Economic Regulations. ................. 13

        2.    The Jurisdictional Element Of § 231(a)(3) Does Not Limit The Law's Reach To Activities That Substantially Affect Interstate Commerce ...................................................................................... 15

        3.    Congress Did Not Find That The Activities Regulated Under § 231(a)(3) Substantially Affect Interstate Commerce. ........................... 16

        4.    The Relationship Between The Activity Regulated Under § 231(a)(3) And Any Effect On Interstate Commerce Is Too Attenuated. ................................................................................... 18

    C.    Section 231(a)(3)'s Lack Of Substantial Affect On Interstate Commerce Requires Dismissal Of The Indictment. ............................................... 19

i

II.    Section 231(a)(3) Violates The First Amendment By Placing A Significant Burden On Expressive Conduct For The Impermissible Purpose Of Suppressing Messages And Viewpoints Associated With The Civil Rights Movement........................................ 19

     A.    Because § 231(a)(3) Burdens A Substantial Amount Of Constitutionally Protected Expression In Relation To Its Legitimate Sweep, The Statute Is Invalid Under The First Amendment. .................................................... 20

     B.    Section 231(a)(3) Regulates The Content Of Protected Expression Without A Permissible Justification. ................................................................ 23

          1.    The First Amendment Requires Strict Scrutiny Of Content-Based And Viewpoint-Based Regulations Of Speech And Expressive Conduct .................................................................... 24

          2.    On Its Face, § 231(a)(3) Regulates The Content Of Protected Expression. .............................................................. 25

          3.    Even If § 231(a)(3) Were Content-Neutral On Its Face, Its Legislative History Reveals A Content-Based Purpose........................... 26

          4.    Section 231(a)(3) Fails Under Strict Scrutiny Because The Burdens It Imposes On Protected Expression Are Only Remotely Connected To Any Potential Federal Interest. ............................................ 28

III.    Section 231(a)(3) Is Unconstitutionally Vague In Violation Of The Due Process Clause Because It Chills Protected Speech, Provides Inadequate Notice Of Criminal Conduct, And Invites Arbitrary And Discriminatory Enforcement And Prosecution...................................................................................... 29

     A.    Section 231(a)(3)'s Imprecise And Subjective Standards Fail To Provide Fair Notice And Risk Arbitrary Enforcement......................................... 30

     B.    Section 231(a)(3) Cannot Be Saved By Construction Without Violating The Constitutional Separation Of Powers. ................................................. 33

IV.    In The Alternative, The Indictment Should Be Dismissed Because Its Language Neither Provides Adequate Notice Nor Assures That The Grand Jury Made The Determinations Required By The Fifth Amendment......................................... 34

Conclusion .................................................................................................... 36

# TABLE OF AUTHORITIES

Page

## SUPREME COURT OPINIONS

*Brandenburg v. Ohio*,
   395 U.S. 444 (1969) ........................................................... 27, 33

*City of Chicago v. Morales*,
   527 U.S. 41 (1999) ................................................................. 32

*City of Houston v. Hill*,
   482 U.S. 451 (1987) ..................................................... 20, 22, 25

*Clark v. Cmty. for Creative Non-Violence*,
   468 U.S. 288 (1984) ............................................................... 20

*Coates v. City of Cincinnati*,
   402 U.S. 611 (1971) .......................................................... 32, 33

*Colautti v. Franklin*,
   439 U.S. 379 (1979) ............................................................... 31

*Cole v. Arkansas*,
   333 U.S. 196 (1948) ............................................................... 34

*Connally v. General Constr. Co.*,
   269 U.S. 385 (1926) ............................................................... 30

*Cox v. Louisiana*,
   379 U.S. 536 (1965) ................................................................. 4

*Dimaya v. Sessions*,
   138 S. Ct. 1204 (2018) ...................................................... 31, 34

*Gonzales v. Raich*,
   545 U.S. 1 (2005) .................................................................. 14

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972) ............................................................... 30

*Greenlaw v. United States*,
   554 U.S. 237 (2008) ............................................................... 23

*Johnson v. United States*,
   576 U.S. 591 (2016) ...................................................... 30, 31, 34

iii

*Kolender v. Lawson,*
    461 U.S. 352 (1983) .................................................................................... 30

*Members of City Council of L.A. v. Taxpayers for Vincent,*
    466 U.S. 789 (1984) .................................................................................... 32

*NAACP v. Claiborne Hardware Co.,*
    458 U.S. 886 (1982) .................................................................................... 27

*Nat'l Ass'n of Mfrs. v. Dep't of Def.,*
    138 S. Ct. 617 (2018) .................................................................................. 19

*Police Dept. of Chicago v. Mosley,*
    408 U.S. 92 (1972) ...................................................................................... 24

*Puerto Rico v. Franklin Cal. Tax-Free Trust,*
    136 S. Ct. 1938 (2016) ................................................................................ 19

*R.A.V. v. City of St. Paul, Minn.,*
    505 U.S. 377 (1992) .................................................................................... 26

*Reed v. Town of Gilbert, Ariz.,*
    576 U.S. 155 (2015) ................................................................ 24, 25, 26, 28

*Rosenberger v. Rector & Visitors of Univ. of Virginia,*
    515 U.S. 819 (1995) ............................................................................ 24, 28

*Russell v. United States,*
    369 U.S. 749 (1962) .................................................................................... 35

*Simon & Schuster, Inc. v. State Crime Victims Bd.,*
    502 U.S. 105 (1991) .................................................................................... 28

*Smith v. Goguen,*
    415 U.S. 566 (1974) .................................................................................... 30

*Smith v. O'Grady,*
    312 U.S. 329 (1941) .................................................................................... 34

*St. Paul Fire & Marine Ins. Co. v. Barry,*
    438 U.S. 531 (1978) .................................................................................... 16

*Stirone v. United States,*
    361 U.S. 212 (1960) .................................................................................... 35

*Texas v. Johnson,*
    491 U.S. 397 (1989) .................................................................................... 20

*United States v. Davis,*
   139 S. Ct. 2319 (2019) ................................................................. 31, 33

*United States v. Kozminski,*
   487 U.S. 931 (1988) ........................................................................ 33

*United States v. L. Cohen Grocery Co.,*
   255 U.S. 81 (1921) .......................................................................... 31

*United States v. Lopez,*
   514 U.S. 549 (1995) ............................................ 1, 11, 12, 13, 14, 16,17

*United States v. Morrison,*
   529 U.S. 598 (2000) .................................................................. *passim*

*United States v. Ragen,*
   314 U.S. 513 (1942) ........................................................................ 31

*United States v. Reese,*
   92 U.S. 214 (1876) .......................................................................... 32

*United States v. Robertson,*
   514 U.S. 669 (1995) ........................................................................ 12

*United States v. Stevens,*
   559 U.S. 460 (2010) .............................................. 19, 20, 23, 32, 33

*Village of Hoffman Estates v. Flipside,*
   455 U.S. 489 (1982) ........................................................................ 30

*Virginia v. Black,*
   538 U.S. 343 (2003) ........................................................................ 20

*Virginia v. Hicks,*
   539 U.S. 113 (2003) ........................................................................ 32

*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989) .............................................................. 24, 26, 28

*Webster v. Fall,*
   266 U.S. 507 (1925) ........................................................................ 23

*Winters v. New York,*
   333 U.S. 507 (1948) ........................................................................ 20

## FEDERAL COURT OPINIONS

*Glik v. Cunniffe,*
   655 F.3d 78 (1st Cir. 2011) ............................................................ 22

*Knox v. Brnovich,*
    907 F.3d 1167 (9th Cir. 2018) ................................................. 20

*Long Beach Area Peace Network v. City of Long Beach,*
    574 F.3d 1011 (9th Cir.2009) ................................................. 22

*McCoy v. City of Columbia,*
    929 F. Supp. 2d 541 (D.S.C. 2013) ................................... 21, 25, 32-33

*Musick v. Burke,*
    913 F.2d 1390 (9th Cir. 1990) ................................................. 18

*Nat'l Mobilization Comm. to End War in Viet Nam v. Foran,*
    411 F.2d 934 (7th Cir. 1969) ................................................. 23

*In re Nat'l Sec. Letter,*
    863 F.3d 1110 (9th Cir. 2017) ................................................. 24

*Nunez v. Davis,*
    169 F.3d 1222 (9th Cir. 1999) ................................................. 20

*Roy v. City of Monroe,*
    950 F.3d 245 (5th Cir. 2020) ................................................. 21

*United States v. Adams,*
    343 F.3d 1024 (9th Cir. 2003) ............................................. 12. 13

*United States v. Atcheson,*
    94 F.3d 1237 (9th Cir. 1996) ................................................. 16

*United States v. Bolton,*
    68 F.3d 396 (10th Cir. 1995) ................................................. 16

*United States v. Coutchavlis,*
    260 F.3d 1149 (9th Cir. 2001) ................................................. 30

*United States v. Du Bo,*
    186 F.3d 1177 (9th Cir. 1999) ................................................. 35

*United States v. Hoffman,*
    334 F. Supp. 504 (D. Col. 1971) ................................................. 23

*United States v. Keith,*
    605 F.2d 462 (9th Cir. 1979) ................................................. 35

*United States v. McCoy,*
    323 F.3d 1114 (9th Cir. 2003) ................................................. 12

*United States v. Mechanic*,
    454 F.2d 849 (8th Cir. 1971) ............................................................... 23

## UNITED STATES CODE

18 U.S.C. § 111(a) ............................................................................ 29, 30

18 U.S.C. § 231(a) .............................................................................. *passim*

18 U.S.C. § 232(1) .................................................................. 13, 17, 22, 31

18 U.S.C. § 245 .................................................................................... 4

## RULES

Rule 7(c) ....................................................................................... 2, 34, 35

Rule 12(b) ............................................................................................ 1

## OTHER

114 Cong. Dig. 72 (1968) ..................................................................... 7

BLACK'S LAW DICTIONARY (11th ed. 2019) ........................................ 16

Joseph Story, *Commentaries on the Constitution*, § 1779 (1833) ............... 34

**Introduction**

The defendant, Kevin Phomma, through counsel, moves the Court pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure to dismiss the indictment as failing to state a valid offense and violating an array of constitutional protections. The indictment charges a violation of 18 U.S.C. § 231(a)(3), a seldom-invoked section of the criminal code authored by legislators to counter the protections of the Civil Rights Act and to silence civil rights leaders in 1968. That statute broadly prohibits an array of conduct deemed to interfere with law enforcement officers performing duties "incident to or during the commission of a civil disorder." The indictment suffers multiple defects requiring dismissal.

First, § 231(a)(3) exceeds Congress's Commerce Clause authority by reaching purely intrastate interactions between individuals and local law enforcement officers that have always been the province of the States. Although the statutory language requires the existence of a "civil disorder" that affects commerce "in any way or degree," it does not require any causal nexus between the defendant's prohibited act and the purported commercial impact, nor does it require a substantial effect on commerce. No construction of the statute avoids constitutional infirmity under the reasoning of *United States v. Lopez*, 514 U.S. 549 (1995), and *United States v. Morrison*, 529 U.S. 598 (2000).

Second, as illuminated by the statute's origins, § 231(a)(3) is a content-based restriction on expression. Because of its broad reach and lack of legitimate federal interest in controlling local matters, the prohibition fails strict scrutiny and violates the First Amendment.

Third, the statute is also unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause because it employs imprecise terms in defining the federal crime, providing

both inadequate notice of the conduct prohibited and leaving insufficient guidance to avoid arbitrary and discriminatory enforcement.

Finally, the boilerplate allegations in the indictment violate both the presentment and notice functions of grand jury indictments under the Fifth and Sixth Amendments and Rule 7(c) of the Federal Rules of Criminal Procedure.

Based on each of these grounds, separately and cumulatively, the Court should dismiss the indictment.

## Relevant Statutory History and Factual Background

The indictment against Mr. Phomma charges a violation of 18 U.S.C. § 231(a)(3), entitled Civil Disorders:

> (3) Whoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function--
>
> Shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 231(a)(3). The facts relevant to this motion to dismiss include both the unique history of the statute's passage to quell civil rights protests in the late 1960s and its rare application, after decades of disuse, in the context of Portland's protests for racial justice.

### A.    The Primary Proponent Of The Civil Obedience Act of 1968 Intended It To Neutralize Specific Civil Rights Leaders And Silence Civil Rights Advocacy.

Section 231(a)(3) is one of three criminal offense provisions included under the Civil Obedience Act of 1968 (Pub. L. 90-284, April 11, 1968, Title X; *codified at* 18 U.S.C. §§ 231(a)(1)-(3)), which the Senate originally adopted as an amendment to the Civil Rights Act of 1968. *See* Exhibit A (114 Cong. Rec. 1287-97 (Jan. 29, 1968)) (proposed); Exhibit B (114 Cong.

Rec. 5529-5550 (Mar. 6, 1968)) (adopted).[1] Senator Russell B. Long of Louisiana was the author and primary proponent of the Civil Obedience Act, which became "known popularly as the Long amendment." Exhibit F at 144 (House Committee on Rules, *Consideration of H.R. 2516: Disagreeing to Senate Amendments and Sending the Bill to Conference*, April 8, 1968).

Senator Long "consistently opposed any legislation designed to improve the lot of blacks in the South" during his four decades in Congress.[2] In a Senate hearing in 1960, Senator Long made his support for racial apartheid clear, stating: "The colored man should be asked to understand that we believe that members of each race should go with their own kind, marry their own kind, and live with their own kind." Exhibit G at 3 (106 Cong. Rec. 4183 (Mar. 2, 1960)). During a hearing in 1964, Senator Long expressed his view that the civil rights movement showed ingratitude for the benefits the American system of chattel slavery conferred upon the descendants of the enslaved:

> Mr. LONG of Louisiana.   Would it not be fair to ask what kind of fix the colored folks would be in if they had not been brought to this country, but had been allowed to roam the jungles, with tigers chasing them, or being subjected to the other elements they would have to contend with, compared with the fine conditions they enjoy in America?

Exhibit H at 3 (110 Cong. Rec. 7903 (Apr. 14, 1964)).

---

[1] The documents comprising the Civil Obedience Act's legislative history are submitted separately as Exhibits in Support of Motion to Dismiss.

[2] Michael S. Martin, *Russell Long: A Life in Politics*, University Press of Mississippi, 2014, at 76.

As the Senate debated the Civil Rights Act of 1968, Senator Long proposed the Civil Obedience Act as a rejoinder to both the civil rights bill and to the civil rights movement. Exhibit A at 8-10 (114 Cong. Rec. 1294-96 (Jan. 29, 1968)). In Senate hearings between January and March of 1968, Senator Long expressed three related purposes that his amendment aimed to fulfill.

First, Senator Long wanted the Civil Obedience Act to nullify the legal protections proposed under the "hate crime" title of the Civil Rights Act of 1968. That title, which was ultimately enacted and codified at 18 U.S.C. § 245, authorized criminal penalties for interfering with another person because of the person's race or because the person engaged in a federally protected activity. Senator Long critiqued the hate crime law at length directly before he first presented his amendment in a Senate hearing on January 29, 1968. Exhibit A at 1-8 (114 Cong. Rec. 1287-94 (Jan. 29, 1968)). He said his "greatest immediate concern" about the hate crime law was "the unwitting stumbling block it could place before State and local officials in their honest attempts to detain and prosecute incendiary rabble rousers." *Id.* at 3 (114 Cong. Rec. 1289). He complained that "half of the Baton Rouge Police Force could have been thrown into jail" under the hate crime law for beating and setting attack dogs on peaceful demonstrators in the incident that precipitated *Cox v. Louisiana*, 379 U.S. 536 (1965). *Id.*

Senator Long offered his Civil Obedience Act as the solution:

> If we are going to seek to pass a civil rights bill, it should be a bill that would protect the public from irresponsible rabble rousers, instead of a bill that would protect such persons from the public.

Exhibit A at 11 (114 Cong. Rec. 1297 (Jan. 29, 1968)). Thus, Senator Long proposed the Civil Obedience Act in order to protect individuals whose actions meet the criteria of a hate crime, and, in turn, to prosecute the classes of individuals whose rights are protected under the hate crime law.

Second, the Civil Obedience Act was designed to jail and silence specific civil rights leaders whose names Senator Long repeated throughout the amendment's legislative history. *See*, *e.g.*, Exhibit C at 1-3 (114 Cong. Rec. 544-546 (Jan. 22, 1968)), Exhibit A at 9-12 (114 Cong. Rec. 1294-97 (Jan. 29, 1968)), Exhibit D at 1 (114 Cong. Rec. 1817 (Feb. 1, 1968)), Exhibit B at 3-6 (114 Cong. Rec. 5533-5536 (Mar. 6, 1968)). Senator Long traced the need for his amendment to "a so-called civil rights march led by Dr. Martin Luther King in the streets of Birmingham in March of 1963." Exhibit A at 8 (114 Cong. Rec. 1294 (Jan. 29, 1968)). He noted that during the march, Dr. King had "addressed a tense crowd with inflammatory words" and that, from the Birmingham jail, Dr. King "wrote an inflammatory letter which gained wide recognition in its pleas for Negroes to disobey those laws they felt unjust." *Id.* Senator Long credited Dr. King's letter from the Birmingham Jail as having directly caused "the ultimate in lawlessness, wanton killing, and senseless, destructive rioting." *Id.* Senator Long wondered how the Nobel Peace Prize could be awarded to Dr. King, "a man who start[ed] a drive to put the great cities of America to the torch by urging people to disobey laws." *Id.* He compared Dr. King's societal influence to "a single diseased cell" which "develops into a killing cancer." *Id.*

Senator Long also targeted Stokely Carmichael and H. Rap Brown, two prominent Black civil rights leaders who had each served as chairmen of the influential Student Nonviolent Coordinating Committee following the tenure of Representative John Lewis. While calling his

amendment for a vote, Senator Long urged his colleagues to "do something about" Brown and Carmichael:

> People ask, "Why don't you do something about H. Rap Brown and Stokely Carmichael?" If Senators want to do something about it, they should adopt this measure, rather than give the prosecutor a dead letter.

Exhibit B at 6 (114 Cong. Rec. 5536 (Mar. 6, 1968)). Senator Long stated that the Civil Obedience Act would apply to intrastate conduct so that it would "not leave available to Rap Brown or Stokely Carmichael the technical defense that they did not cross the State boundary with the intent to create a riot." *Id.* at 3 (114 Cong. Rec. 5533). Senator Gary Hart of Colorado called out the improper targeting, worrying that under Long's rationale, the Senate would "not be legislating . . . out of prudence," but rather would "be legislating in retaliation against Carmichael and Brown." *Id.* at 10 (114 Cong. Rec. 5540).

Third, Senator Long promoted the Civil Obedience Act as a means to suppress civil rights advocacy generally. Senator Long claimed that his proposal would "strike at" the "doctrine . . . that one should not obey the laws that stand in the way of alleged 'civil rights.'" Exhibit A at 9 (114 Cong. Rec. 1295 (Jan. 29, 1968)). He claimed this message was inflammatory and had "in large measure brought on all these riots and presented the need for action." *Id*. He wished to prevent speakers from "stirring up our fine citizens . . . and giving the wrong idea that everyone is trying to do something evil to them because they are of a different race." Exhibit C at 1 (114 Cong. Rec. 544 (Jan. 22, 1968)). He contended that "the people want us to pass a law" to stop civil rights activists from "going around accusing all the American people of being a bunch of murderers and assassins, which we are not, accusing us of being international criminals, which we are not." Exhibit D at 1 (114 Cong. Rec. 1817 (Feb. 1, 1968)). Because Senator Long believed that criticism

of white supremacy and demands for racial justice were bound to cause riots, he proposed the Civil Obedience Act as a tool to suppress such expression.

Congress adopted the Civil Obedience Act in a rushed process with little deliberation, leaving the comments of Senator Long, as its proponent, the primary evidence of congressional intent. The amendment never faced scrutiny in any Senate committee prior to its proposal, and senators were called to a vote only five weeks after its introduction. *See* Exhibit B at 1 (114 Cong. Rec. 5531 (Mar. 6, 1968)). Senator Hart criticized the legislative process by which a "series of six or seven amendments, none of which, I think, any Senators have seen, . . . will be offered in succession." *Id.* at 5 (114 Cong. Rec. 5535).

The Senate voted to adopt three of Senator Long's seven proposals. *See* Exhibit E at 1-2 (114 Cong. Dig. 72, 81-82 (1968)). The three surviving provisions created federal crimes for: (1) teaching the use of weapons or explosives with reason to know that the same will be used in a civil disorder; (2) transport or manufacture of weapons or explosives for use in civil disorder; (3) interference with the duties of a fireman or law enforcement officer incident to a civil disorder. *Id.* at 1 (114 Cong. Dig. at 81); *codified at* 18 U.S.C. §§ 231(a)(1), (a)(2), and (a)(3).[3]

The first two provisions concerning firearms and explosives were adopted together in a single vote with support from gun control proponents. Exhibit B at 9 (114 Cong. Rec. 5539 (Mar. 6, 1968)). With respect to the third provision, which became § 231(a)(3), Senator Long told his

---

[3] The proposed federal crimes included: (1) incitement of civil disorder; (2) teaching use of weapons for civil disorder; (3) transport or manufacture of weapons or explosives for use in civil disorder; (4) unlawful acts of violence in furtherance of civil disorder; (5) interfering with a fireman or law enforcement officer performing duties incident to a civil disorder; (6) taking anything of value incident to a civil disorder; (7) sniping, shooting, or throwing an object at a motor vehicle on an interstate highway. Exhibit B at 2 (114 Cong. Rec. 5532 (Mar. 6, 1968)).

colleagues that this provision "would make it a Federal offense for people to snipe at firemen or shoot at policemen while they are trying to do their duty protecting lives and property." *Id.* at 12 (114 Cong. Rec. 5542). After little debate and no supportive comment from any senator, the Senate adopted § 231(a)(3) by voice vote, leaving no record of individual votes. *Id.* (Presiding Officer).

After passing the Senate, the Civil Rights Act of 1968 returned to the House Rules Committee laden with amendments. Exhibit F. Members of the Rules Committee expressed outrage that the bill contained "matters and issues that are decidedly extraneous to the whole question of civil rights" attributable to "enemies of civil rights legislation per se." *Id.* at 34 (Rep. John Anderson of Illinois). However, the calls for additional consideration were upended on April 4, 1968, when an assassin took Dr. King's life and civil unrest took hold across the United States. Thus, on April 9, 1968, the Rules Committee released the bill to the House floor for an up-down majority vote, where the law was passed the next day—without further consideration of the Senate's Civil Obedience Act amendment.[4]

### B.    The Government Brought The Present Charge Under § 231(a)(3) In The Context Of A Summer Of Black Lives Matter Protests.

On May 25, 2020, a Minneapolis police officer asphyxiated George Floyd under his knee for eight minutes and forty-six seconds until Mr. Floyd showed no signs of life. A video of the incident was widely shared across social media platforms to visceral public reactions of grief, shock, and outrage. The incident exemplified the systemic racial injustices in the United States that have degraded human dignity and caused the premature deaths of Black people since the

---

[4] Marjorie Hunter, *Rules Panel Clears Rights Bill for Vote in the House Today*, The New York Times, April 9, 1968, at 1.

country's founding.[5] The video inspired public fury that cascaded into the largest protest movement in the history of the United States.[6] Data suggest that between 15 and 28 million people braved a deadly pandemic to demand justice for George Floyd and systemic reforms for racial justice.[7]

In Portland, protests began on May 28, 2020, and continued thereafter on an almost nightly basis for six months.[8] The mostly peaceful protests called attention to the Portland Police Bureau's (PPB) longstanding pattern of arbitrary uses of force and racially disproportionate enforcement.[9] The federal government inserted itself into these local matters by prosecuting protesters for incidents involving protestors clashing with PPB officers. At present, the United States has charged at least 15 individuals in the District of Oregon with felony civil disorder under § 231(a)(3) for local incidents involving city and state police officers. All of these prosecutions have arisen from demonstrations in support of racial justice.

---

[5] *See* Derrick Johnson, *In America, Black Deaths Are Not A Flaw In The System. They Are The System*, The Guardian, Jun. 3, 2020, https://www.theguardian.com/commentisfree/2020/jun/03/america-black-deaths-racism.

[6] *See* Larry Buchanan, et al., *Black Lives Matter May Be the Largest Movement in U.S. History*, New York Times, July 3, 2020, https://www.nytimes.com/interactive/2020/07/03/us/george-floyd-protests-crowd-size.html.

[7] *Id.*

[8] *See* Jayati Ramakrishnan, *Protesters Take to Portland Streets Following Minneapolis Police Killing of George Floyd*, The Oregonian, May 28, 2020, https://www.oregonlive.com/news/2020/05/protesters-take-to-portland-streets-following-minneapolis-police-killing-of-george-floyd.html.

[9] Tim Dickinson, *Portland: Progressive City, Brutal Police*, Rolling Stone, Jul. 17, 2020, https://www.rollingstone.com/politics/politics-features/portland-oregon-police-brutality-history-1027677/

In the present case, Portland Police Officers arrested Kevin Phomma on August 26, 2020, and charged him with misdemeanor offenses alleging Interfering with a Peace Officer, Disorderly Conduct, Harassment, and Use of Pepper Spray. Mr. Phomma was involved in the protest against racial injustice at the Immigration and Customs Enforcement (ICE) building located at 4310 S.W. Macadam Avenue, Portland, Oregon. Mr. Phomma was arrested, booked, and released, and given a date to appear in Multnomah County state court. There is a pending indictment in Multnomah County alleging Assaulting a Public Safety Officer, Unlawful Use of Deleterious Agent in the First Degree (three counts), Riot, Interfering with a Peace, Parole or Probation Officer, and Disorderly Conduct in the Second Degree.

On September 4, 2020, Mr. Phomma voluntarily appeared in federal court as he learned there was a Criminal Complaint charging him with one count of Civil Disorder in violation of 18 U.S.C. § 231(a)(3). He was released on pretrial conditions. On September 29, 2020, he was arraigned on the instant Indictment. His release was continued. Trial is presently scheduled for April 27, 20201.

The Indictment in this case, which is virtually identical to other civil disorder charges brought by the federal government in this District, states:

> On or about August 26, 2020, in the District of Oregon, during a civil disorder, defendant KEVIN PHOMMA, knowingly committed a violent act for the intended purpose of obstructing, impeding and interfering with a law enforcement officer who was lawfully engaged in the lawful performance of their official duties incident to and during the commission of a civil disorder, and that such civil disorder in any way or degree obstructed, delayed and adversely affected commerce and the movement of any article or commodity in commerce;
>
> In violation of Title 18, United States Code, Section 231(a)(3).

Indictment, ECF 8.

**Page 10 MOTION TO DISMISS INDICTMENT**

**ARGUMENT**

I.      **Section 231(a)(3) Unconstitutionally Intrudes Into The States' General Responsibility For Enforcing Criminal Laws And Exceeds Congress's Commerce Clause Power Because It Criminalizes Intrastate Activity That Lacks A Substantial Nexus To Interstate Commerce.**

The outer limits of congressional authority under the Commerce Clause prohibit the criminalization of noneconomic intrastate activity unless "the regulated activity '*substantially* affects' interstate commerce." *Lopez*, 514 U.S. at 559 (emphasis added). Based on that test, the Supreme Court has struck down the federalization of gun possession in a school zone and the federalization of domestic violence in the Violence Against Women Act as lacking sufficient connection to interstate commerce. *Lopez*, 514 U.S. at 552-64; *Morrison*, 529 U.S. at 607-19. Under *Morrison* and *Lopez*, § 231(a)(3) unconstitutionally exceeds Congress's authority and intrudes into the States' primary role in general law enforcement because it broadly applies to purely local conduct and requires only an attenuated connection to interstate commerce.

A.      **The Supreme Court's Commerce Clause Jurisprudence Protects The Federal-State Balance By Prohibiting Regulation Of Intrastate Activity That Does Not "Substantially Affect" Intrastate Commerce.**

"Under our federal system, the States possess primary authority for defining and enforcing the criminal law." *Lopez*, 514 U.S. at 561 n. 3 (internal quotation marks omitted). Accordingly, the Supreme Court in *Lopez* concluded that, in the criminal context, Congress's "power . . . [t]o regulate Commerce with foreign Nations, and among the several States[,]" under Article I, § 8, cl. 3, is inherently limited by the Tenth Amendment's reservation of police power to the States. The limited federal commerce power permits Congress to regulate only three categories of activity: (1) "the use of the channels of interstate commerce;" (2) "the instrumentalities of interstate

commerce, or persons or things in interstate commerce;" and (3) "those activities that *substantially* affect interstate commerce." *Id.* (emphasis added).

The Supreme Court developed the third *Lopez* category in order to define "the outer limits" on Congress's authority to enact legislation "regulating intrastate economic activity" that "substantially affect[s] interstate commerce." *Lopez*, 514 U.S. at 559; *see also United States v. Robertson*, 514 U.S. 669, 671 (1995) ("The 'affecting commerce' test was developed in our jurisprudence to define the extent of Congress' power over purely *intra*state commercial activities that nonetheless have substantial *inter*state effects") (emphasis in original). The regulated activity must "substantially affect" interstate commerce because "[t]he regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States." *Morrison*, 529 U.S. at 618.

In *Morrison*, the Supreme Court established a "controlling four-factor test for determining whether a regulated activity 'substantially affects' interstate commerce." *United States v. Adams*, 343 F.3d 1024, 1028 (9th Cir. 2003) (quoting *United States v. McCoy*, 323 F.3d 1114, 1119 (9th Cir. 2003)). Those factors are:

> (1) whether the regulated activity is commercial/economic in nature; (2) whether an express jurisdictional element is provided in the statute to limit its reach; (3) whether Congress made express findings about the effects of the proscribed activity on interstate commerce; and (4) whether the link between the prohibited activity and the effect on interstate commerce is attenuated.

*Adams*, 343 F.3d at 1028 (citing *Morrison*, 529 U.S. at 610-612). "The 'most important' factors for a court to consider are the first and the fourth." *Id.*

Page 12 MOTION TO DISMISS INDICTMENT

**B.    Section 231(a)(3) Regulates Intrastate Activities That Do Not Substantially Affect Interstate Commerce For Purposes Of The Third *Lopez* Category.**

Section 231(a)(3) criminalizes "any act" to obstruct, impede or interfere with a local police officer or firefighter performing lawful duties "incident to and during the commission of a civil disorder which *in any way or degree* obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce" (emphasis added). "[C]ivil disorder" is defined as "any public disturbance involving violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." 18 U.S.C. § 232(1). Because the statute is not aimed at the channels or instrumentalities of commerce, only the third *Lopez* factor is at issue. However, under the four controlling factors described in *Adams* and *Morrison*, § 231(a)(3) does not regulate activity that substantially affects interstate commerce. Accordingly, the statute is unconstitutional.

*1.    Section 231(a)(3) Does Not Regulate Economic Activity And Does Not Support Any Larger Scheme Of Economic Regulations.*

As in *Lopez* and *Morrison*, the act of interfering with the duties of a law enforcement officer or state firefighter incident to a civil disorder is not economic in nature. It therefore fails the first *Morrison* factor.

In *Lopez*, the Court found the activity of gun possession under the Gun-Free School Zones Act has "nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Lopez*, 514 U.S. at 567. Further, the Gun-Free School Zones Act was "not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Id.*

Similarly, in *Morrison*, the Supreme Court concluded that the civil remedy for gender-motivated violence under Violence Against Women Act was a regulation of noneconomic activity

that exceeded Congress's commerce authority. 529 U.S. at 617. Even though the VAWA was enacted with the support of significant congressional findings regarding the "nationwide, aggregated impact" of gender-motivated violence on interstate commerce, the Court "reject[ed] the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." *Id.* at 617. The "noneconomic, criminal nature of the conduct at issue was central" to the *Lopez* and *Morrison* rulings. *Morrison*, 529 U.S. at 610.

In contrast to *Lopez* and *Morrison*, in *Gonzales v. Raich*, the Supreme Court upheld a federal law prohibiting the intrastate cultivation of marijuana for personal use because the law formed an "essential part" of the Controlled Substances Act (CSA), which encompassed "a larger regulation of economic activity." 545 U.S. 1, 24-25 (2005) (quoting *Lopez*, 514 U.S. at 561). The majority observed that the "primary purpose" of the CSA is "to control the supply and demand of controlled substances in both lawful and unlawful drug markets." *Raich*, 545 U.S. at 19. Understood within that larger framework, the challenged provision was a regulation on "economic activity" because "failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA." *Id.* at 22.

As with the statutes under consideration in *Lopez* and *Morrison*, the activity regulated by § 231(a)(3) is noneconomic for purposes of the first *Morrison* factor. The gravamen of § 231(a)(3) criminalizes obstruction, interference, and impeding state officers, with no direct connection to commerce or economic activity. And, unlike in *Raich*, § 231(a)(3) is not part of any larger body of economic regulation; it involves "a brief, single-subject statute[,]" which "by its terms has nothing to do with commerce or any sort of economic enterprise, however broadly one might define those terms." *Raich*, 545 U.S. at 23-24 (distinguishing *Lopez*, 514 U.S. at 561) (internal

quotation marks omitted); *accord Morrison*, 529 U.S. at 613 ("Gender-motivated crimes of violence are not, in any sense of the phrase, economic activity").

2.   *The Jurisdictional Element Of § 231(a)(3) Does Not Limit The Law's Reach To Activities That Substantially Affect Interstate Commerce*

Although § 231(a)(3) contains a commercial nexus element, the element is faulty because it does not limit the reach of the statute to activities that "substantially affect" interstate commerce. There are several problems under the second *Morrison* factor on limitations to the statue's reach.

First, the commercial nexus element is not connected to the "any act" element. Section 231(a)(3) makes it a crime to:

> commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder *which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce*.

(Emphasis added). The commercial nexus clause unambiguously modifies the term "civil disorder," not "any act." Thus, a charge under § 231(a)(3) need not be supported by evidence that a defendant's *act* impacted interstate commerce. Instead, it requires evidence only that the act interfered with an officer engaged in the performance of duties "incident to and during the commission of a civil disorder," and that the civil disorder, not the individual's act, minimally affected commerce.

The statutory "incident to and during" connector further diminishes any required link to interstate commerce. Although the statute does not make clear whether the connector applies to the act itself or to the lawful performance of official duties, either construction places the interstate commerce element another step removed from the regulated activity. The term "incident" as an adjective connotes a degree of separation, in that one occurrence of lesser importance is

"[d]ependent on, subordinate to, arising out of, or otherwise connected with (something else, usu. of greater importance)." INCIDENT, BLACK'S LAW DICTIONARY (11th ed. 2019). Activity with only an incidental connection to an event that affects commerce is not a permissible subject of federal criminal law.

Finally, the commercial nexus element of § 231(a)(3) does not require a *substantial* effect on interstate commerce, but instead requires a civil disorder that affects commerce "in any way or degree." The terms are virtual opposites. Substantial means "[c]onsiderable in extent, amount, or value," whereas the word "any" is expansive and unqualified. *Compare* SUBSTANTIAL, BLACK'S LAW DICTIONARY (11th ed. 2019) *with* ANY, BLACK'S LAW DICTIONARY (11th ed. 2019); *see St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 550 (1978) (statutory language that covered "'any' act" was "broad and unqualified"). An "any way or degree" impact on commerce is not a "substantial" impact.[10] The second *Morrison* factor is not satisfied.

> 3.    *Congress Did Not Find That The Activities Regulated Under § 231(a)(3) Substantially Affect Interstate Commerce.*

Formal congressional findings are neither required nor sufficient to establish a valid exercise of federal commerce authority. *Lopez*, 514 U.S. at 562-63; *Morrison*, 529 U.S. at 614.

---

[10] Although the Hobbs Act includes "in any way or degree" language, the Ninth Circuit has upheld this language only because "the Hobbs Act is directly aimed at economic activities" that themselves "affect[] commerce." *United States v. Atcheson*, 94 F.3d 1237, 1242 (9th Cir. 1996). Regulations on direct commercial impacts need not "substantially affect commerce to pass constitutional muster" because an activity with a *de minimis* impact on commerce will have the required substantial effect "through repetition" and "in aggregate." *Id.* (quoting *United States v. Bolton*, 68 F.3d 396 (10th Cir. 1995)). Such direct commercial impacts place activities such as Hobbs Act robbery under the first or second *Lopez* categories. By contrast, under § 231(a)(3), the language of "in any way or degree" attaches not to the offense conduct, but to the incidental occurrence of a civil disorder. In the context of such an indirect impact, the language of "in any way or degree" fails the the third *Lopez* category requiring a substantial effect.

Congressional findings may demonstrate that an activity "substantially affects interstate commerce, even though no such substantial effect [is] visible to the naked eye." *Lopez*, 514 U.S. at 563. But "the existence of congressional findings is not sufficient" when Congress merely offers a "but-for causal chain from the initial occurrence of violent crime . . . to every attenuated effect upon interstate commerce." *Morrison*, 529 U.S. at 615

Here, Congress made no findings to establish that the activity regulated by § 231(a)(3) substantially affects interstate commerce beyond any impact "visible to the naked eye." The only potentially relevant findings relate to the impact of "riots" on interstate commerce. *See* Exhibit A at 8-9 (114 Cong. Rec. 1294-95 (Jan. 29, 1968)). Upon first proposing the Civil Obedience Act, Senator Long stated certain facts, without citation, concerning what he called the "wholesale Negro violence," which he said "was an almost nightly affair in the streets of our cities" between 1965 and 1967. *Id.* at 9 (114 Cong. Rec. 1295). For example, he said:

> In [1967], nearly 100 people were killed. Nearly 2,000 were injured. Police reported 4,289 cases of arson alone. Over 16,000 rioters were arrested. The estimated property loss was in the neighborhood of $160 million. The estimated economic loss to riot-torn businesses was $504 million.

*Id.* Senator Long asserted that these "riots" impeded interstate commerce:

> Any riot, as we know and experience them today, generally does impede the flow of goods in interstate commerce. It stops the movement of people in interstate commerce. It interferes with the goods that were intended to move in interstate commerce.

Exhibit B at 5-6 (114 Cong. Rec. 5535-36 (Mar. 6, 1968)).

But the statutory definition of "civil disorder" involving "acts of violence by assemblages of three or more persons" (18 U.S.C. § 232(1)) has no connection to riots on the scale described by Senator Long. Moreover, § 231(a)(3) does not target the destructive behavior attendant to a riot; the criminalized conduct is interference with an official's duties "incident to and during" a

**Page 17 MOTION TO DISMISS INDICTMENT**

civil disorder. The congressional record contains no findings that individual interference with police and firefighters as defined under § 231(a)(3) substantially affects interstate commerce. The third *Morrison* factor is not satisfied.

       4.    *The Relationship Between The Activity Regulated Under § 231(a)(3) And Any Effect On Interstate Commerce Is Too Attenuated.*

Any causal chain that could link the activity proscribed under § 231(a)(3) to any substantial impact on interstate commerce is too far attenuated to place the activity within reach of Congress' commerce authority. The offense conduct of § 231(a)(3) need not affect commerce directly. It suffices to establish that a person's acts interfered with an official's duties performed "incident to and during" any "civil disorder" that, in turn, affects commerce. Such an "incidental effect on interstate commerce . . . does not warrant federal intervention." *Musick v. Burke*, 913 F.2d 1390, 1397 (9th Cir. 1990). The noneconomic conduct penalized by § 231 by definition is too attenuated to satisfy the "substantially affects" test for commercial impact.

Even if interference with police and firefighters under § 231(a)(3) could affect commerce in the aggregate, when considered on a nationwide scale, that would be insufficient to place those acts within the federal commerce authority. In *Morrison*, the Supreme Court "reject[ed] the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." 529 U.S. at 617. Here, the paucity of cases prosecuted under § 231(a)(3) further negates any claim of an aggregate effect.

In sum, the four *Morrison* factors demonstrate that § 231(a)(3) regulates purely local, noneconomic activities that do not "substantially affect" interstate commerce. As a result, § 231(a)(3) falls outside of Congress's power to regulate under the Commerce Clause.

**Page 18 MOTION TO DISMISS INDICTMENT**

**C.     Section 231(a)(3)'s Lack Of Substantial Affect On Interstate Commerce Requires Dismissal Of The Indictment.**

The commercial nexus language of § 231(a)(3) reaches hopelessly beyond the bounds of Congress' commerce authority. Dismissal of the indictment is the required remedy. Although ambiguity can be resolved by construction, § 231(a)(3)'s lack of commercial nexus is not ambiguous. The statute plainly applies to noneconomic interference with state and local officers; the only required impact on interstate commerce is indirect through the existence of a "civil disorder"; and the law's "in any way or degree" language is inconsistent with requiring a "substantial" impact on interstate commerce. "The Court cannot rewrite a law to conform it to constitutional requirements, for doing so would constitute a serious invasion of the legislative domain and sharply diminish Congress's incentive to draft a narrowly tailored law in the first place." *United States v. Stevens*, 559 U.S. 460, 481 (2010); *see Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 629 (2018) (courts are "not free to 'rewrite the statute' to the Government's liking.") (citing *Puerto Rico v. Franklin Cal. Tax-Free Trust*, 136 S. Ct.1938, 1949 (2016)). Section 231(a)(3) unconstitutionally intrudes upon State prerogatives, and no reasonable interpretation of the statute can avoid that constitutional problem.

**II.     Section 231(a)(3) Violates The First Amendment By Placing A Significant Burden On Expressive Conduct For The Impermissible Purpose Of Suppressing Messages And Viewpoints Associated With The Civil Rights Movement.**

Section 231(a)(3) violates the First Amendment in two ways. First, § 231(a)(3) is a substantially overbroad regulation of protected expression because it imposes steep criminal penalties on an expansive range of speech and expressive conduct. Second, § 231(a)(3) was enacted for the express legislative purpose of suppressing the content of messages favoring civil

rights advocacy, and the statute's content-based text and purpose fail strict scrutiny. The statute's unconstitutionality requires dismissal of the indictment.

### A. Because § 231(a)(3) Burdens A Substantial Amount Of Constitutionally Protected Expression In Relation To Its Legitimate Sweep, The Statute Is Invalid Under The First Amendment.

"In the First Amendment context, . . . a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Stevens*, 559 U.S. at 473. The First Amendment protects expressive conduct like cross-burning, flag-burning, and assembly in inconvenient places. *See Virginia v. Black*, 538 U.S. 343, 365-66 (2003) ("[S]ometimes the cross burning is a statement of ideology, a symbol of group solidarity"); *Texas v. Johnson*, 491 U.S. 397, 405-06 (1989) (flag burning constituted "expressive conduct" protected by the First Amendment); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984) (assuming that "sleeping in connection with the demonstration is expressive conduct protected to some extent by the First Amendment."). Conduct is expressive under the First Amendment when it "is intended to convey a 'particularized message' and the likelihood is great that the message would be so understood." *Knox v. Brnovich*, 907 F.3d 1167, 1181 (9th Cir. 2018) (quoting *Nunez v. Davis*, 169 F.3d 1222, 1226 (9th Cir. 1999)).

Section 231(a)(3) extends to a substantial amount of constitutionally protected speech and expressive conduct in excess of the law's legitimate sweep. Such broad criminal statutes like § 231(a)(3) "must be scrutinized with particular care." *City of Houston v. Hill*, 482 U.S. 451, 459 (1987); *see also Winters v. New York*, 333 U.S. 507, 515 (1948) ("The standards of certainty in statutes punishing for offenses is higher than in those depending primarily upon civil sanction for enforcement."). Criminal laws that "make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application." *Id.*

Several of the statute's terms are so left so broad and indefinite as to impose unqualified burdens on a range of protected expression.

First, by penalizing "any act," § 231(a)(3) reaches to the outer limits of verbal and expressive conduct without drawing any distinction that could exclude acts undertaken merely to convey a message or symbolic content. *Roy v. City of Monroe*, 950 F.3d 245, 252 (5th Cir. 2020) (acknowledging that "[s]tanding alone . . . a prohibition on 'any act [undertaken] in such a manner as to disturb or alarm the public' fails meaningfully to guide the police and thus poses a substantial risk of arbitrary or discriminatory enforcement.")

Second, § 231(a)(3) imposes a substantial burden on protected expression by requiring that "any act . . . obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties." The term "interfere," which the statute leaves undefined, reaches a broad range of speech and expressive conduct. The law's author acknowledged this when, in a Senate hearing two days after he introduced the Civil Obedience Act, he criticized the term "interference" as used in the hate crime law by asking whether "almost anything could be regarded as an interference?" Exhibit D at 3 (114 Cong. Rec. 1819 (Feb. 1, 1968) (Sen. Long)). In the context of the § 231(a)(3), Senator Long's interpretation of "interference" rings true because "there are numerous examples in which a person's speech could interfere with . . . a police officer in the lawful discharge of the officer's duties." *McCoy v. City of Columbia*, 929 F. Supp. 2d 541, 550 (D.S.C. 2013) (invalidating a state statute for overbreadth that made it "unlawful for any person to interfere with or molest a police officer in the lawful discharge of his duties.").

Indeed, § 231(a)(3) authorizes a felony conviction for a bystander who yells at police to desist from an arrest, one who flips off officers to distract or to encourage resistance, or one who

records police activity with a cell phone. *Hill*, 482 U.S. at 459 ("[W]e have repeatedly invalidated laws that provide the police with unfettered discretion to arrest individuals for words or conduct that annoy or offend them."); *Glik v. Cunniffe*, 655 F.3d 78, 83 (1st Cir. 2011) ("[T]he First Amendment protects the filming of government officials in public spaces."). The First Amendment does not permit such an unqualified prohibition on "interference" with police duties because "the freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state" *Hill*, 482 U.S. at 462–63 (1987)

Third, the term "civil disorder," as defined under § 232(1), is extremely far-reaching, applying to "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of . . . injury to the property." Rather than limiting the statute, § 231(a)(3)'s language reaches "any public disturbance" in the types of traditional public fora where First Amendment protections are at their zenith. *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1022 (9th Cir.2009) ("In traditional public fora . . . First Amendment protections are strongest, and regulation is most suspect.").

Moreover, the "civil disorder" definition sweeps broadly to cover incidents in which three or more persons cause an immediate danger of injury to persons or property. 18 U.S.C. § 232(1). The definition can just as easily be met by a violent mob of thousands as it can by the ejection of several unruly individuals from a bar, concert, or sporting event, or even by three teenagers whose skateboarding damages property. Finally, to be convicted under § 231(a)(3), a person's interference with police duties must merely occur "incident to and during" the civil disorder, and it need not be shown that the defendant incited the civil disorder or engaged in "acts of violence"

that the civil disorder "involves." The term "civil disorder" fails to limit the overbreadth of penalizing "any act" of interference with police duties.

Under the far-reaching terms of § 231(a)(3), "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Stevens*, 559 U.S. 460 at 473. The terms of § 231(a)(3) do not permit rewriting the statute to limit its application to only those categories of activity that do not fall under the protections of the First Amendment.[11] In light of this unambiguously broad language of "any act," "to obstruct, impeded, or interfere," and "civil disorder," "[t]he Court cannot rewrite a law to conform it to constitutional requirements, for doing so would constitute a serious invasion of the legislative domain, and sharply diminish Congress's incentive to draft a narrowly tailored law in the first place." *Stevens*, 559 U.S. at 481. Section 231(a)(3) is hopelessly overbroad and invalid.

### B.    Section 231(a)(3) Regulates The Content Of Protected Expression Without A Permissible Justification.

The broad language of the statute and its purpose to target certain speech and political movements for civil rights invalidates the statute under the First Amendment.

---

[11] The few out-of-Circuit cases purporting to construe § 231(a)(3) preceded Supreme Court authority on expressive conduct, judicial rewriting of statutes, and other relevant constitutional precedent. *See United States v. Mechanic*, 454 F.2d 849, 853-54 (8th Cir. 1971); *United States v. Hoffman*, 334 F. Supp. 504 (D. Col. 1971). And *Mechanic* depended on a case from 1969 in which the statute's constitutionality was conceded. 454 F.2d at 852 (citing *Nat'l Mobilization Comm. to End War in Viet Nam v. Foran*, 411 F.2d 934, 937 (7th Cir. 1969) ("The plaintiffs appear to have conceded the constitutionality of Section 231(a) (3), for it was not attacked in their brief or oral argument.")). Under the party presentation principle, decisions involving parties who did not raise the relevant legal questions have no persuasive effect. *Greenlaw v. United States*, 554 U.S. 237, 243 (2008) ("[W]e rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present."); *see Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.").

1.    *The First Amendment Requires Strict Scrutiny Of Content-Based And Viewpoint-Based Regulations Of Speech And Expressive Conduct*

"[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). "When the government restricts speech based on its content, a court will subject the restriction to strict scrutiny." *In re Nat'l Sec. Letter*, 863 F.3d 1110, 1121 (9th Cir. 2017) (citing *Reed*, 576 U.S. at 162). "A speech regulation targeted at specific subject matter is content-based even if it does not discriminate among viewpoints within that subject matter." *Reed*, 576 U.S. at 169. By contrast, viewpoint discrimination is a "more blatant" and "egregious form of content discrimination" which "targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995).

In *Reed*, the Supreme Court clarified that "strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based." 576 U.S. at 166. Before concluding that a law is content-neutral, *Reed* requires a court to inquire separately into the law's text and purpose. The two-step test asks (1) "whether the law is content neutral on its face"; and (2) whether "the purpose and justification for the law are content based." *Id.* at 165-166. A court "must evaluate each question before it concludes that the law is content neutral and thus subject to a lower level of scrutiny." *Id.* at 166. "The government's purpose is the controlling consideration" in determining content-neutrality. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

**Page 24 MOTION TO DISMISS INDICTMENT**

2.    *On Its Face, § 231(a)(3) Regulates The Content Of Protected Expression.*

The "first step in the content-neutrality analysis" is "determining whether a law is content neutral on its face." *Reed*, 576 U.S. at 165. By its own sweeping terms, § 231(a)(3) authorizes criminal penalties for "any act" of speech or expressive conduct intended merely to "interfere with," that is, to criticize or challenge the manner in which police officers discharge their duties. In *Hill*, the Supreme Court considered a First Amendment overbreadth challenge to a law that similarly made it a crime to "in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty." 482 U.S. at 455. The defendant in *Hill* shouted at police officers in an admitted attempt to divert the officer away from a friend. *Id. at* 453-43. The Court concluded that the statute reached "verbal criticism and challenge directed at police officers," *id.* at 461, conferring authority on those officers "to make arrests selectively *on the basis of the content of the speech*," *id.* at 465 n.15 (emphasis added).

In *McCoy*, the district court relied on *Hill*'s reasoning to invalidate a law even more similar to § 231(a)(3). 929 F. Supp. 2d at 551. The city ordinance at issue made it "unlawful for any person to interfere with or molest a police officer in the lawful discharge of his duties." *Id.* at 546. The court's holding was based on vagueness and overbreadth: the law was not limited to "*physical* interference or molestation" because those terms were left undefined. *Id.* at 549 (emphasis in original). Thus, as in *Hill*, the court found the ordinance permitted police to "make arrests selectively on the basis of the content of the speech[.]" *Id.* at 551 (internal quotation marks omitted) (quoting *Hill*, 482 U.S. at 465 n.15).

As in *Hill* and *McCoy*, § 231(a)(3) singles out forms of expression that contain messages that criticize, challenge, insult, or object to the actions of law enforcement officers. Thus, it is a

content-based speech regulation. *Reed*, 576 U.S. at 163. The statute's terms "any act" and "interfere" are left unqualified and undefined, thereby allowing arrest and prosecution of one whose words have sufficiently provoked the anger of a police officer so as to even briefly "interfere" with his duties. In that way, § 231(a)(3) restricts speech "based on the message the speaker conveys[.]" *Reed*, 576 U.S. at 163.

> 3.    *Even If § 231(a)(3) Were Content-Neutral On Its Face, Its Legislative History Reveals A Content-Based Purpose.*

The First Amendment generally prevents the government from proscribing speech and expressive conduct because of disapproval of ideas, like those animating the civil rights movement. *See R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992) ("The First Amendment generally prevents government from proscribing speech or even expressive conduct because of disapproval of the ideas expressed."). The Supreme Court in *Reed* recognized a "category of laws that, though facially content neutral, will be considered content-based regulations of speech" by virtue of having been "adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Reed*, 576 U.S. at 164 (quoting *Ward*, 491 U.S. at 791). The First Amendment therefore requires courts to inspect a law's legislative background for "animus toward the ideas" regulated. *Id.* at 165. If the law was "adopted by the government 'because of disagreement with the message [the speech] conveys," then, "like those [laws] that are content based on their face, [it] must also satisfy strict scrutiny." *Id.* at 164-65 (quoting *Ward*, 491 U.S. at 791). Section 231(a)(3)'s content-based purpose brings it within that category of laws.

The legislative history of § 231(a)(3) shows that it was enacted to suppress messages in support of civil rights and racial justice for Black Americans. During hearings, Senator Long explained the law's content-based purpose clearly and repeatedly. Exhibits A-D. He intended his

amendment to nullify constitutional protections that the civil rights bill's hate crime provision promised to extend to Black Americans who speak out about racial injustice. Exhibit A at 1-8 (114 Cong. Rec. 1287-1294 (Jan. 29, 1968)). It was Dr. Martin Luther King Jr., Senator Long argued, whose "inflammatory letter" from the Birmingham jail, had "in large measure brought on all these riots and presented the need for action." *Id.* at 8 (114 Cong. Rec. 1294). Any message in support of civil rights for Black Americans was liable, in Senator Long's estimation, to incite a riot. As a solution, the Civil Obedience Act would deter individuals from "stirring up our fine citizens . . . and giving the wrong idea that everyone is trying to do something evil to them because they are of a different race," Exhibit C at 1 (114 Cong. Rec. 544 (Jan. 22, 1968)), and from "accusing all the American people of being a bunch of murderers and assassins" or "international criminals, which we are not," Exhibit D at 1 (114 Cong. Rec. 1817 (Feb. 1, 1968)).

Senator Long's articulated purpose is inconsistent with the "freedoms guaranteed by the First and Fourteenth Amendments" because the targeted speech is not "directed to inciting or producing imminent lawless action and is [not] likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 448 (1969). In *NAACP v. Claiborne Hardware Co.*, the Court recognized constitutional protections for associational speech aimed at collective action. 458 U.S. 886, 907-08 (1982). *Claiborne* involved a civil injunction brought by white merchants against the NAACP for a business boycott to achieve equal treatment of Black patrons. The state court had upheld judgment against the NAACP based in part on threatening statements and violent acts by individual boycotters. But the Supreme Court reversed, articulating broad protection for speech intended to create social pressure. "[S]peech does not lose its protected character . . . simply because it may embarrass others or coerce them into action." *Claiborne*, 458 U.S. at 909-10. Citing *Brandenburg*, the Court approved protection for "[s]trong and effective extemporaneous rhetoric,"

**Page 27 MOTION TO DISMISS INDICTMENT**

and dismissed liability for acts of violence "weeks or months" after the speech in question. *Id*. at 928. Senator Long's dragnet effort to address riots by suppressing civil rights advocacy does not comport with *Claiborne*: "The right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected." *Id*. at 908.

Senator Long's stated justifications for his legislation were aimed at suppressing the content of expression related to civil rights and racial justice. He singled out specific messages for punishment "because of disagreement with the message [the speech] conveys.'" *Reed*, 576 U.S. at 164 (quoting *Ward*, 491 U.S. at 791). By singling out specific ideas and speakers as targets for his legislation, Senator Long's statements also reflected both a content-discriminatory and a viewpoint-discriminatory purpose. "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger*, 515 U.S. at 829. Viewpoint-based restrictions generally fail judicial scrutiny because they "rais[e] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace." *Simon & Schuster, Inc. v. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991).

> 4. *Section 231(a)(3) Fails Under Strict Scrutiny Because The Burdens It Imposes On Protected Expression Are Only Remotely Connected To Any Potential Federal Interest.*

If this Court concludes that § 231(a)(3) is content-based on its face or in its legislative purpose, then strict scrutiny applies. *Reed*, 576 U.S. at 163-164. To overcome strict scrutiny, the government has the burden of proving "that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171. Section 231(a)(3) cannot survive

strict scrutiny because the relevant federal interest is remote and the statutory language lacks narrow tailoring.

First, the federal government's interest in prosecuting "any act" of interference with the duties of non-federal public officials is not readily apparent. Although the law anemically invokes an interstate commerce nexus, the intrastate noneconomic activities that the law targets are wholly attenuated from interstate commerce. State and local laws amply protect police officers and firefighters from public obstruction in the circumstances covered by § 231(a)(3). It is these local jurisdictions, not the federal government, to which the Tenth Amendment reserves the right to enact such laws. Accordingly, there is no *federal* interest in regulating the content of expression targeted under § 231(a)(3).

Second, no government interest can support the broad scope of § 231(a)(3). The terms of § 231(a)(3) could extend felony criminal liability to challenges and criticism directed at police officers over the course of routine intrastate conflicts. By contrast, the federal law that punishes interference with federal, rather than local law enforcement officers, applies narrowly to forceful acts and can be charged as a misdemeanor. 18 U.S.C. § 111(a). The comparative lack of narrow tailoring in the language of § 231(a)(3) shows that the law was meant to burden expression rather than serve a compelling government interest. Under strict scrutiny, no compelling governmental interest that arises under § 231(a)(3) can justify its impermissible purpose and its weighty burden on protected expression..

III.    **Section 231(a)(3) Is Unconstitutionally Vague In Violation Of The Due Process Clause Because It Chills Protected Speech, Provides Inadequate Notice Of Criminal Conduct, And Invites Arbitrary And Discriminatory Enforcement And Prosecution.**

"The prohibition of vagueness in criminal statutes 'is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law,' and a statute that

flouts it 'violates the first essential of due process.'" *Johnson v. United States*, 576 U.S. 591, 595 (2016) (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)). A criminal statute runs afoul of the Due Process Clause for its vagueness when it (1) fails to provide sufficient notice that would enable ordinary people to understand what conduct it prohibits; or (2) encourages arbitrary and discriminatory enforcement. *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972); *United States v. Coutchavlis*, 260 F.3d 1149, 1155 (9th Cir. 2001).

Vagueness concerns are most acute when the statute imposes criminal penalties and implicates the First Amendment by chilling exercise of protected expression. *Kolender v. Lawson*, 461 U.S. 352, 358-59 n.8 (1983); *Village of Hoffman Estates v. Flipside*, 455 U.S. 489, 498-99 (1982); *see Smith v. Goguen*, 415 U.S. 566, 573 (1974) (Where "a statute's literal scope [reaches] expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts.").

### A.    Section 231(a)(3)'s Imprecise And Subjective Standards Fail To Provide Fair Notice And Risk Arbitrary Enforcement.

Section 231(a)(3) fails the core tests for satisfying the certainty requirements of the Due Process Clause. First, it is replete with vague and imprecise terms that fail to provide a person of ordinary intelligence a reasonable opportunity to know what is prohibited:

- **"any act"** can include pure speech, expressive conduct, minimal jostling, and grievous assaults;

- **"to obstruct, impede, or interfere"** leaves uncertainty as to whether it defines a culpable mens rea or a required result and, additionally, offers no objective limit requiring, for example, *forcible* interference or assault, *cf.* 18 U.S.C. § 111(a);

- **"incident to and during the commission of a civil disorder"** leaves the degree of connection with a "civil disorder" unclear and fails to state whether the defendant must have participated in the civil disorder;

- **"in any way obstructs, delays, or adversely affects commerce"** provides no limiting concept for what it means to obstruct, delay, or adversely affect commerce.

The corresponding definition of "civil disorder" in § 232(1) offers no limitation to solve the vagueness problem because it could apply to virtually any tumultuous public gathering to which police might be called, not just large-scale riots.

In *Johnson*, the Court found the residual clause of the Armed Career Criminal Act vague because the statute failed to provide guidance to establish the "substantial risk" created by the "ordinary case" of a crime. 576 U.S at 597; *accord United States v. Davis*, 139 S. Ct. 2319, 2326 (2019) (compounded uncertainty regarding assessment of risk and ordinary case); *Dimaya v. Sessions*, 138 S. Ct. 1204, 1213-14 (2018) (same). Section 231(a)(3) involves a similar compound structure, setting out "any act" as "incident to or during" a separately described "civil disorder" with no clearly articulated nexus.

Notably, § 231(a)(3) provides no express mens rea at all, leaving police, prosecutors, and judges to decide whether the statute requires knowledge (and if so, of what) or specific intent (and if so, to do what) or neither. A statute's constitutionality under the vagueness doctrine is "closely related" to whether it contains an express mens rea requirement. *See Colautti v. Franklin*, 439 U.S. 379, 395 (1979) ("Because of the absence of a scienter requirement in the provision . . . the statute is little more than 'a trap for those who act in good faith.'") (quoting *United States v. Ragen*, 314 U.S. 513, 524 (1942)).

The statute is also prone to vagueness challenge because its terms are dependent on the subjective reaction of others, rather than the acts and intent of the defendant. In *United States v. L. Cohen Grocery Co.*, 255 U.S. 81 (1921), for example, the Court held that a prohibition on "unjust or unreasonable rate[s] or charge[s]" was unconstitutionally vague because assessment of whether

charges were "unjust or unreasonable" was left entirely to the "estimation of the court and jury." *Id*. at 89. The Court likewise struck down an ordinance that criminalized behaving in a manner "annoying to persons passing by." *Coates v. City of Cincinnati*, 402 U.S. 611, 612 (1971). Because "[c]onduct that annoys some people does not annoy others," the ordinance did not "specif[y] any "standard of conduct . . . at all." *Id*. at 614. And in *City of Chicago v. Morales*, 527 U.S. 41 (1999), the Court invalidated a statute that prohibited loitering "with no apparent purpose," because it improperly left "'it to the courts to step inside and say who could be rightfully detained, and who should be set at large.'" *Id.* at 60 (quoting *United States v. Reese*, 92 U.S. 214, 221 (1876)).

Here, § 231(a)(3) triggers criminal liability based on the reactions of others in two ways. First, it asks whether the defendant's conduct interferes with or impedes others. A gesture, sign, or other act that distracts one officer could have no impact at all another officer. Second, the statute asks whether the defendant's act is "incident to and during" a civil disorder in which the defendant may have no involvement at all. These subjective standards leave it to the discretion of police and prosecutors to determine whether a particular individual's conduct runs afoul of the law.

By enacting subsection 3 of the Civil Obedience Act, Congress created "a criminal prohibition of alarming breadth." *Stevens*, 559 U.S. at 474. The "very existence" of statutes like § 231(a)(3) is pernicious because it "may cause others not before the court to refrain from constitutionally protected speech or expression." *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 799 (1984). The mere "threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech," "especially when the overbroad statute imposes criminal sanctions." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

As with the law at issue in *McCoy*, which made it unlawful "for any person to interfere with or molest a police officer," § 231(a)(3)'s vagueness chills protected speech. *McCoy*, 929 F.

Supp. 2d at 547-53. By expansively encompassing "any act" that could interfere with the duties of a police officer or firefighter during a civil disorder, § 231(a)(3) is not limited to "violent acts" or acts that result in bodily injury or that otherwise put persons or property in imminent danger. *See Brandenburg*, 395 U.S. at 447 ("[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."). The statute does not weed out those acts with expressive content or those that occur in a traditional public forum. Section 231(a)(3) reaches a substantial amount of expressive conduct, and without clear boundaries, the law chills free speech.

**B.    Section 231(a)(3) Cannot Be Saved By Construction Without Violating The Constitutional Separation Of Powers.**

A statute's vagueness does not permit judges to "'rewrite [the] . . . law to conform it to constitutional requirements.'" *Stevens*, 559 U.S. at 481. "When Congress passes a vague law, the role of courts under our Constitution is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite Congress to try again." *Davis*, 139 S. Ct. at 2323. "Vague statutes threaten to hand responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges, eroding the people's ability to oversee the creation of the laws they are expected to abide." *Id.* at 2325. In the present case, the statute's scope "may entirely depend" on a law enforcement official's unbounded speculation about subjective factors, *Coates*, 402 U.S. at 614, thus subjecting "individuals to the risk of arbitrary or discriminatory prosecution and conviction," *United States v. Kozminski*, 487 U.S. 931, 949-950 (1988) (holding statute unconstitutionally vague where liability "depend[ed] entirely upon the victim's state of mind").

It does not matter whether some conduct clearly falls within § 231(a)(3)'s reach. The Supreme Court's holdings "squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Johnson,* 576 U.S. at 602; *accord Dimaya*, 138 S. Ct. at 1214 n.3 (reaffirming this principle). Section 231(a)(3) is not susceptible to construction that eliminates its many constitutional deficiencies without judicial encroachment on the legislative function of defining criminal laws.

## IV.    In The Alternative, The Indictment Should Be Dismissed Because Its Language Neither Provides Adequate Notice Nor Assures That The Grand Jury Made The Determinations Required By The Fifth Amendment.

The constitutional rights to presentment to a grand jury and adequate notice of the charges are embedded in the Fifth and Sixth Amendments to the Constitution and in Rule 7(c) of the Federal Rules of Criminal Procedure. In the present case, the government mass produced indictments identical in language with the exception of names and dates of the offense. A review of the cases filed under § 231(a)(3) reveals that none of the changes involve specificity regarding the acts or circumstances other than conclusory allegations.

"[R]eal notice of the true nature of the charge" is "the first and most universally recognized requirement of due process." *Smith v. O'Grady*, 312 U.S. 329, 334 (1941). In holding that the notice requirements of the Sixth Amendment apply to the States through the requirement of due process, the Supreme Court stated: "No principle of procedural due process is more clearly established than that notice of the specific charge [is] among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal." *Cole v. Arkansas*, 333 U.S. 196, 201 (1948); *see* Joseph Story, *Commentaries on the Constitution*, § 1779 (1833) ("[T]he indictment must charge the time, and place, and nature, and circumstances, of the offense, with clearness and

certainty; so that the party may have full notice of the charge, and be able to make his defense with all reasonable knowledge and ability.").

The Fifth Amendment's presentment provision also requires that the facts be elucidated sufficiently in the indictment so that the grand jury's finding of probable cause can be ascertained and to foreclose conviction based on any offense not found by the grand jury. *See Stirone v. United States*, 361 U.S. 212, 215-162 (1960) ("[A]fter an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself."). Without specificity of charged conduct and circumstances, the court would be forced to "guess as to what was in the minds of the grand jury at the time they returned the indictment[,]" which would "deprive the defendant of a basic protection that the grand jury was designed to secure," by allowing a defendant to be convicted "on the basis of facts not found by, and perhaps not even presented to, the grand jury that indicted him." *United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999) (quoting *United States v. Keith*, 605 F.2d 462, 464 (9th Cir. 1979) (citing *Russell v. United States*, 369 U.S. 749, 770 (1962)).

The assembly line indictments in the present case fail to fulfill either the notice or presentment requirements of the Fifth and Sixth Amendments. The indictments evidence no attempt to fulfill the Rule 7(c) requirement of a "plain, concise, and definite written statement of the essential facts constituting the offense charged." The indictment's only deviation from duplicating the exact statutory language of § 231(a)(3) are the addition of "violent" to describe the act and the charged mental states of "knowingly" and "for the intended purpose." The indictment does not include any description of the actual conduct or the specific circumstances involved. Accordingly, the indictment does not demonstrate that the grand jury made the required finding of probable cause, and it provides the defense no notice regarding the conduct charged.

**Page 35 MOTION TO DISMISS INDICTMENT**

**Conclusion**

For the foregoing reasons, the indictment should be dismissed.

Respectfully submitted this 1st day of February, 2021.

*/s/ Gerald M. Needham*
Gerald M. Needham
Attorney for Defendant

*/s/ Stephen R. Sady*
Stephen R. Sady
Chief Deputy Federal Defender

Jacob Sweet
Research Attorney

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 10,357 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

Dated February 1, 2021.

<div style="margin-left:40%">

*/s/ Gerald M. Needham*
Gerald M. Needham
Attorney for Defendant

*/s/ Stephen R. Sady*
Stephen R. Sady
Chief Deputy Federal Defender

Jacob Sweet
Research Attorney

</div>