SCOTT ERIK ASPHAUG, OSB #833674
Acting United States Attorney
District of Oregon
**KELLY A. ZUSMAN, OSB #891843**
Criminal Division Chief
Kelly.Zusman@usdoj.gov
**AMY E. POTTER, D.C. Bar #482806**
Deputy Criminal Chief, Criminal Appeals
Amy.Potter@usdoj.gov
**THOMAS S. RATCLIFFE, ILSB #6243708**
Assistant United States Attorney
Thomas.Ratcliffe@usdoj.gov
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **3:20-cr-00465-JO** |
| **v.** | **GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS INDICTMENT** |
| **KEVIN PHOMMA,** | |
| **Defendant.** | |

The riots that took place in Portland last year were violent. Dozens of police officers and protesters were injured. Local businesses suffered millions in losses. These violent activities took place during, and sometimes after, peaceful protest activities. And it is this violence – not the peaceful protests – that underlie the government's prosecution of approximately 15 individuals for violating 18 U.S.C. § 231(a)(3). Each person charged with violating Section 231(a)(3) assaulted a police officer during the course of that officer's efforts to quell the

**Government's Response to Defendant's Motion to Dismiss Indictment**          **Page 1**

violence.  The statute is constitutional, and it was employed in this district in a constitutional manner.

Seizing on stray remarks from a Louisiana senator who sponsored the Civil Disorder bill, Phomma urges this Court to ignore the presumption favoring the constitutionality of legislative enactments.  This presumption is part of the cornerstone of the separation of powers doctrine. Phomma also lobs different theories for why the statute is faulty, most of which require this Court to speculate as to how the statute *might* be misused.  Lacking any evidence that Section 231(a)(3) has ever been misused, and ignoring the fact that it has been charged in districts throughout the country for similar violent events (including the January attack on the U.S. Capitol), Phomma's motion to dismiss this case should be denied.

## FACTUAL BACKGROUND

Following the May 2020 death of George Floyd at the hands of a Minneapolis police officer, thousands took to the streets to protest and demand racial justice reforms.  Between May 25, 2020, and July 31, 2020, 68 cities witnessed 8,700 protests, 574 of which involved acts of violence. *Report on the 2020 Protests & Civil Unrest*, MAJOR CITIES CHIEFS ASS'N – INTELLIGENCE COMMANDERS GROUP, Oct. 2020, https://majorcitieschiefs.com/wp-content/uploads/2021/01/MCCA-Report-on-the-2020-Protest-and-Civil-Unrest.pdf (last visited March 12, 2021) (hereafter "MCCA Report").  Portland, Oregon, was one of "nine major city law enforcement agencies who encountered civil disobedience in every protest they responded to." *Id.* at 6.

Unfortunately, criminal elements seized on these mass gatherings and exploited them:  In many cities, including Portland, there was massive property damage and looting.  *Id.* at 9-10. Criminals "infiltrated" the protests and used them as "cover" to engage in criminal behavior.  *Id.* at 1, 7.  On the weekend immediately following Floyd's death, criminals emptied several

**Government's Response to Defendant's Motion to Dismiss Indictment**          **Page 2**

downtown jewelry stores, smashed glass display cases, and destroyed the glass-boxed downtown Apple Store and carted off its products by the carload.  Attachment A – FBI Reports (filed under seal).  Apple estimates that it lost $250,000 in merchandise and incurred $10 million in repairs to its building.  Several downtown jewelry stores were smashed and emptied; their combined loss estimates exceeded $1 million, and repairs cost in the hundreds of thousands.  Several jewelers and the Oregon State Beaver store moved to new locations outside of downtown.  Vendors refused to deliver supplies to a downtown restaurant owner, and his employees were afraid to come to work.  Customers told many of these businesses that they would not return because they feared the violence in downtown Portland.

Other rioters chose fire:  Chase Bank across the street from Pioneer Square and the Multnomah County Detention Center were set ablaze by rioters.  Rioters repeatedly tried to set fire to the Portland Police Association Building, the Oregon Historical Society, and eastside police precincts.  *Riot, looting in downtown Portland; fires set at Justice Center, other buildings*, KATU, May 29, 2020, https://katu.com/news/local/protesters-take-to-the-streets-of-portland-damage-reported (last visited March 12, 2021); *Mass Gathering Sets Fire to Portland Police Association Office and Vandalizes Property; Unlawful Assembly Declared*, PORTLAND POLICE BUREAU, Sep. 25, 2020, https://www.portlandoregon.gov/police/news/read.cfm?id=261224 (last visited March 12, 2021); Maggie Vespa, *Hours after mayor accuses demonstrators of attempted murder, violence plays out at Thursday's Portland protests*, KGW, Aug. 8, 2020, https://www.kgw.com/article/news/local/violence-at-thursday-night-protests-east-police-precinct-portland/283-d66110a2-0c22-40a3-8546-fb223eaebca3 (last visited March 12, 2021); Associated Press, *Police precinct set on fire during Portland protest; authorities declare riot*,

USA Today, Aug. 24, 2020, https://www.usatoday.com/story/news/nation/2020/08/24/portland-protests-police-precinct-set-fire/3427950001/ (last visited March 12, 2021).

Portland was one of three cities to see violent criminal activity in over 60% of the protests.  MCCA Report at 8.  In addition to looting and substantial property damage, there were also numerous arsons.  *Id.* at 10.  Targets included government and law enforcement buildings, stores, businesses, dumpsters, police cars, and a UPS truck.  *Id.*  Over 2,000 officers were injured during these violent protests with rocks, frozen water bottles, fireworks, lasers, Molotov cocktails, and hammers.  *Id.* at 11-12.

According to the Insurance Information Institute, nationwide riots in 2020 caused over $1 billion in losses; it was the first major, non-natural catastrophic loss since the 1992 riots in Los Angeles that erupted after the Rodney King verdict.  *Facts + Statistics: Civil Disorders*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-civil-disorders (last visited March 12, 2021).  In Oakland, California, a federal courthouse security officer was shot and killed during a violent protest.  Valerie Richardson, *Officer shot and killed in Oakland during George Floyd protest was black*, The Washington Times, May 31, 2020, https://www.washingtontimes.com/news/2020/may/31/dave-patrick-underwood-named-black-fps-officer-kil/ (last visited March 12, 2021).

The 2020 protests themselves also directly involved commerce:  90% of major cities saw out-of-state protesters, and 29% discovered people receiving payment to participate in protests.  MCCA Report at 13.  In addition, "[l]arge sums of money were also collected through public fundraising and other means to post bail for some protesters, who in turn attended the next protest and recommitted the same crimes."  *Id.* at 16.

**Government's Response to Defendant's Motion to Dismiss Indictment**          **Page 4**

What followed that initial violent weekend after the death of George Floyd was over 100 days of protests and violent riots in Portland.  During the thirteenth consecutive week of violent protests, Phomma sprayed several Portland Police Officers with bear spray.  The officers were wearing gas masks, but one officer noted that his neck and arms "started to burn."  When he and the others removed their gas masks, their faces felt the same burning sensation:



*(Still image from a video depicting Phomma deploying bear spray at officers attempting to clear the area).*

The officers were helping to protect the ICE facility on S.W. Macadam, after it was targeted for violence.  Phomma was arrested around 11 p.m. the night of August 26, 2020, after police had declared an unlawful assembly and gave multiple warnings to disperse.  In addition to the can of bear spray, which Phomma said he had purchased for the sole purpose of bringing it to the protests, Phomma was also carrying a three-



inch dagger in a sheath strapped to the left side of his hip.

On the night of Phomma's arrest, protesters filled the street, making passage by

**Government's Response to Defendant's Motion to Dismiss Indictment**          **Page 5**

cars or delivery vehicles impossible.  KATU news published this photo from the scene:



*Several arrested near Portland ICE building after unlawful assembly declared*, KATU, Aug. 26, 2020, https://katu.com/news/local/several-arrested-near-portland-ice-building-after-unlawful-assembly-declared (last visited March 12, 2021).

No one involved in the Portland riots was arrested and charged with violating 231(a)(3) for participating in a peaceful protest, even if that protest blocked traffic or impeded commerce. No one was charged under Section 231 for shouting or chanting "All Cops Are Bastards." Instead, the arrests were all aimed at those individuals who proactively assaulted police officers or fire fighters after a civil disorder had been declared and at a time when the civil servants were actively attempting to maintain peace and order.  These assaults on officers took place in direct relation to the riots; to the extent the defense suggests otherwise, this is a factual issue that should be resolved by a jury.

## ARGUMENT

Constitutional statutory analysis begins with the statute's plain language, not its provenance.  *United States v. Shill,* 740 F.3d 1347, 1351 (9th Cir. 2014).  Federal legislation enjoys a presumption of constitutionality that may only be overturned "upon a plain showing that

Congress has exceeded its constitutional bounds." *United States v. Morrison,* 529 U.S. 598, 607 (2000).

Section 231(a)(3) criminalizes interference with a police officer or fire fighter "lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function."

The statute defines civil disorder as "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual." 18 U.S.C. § 232(1). And criminal liability extends to actions directed against any federal, state, or local law enforcement officer. 18 U.S.C. § 232(7).

Phomma raises several constitutional challenges to this statute, which we address in turn.

**A. Civil Disorder is Properly Regulated Under the Commerce Clause.**

The Commerce Clause authorizes Congress to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. Art. I, § 8, Cl. 3. "[I]t is now well established that Congress has broad authority under th[at] Clause." *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 549 (2012) (opinion of Roberts, C.J.). Among other things, "the Commerce Clause has . . . long been interpreted" to grant Congress authority "extend[ing] beyond activities actually in interstate commerce to reach other activities that, while wholly local in nature, nevertheless substantially affect interstate commerce." *McLain v. Real Estate Bd. of New Orleans, Inc.*, 444 U.S. 232, 241 (1980). The Supreme Court's precedents accordingly establish that, "under its commerce power," Congress may regulate the "channels of interstate commerce," "instrumentalities of interstate commerce" and "persons or things in

interstate commerce," and "those activities that substantially affect interstate commerce." *Taylor v. United States*, 136 S. Ct. 2074, 2079 (2016) (quoting *United States v. Lopez*, 514 U.S. 549, 558-559 (1995)); *accord Morrison*, 529 U.S. at 608-609; *see also, e.g., Gonzales v. Raich*, 545 U.S. 1, 16-17 (2005); *Perez v. United States*, 402 U.S. 146, 150 (1971).

Section 231(a)(3) is one of many statutory provisions enacted by Congress to protect the flow of interstate commerce from unwarranted interference. Where a civil disorder is "obstruct[ing], delay[ing], or adversely affect[ing]" interstate commerce or the movement of an item in interstate commerce,[1] Congress sought to provide law enforcement and firefighters with the ability to contain and ultimately end the crisis without obstruction from persons like the defendant who would impede them. In doing so, Congress was acting to protect the channels of interstate commerce, including roads and highways, to protect the flow of things in interstate commerce, and to regulate activity that substantially affects interstate commerce. Section 231(a)(3) thus fits comfortably within all three of the areas of Congressional power identified by the Supreme Court in *Lopez*, *Morrison*, and *Taylor*.

Phomma's reliance on *Lopez* and *Morrison* is misplaced. Those decisions struck down statutory provisions that regulated non-economic activity unconnected to interstate commerce and which, crucially, did not contain a jurisdictional element related to interstate commerce. It has long been understood that Congress may regulate even non-economic intrastate activity so long as there is a jurisdictional provision that ensures the statute applies only where the regulated

---

[1] The term "commerce" in Section 231(a)(3) is defined to mean "commerce (A) between any State or the District of Columbia and any place outside thereof; (B) between points within any State or the District of Columbia, but through any place outside thereof; or (C) wholly within the District of Columbia." 18 U.S.C. § 232(2). The first two prongs of this definition define commerce as interstate commerce and implement Congress' Commerce Clause power. The third prong, which relies on Congress' plenary power to legislate over the seat of government, is not at issue in this case.

**Government's Response to Defendant's Motion to Dismiss Indictment**          **Page 8**

activity affects (or would affect) interstate commerce.  *Compare United States v. Bass*, 404 U.S. 336 (1971) (applying a statute that regulated "receiv[ing], possess[ing], or transport[ing] in commerce or affecting commerce . . . any firearm" by a felon), *with Lopez*, 514 U.S. at 562 (striking down statute where, "[u]nlike the statute in *Bass*, [the Gun-Free School Zones Act had] no express jurisdictional element which might limit its reach to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce"), *and Morrison*, 529 U.S. at 613 (holding that the civil remedies in 42 U.S.C. § 13981 were beyond Congress' power under the Commerce Clause where, "[l]ike the Gun–Free School Zones Act at issue in *Lopez*, § 13981 contain[ed] no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce.").

Indeed, the very constitutional defect identified in *Lopez* was cured by the addition of a jurisdictional element.  *United States v. Dorsey*, 418 F.3d 1038, 1046 (9th Cir. 2005) ("This jurisdictional element saves § 922(q) from the infirmity that defeated it in *Lopez*"), *abrogated on other grounds*, *Arizona v. Gant* 556 U.S. 332 (2009).  As in *Dorsey*, the Ninth Circuit has regularly upheld as constitutional Congress' use of a "jurisdictional hook" to ensure that a statute regulating intrastate activity affects interstate commerce.  *See United States v. Alderman*, 565 F.3d 641, 647-48 (9th Cir. 2009) (possession of body armor); *United States v. Cortes,* 299 F.3d 1030, 1035 (9th Cir. 2002) (carjacking); *cf. United States v. Mason*, 993 F. Supp. 2d 1308, 1316 (D. Or. 2014) (possession of a weapon).  Moreover, as the Fourth Circuit has recognized, Supreme Court precedent holds that "Congress may regulate violent conduct interfering with interstate commerce even when the conduct itself has a 'minimal' effect on such commerce." *United States v. Hill*, 927 F.3d 188, 199 (4th Cir. 2019) (quoting *Taylor*, 136 S. Ct. at 2079).

To be sure, a constitutionally adequate jurisdictional element must be meaningful and not merely a "talisman that wards off constitutional challenges." *Alderman*, 565 F.3d at 648 (citing *United States v. Patton*, 451 F.3d 615, 632 (10th Cir. 2006)). It cannot be a "pretextual incantation evoking the phantasm of commerce." *United States v. Maxwell*, 446 F.3d 1210, 1218 (11th Cir. 2006); *accord United States v. McCoy*, 323 F.3d 1114, 1126 (9th Cir.2003), *overruled on other grounds by Gonzales v. Raich*, 545 U.S. 1 (2005), *as recognized in United States v. McCalla*, 545 F.3d 750, 756 (9th Cir. 2008). Section 231(a)(3)'s jurisdictional hook easily meets this test. There are innumerable disturbances of the peace, but Section 231(a)(3) applies only to the subset of civil disturbances that affect interstate commerce, such as those that cut off through-fares or prevent use of significant commercial or government buildings for an extended period of time. And an individual can be charged under Section 231(a)(3) only if he or she impedes or attempts to impede police or firefighters – the very public safety professionals charged with containing, mitigating, and ultimately ending the public disturbance, and thereby restoring the channels and instrumentalities of interstate commerce. The statute thus only applies in relation to civil disturbances that adversely affect interstate commerce and only with regard to a specific class of activities that will tend to prolong the obstruction of interstate commerce.

The jurisdictional element that the Ninth Circuit, in *Dorsey*, found sufficient to make the Gun-Free School Zones Act constitutional required that the firearm at issue "ha[ve] moved in" or "otherwise affect[] interstate or foreign commerce." 418 F.3d at 1045. Section 231(a)(3)'s jurisdictional element has a much tighter temporal limitation. While, under Section 231(a), the defendant's conduct must take place contemporaneous with the civil disorder that disrupted commerce, under the gun statute the gun may have moved in interstate commerce at some point in the distant past. Section 231(a) also has a more proximate relationship to Congress' goal of

protecting interstate commerce. Section 231(a) aims directly to end an impediment to interstate commerce, while the gun statute regulates commerce indirectly by prohibiting the intrastate use of an item that previously moved in interstate commerce. Thus, *Dorsey*'s holding requires a similar holding here.[2]

Additionally, Phomma's argument that the jurisdictional element is required to involve a *substantial* effect on commerce is wrong. Jurisdictional elements generally condition the application of a statute on an effect on interstate commerce in the particular case. For example, similar to the Gun-Free School Zones Act element discussed above, the Hobbs Act likewise applies to one who "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce" by robbery or extortion. 18 U.S.C. § 1951. Section 231(a)(3)'s jurisdictional element is no broader than this. *See Taylor*, 136 S. Ct. at 2079 (discussing the breadth of the Hobbs Act jurisdictional element); *see also United States v. Juvenile Male*, 118 F.3d 1344, 1347-1349 (9th Cir. 1997) (holding that RICO's jurisdictional nexus requirement can, consistent with *Lopez*, be satisfied by showing a de minimis effect on commerce in the individual case).

The "substantially affects" test that Phomma advocates applies where Congress seeks to regulate an entire class of activities based on the aggregate effect of that entire class rather than the specific effect of the activity of a particular defendant. Thus, in *Raich*, the Supreme Court found the Controlled Substances Act's categorical ban on intrastate manufacture and possession of marijuana was constitutional because Congress had a rational basis for concluding that the "class of activities" *in the aggregate* substantially affected commerce, and the Act could be

---

[2] Moreover, even if there were some hypothetical application of Section 231(a)(3) that reached beyond Congress' constitutional power, that would not facially invalidate the statute. *See, e.g.*, *Hill v. Colorado*, 530 U.S. 703, 733 (2000).

**Government's Response to Defendant's Motion to Dismiss Indictment**          **Page 11**

applied constitutionally to Angel Raich's intrastate growing of marijuana for personal medicinal purposes even though her activity did not substantially affect interstate commerce. 545 U.S. at 15-22. Defendant is thus mistaken when he argues that the government must show that *his* activity *substantially* affected commerce or that a jurisdictional element must include a "substantially affects" requirement.

Phomma is also wrong in arguing that Section 231(a)(3)'s jurisdictional element is insufficient, because the defendant's personal conduct need not affect commerce as long as the underlying civil disorder affected commerce. Other statutes likewise do not require proof that the defendant personally affected commerce, where the defendant's conduct relates to an underlying activity that had the required effect. *See, e.g.*, *Juvenile Male*, 118 F.3d at 1347-49 (upholding RICO's jurisdictional nexus requirement where it is the racketeering enterprise, not the defendant himself, that must affect commerce).

Phomma's attempt to distinguish the Hobbs Act on the ground that the Hobbs Act is "directly aimed at economic activities" likewise fails. Both the Hobbs Act and Section 231(a)(3) aim to protect interstate commerce from illegal acts that impede commerce. In any event, the Ninth Circuit has upheld RICO's similar jurisdictional nexus requirement, and RICO applies to non-economic enterprises. *See National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 256-58 (1994) (holding that RICO does not require that the enterprise or predicate acts be accompanied by an economic motive). Like a RICO enterprise, a civil disorder "surely can have a detrimental influence on interstate or foreign commerce without having its own profit-seeking motives." *Id.* at 258.

Because Section 231(a)(3) applies only where a defendant seeks to impede the work of police or firefighters incident to a civil disturbance that affects interstate commerce, Ninth

Circuit precedent provides that it is within Congress' Commerce Clause power. Even under the most restrictive theory of Congress' Commerce Clause power, a law protecting interstate commerce from interference, as Section 231(a)(3) does, is a permissible use of Congressional power. Such a law "bears an obvious, simple, and direct relation to regulating interstate commerce: it allows commerce to flow between States unobstructed." *Taylor*, 136 S. Ct. at 2085 (Thomas, J., dissenting) (quotation marks omitted); *see also id.* ("Congress' power '[t]o regulate Commerce among the several States,' Art. I, § 8, cl. 3, would lack force or practical effect if Congress lacked the authority to enact criminal laws prohibiting interference with interstate commerce or the movement of articles or goods in interstate commerce."); *cf.* Def's Ex. B at 2 (statement of Sen. Long that "if the riot impedes interstate commerce, Congress has a duty to protect the movement of commerce").

The jurisdictional element in Section 231(a)(3) ensures that the statute applies only where the civil disturbance that the defendant sought to prolong – by obstructing the public safety personnel whose duty is to mitigate, contain, and end the disturbance – is one that adversely affected interstate commerce. Under Circuit precedent, such a jurisdictional provision renders the statute constitutional. Moreover, under any understanding of the Commerce Clause, a statute that protects the flow of commerce between the states from obstructions, as Section 231(a)(3) does, is a permissible use of Congress' Commerce Clause powers.

Additionally, because Phomma participated in a protest near the ICE facility that affected a federally protected function (ICE's investigative functions), the government could supersede to allege that alternative basis for liability in lieu of the interstate commerce clause provision. Consequently, even if the court were to accept Phomma's Commerce Clause challenge, any dismissal should be without prejudice.

**Government's Response to Defendant's Motion to Dismiss Indictment**          **Page 13**

**B.  Because the Civil Disorder Statute Regulates Intentional Acts, Not Protected Speech, It Can Be Harmonized with the First Amendment.**

Phomma's argument that Section 231(a)(3) is facially overbroad under the First Amendment also fails.  Phomma seeks "to challenge [the] statute not because [his] own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."  *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973).  Phomma must identify an exception to the normal rules favoring as-applied challenges and case-specific standing, *see, e.g., Los Angeles Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39 (1999), to facially invalidate Section 231(a)(3) as substantially overbroad, because his own conduct is clearly not speech.

Overbreadth can invalidate a criminal law only if "'a substantial number' of its applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.'" *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008) (quoting *New York v. Ferber*, 458 U.S. 747, 769-771 (1982)); *see also United States v. Williams*, 553 U.S. 285, 293 (2008); *City of Houston v. Hill*, 482 U.S. 451, 458 (1987) (citing *Ferber*, 458 U.S. at 769).

"A statute is facially invalid if it prohibits a substantial amount of protected speech." *Williams,* 553 U.S. at 293; *see also Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972).  An overbreadth challenge faces a steep uphill climb when the statute focuses mainly on conduct. *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (noting the "substantial social costs created by the overbreadth doctrine when it blocks application of a law to . . . constitutionally unprotected conduct").

Moreover, "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984). Rather, a defendant must show a "realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court . . . ." *Id.* at 801. And laws that are "not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)" are far less likely to present such a danger. *Hicks*, 539 U.S. at 124; *see id.* (observing that an "overbreadth challenge" to such a law will "[r]arely, if ever, . . . succeed").

Invalidating a statute for overbreadth is "strong medicine" to be applied "sparingly and only as a last resort." *Broadrick*, 413 U.S. at 613. Thus, if the statute is "readily susceptible" to a narrowing construction that would make it constitutional, it must be upheld. *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 397 (1988); *accord Broadrick*, 413 U.S. at 613; *United States v. Rundo*, No. 19-50189, 2021 WL 821938 at *2 (9th Cir. 2021) ("we construe [the riot statute] as constitutional if we can reasonably do so").

Phomma is charged with violating a provision that criminalizes obstructing police officers or firefighters in the context of civil disorders. The crime primarily prohibits conduct, not speech. And to the extent it reaches speech, it does so incidentally and only with respect to the type of illegal, obstructive, or threatening communications that have long been recognized as unprotected. It does not criminalize verbally criticizing police or other protected speech, and it is therefore not an overbroad restriction of speech.

### 1.  Section § 231(a)(3) prohibits obstructive conduct, not protected speech.

The starting point for analyzing Phomma's claim that Section 231(a)(3) is overbroad is to determine what the statute criminalizes. *Williams,* 553 U.S. at 293. "[I]t is impossible to

determine whether a statute reaches too far without first knowing what the statute covers." *Id.*
The next step is to determine whether the statute, as it is construed, "criminalizes a substantial
amount of protected expressive activity." *Id.* at 297.

The civil disorder statute criminalizes "any act to obstruct, impede, or interfere with any
fireman or law enforcement officer" who is engaged in the lawful performance of his official
duties during a civil disorder that affected interstate commerce.  18 U.S.C. §  231(a)(3).  And it
does so in the context of a civil disorder, which is "any public disturbance involving acts of
violence by assemblages of three or more persons, which causes an immediate danger of or
results in damage or injury to the property or person of any other individual."  18 U.S.C.
§ 232(1).  The statute's scope consists primarily, if not exclusively, of conduct or unprotected
speech, such as threats.

The civil disorder statute prohibits not the presence at a civil disorder, but rather, "an act
committed during the course of such disorder." *United States v. Mechanic*, 454 F.2d 849, 853
(8th Cir. 1971).  It covers intentional conduct, not "mere inadvertent conduct."  *United States v.
Featherston,* 461 F.2d 1119, 1122 (5th Cir. 1972).  Moreover, Section 231(a)(3) is not unique;
many state and federal statutes likewise criminalize obstructing the government's efforts to
enforce the law and maintain public order.  *See, e.g., United States v. Jeter,* 775 F.2d 670, 679
(6th Cir. 1985) (holding that federal obstruction of justice statute, 18 U.S.C. § 1503, is neither
overbroad nor vague); 26 U.S.C. § 7212(a) (prohibiting obstructing or impeding the
administration of the tax laws); 18 U.S.C. § 2237 (making it unlawful to "oppose, prevent,
impede, intimidate or interfere with" a maritime investigation); *United States v. Brice,* 926 F.2d
925, 930-31 (9th Cir. 1991) (rejecting overbreadth and vagueness challenges to 41 C.F.R. § 101-
20.305, regulation prohibiting impeding or disrupting government duties); *see also* Cal. Penal

Code § 148 (prohibiting resisting, delaying, or obstructing any peace officer or emergency

medical technician); *State v. Illig-Renn,* 341 Or. 228 (2006) (rejecting constitutional attacks

leveled against O.R.S. 162.247(1)(b), which prohibits interference with a police officer); *State v.*

*Steen,* 164 Wash. App. 789, 808 (2011) (rejecting as-applied constitutional challenge to RCW

9A.76.020(1), which criminalizes obstructing police officers).

Phomma relegates prior decisions interpreting § 231(a)(3) to a footnote because they

predate much of the recent First Amendment jurisprudence.  The Eighth Circuit squarely rejected

First Amendment attacks leveled against Section 231(a)(3) in *Mechanic.*  Phomma's argument

glosses over the critical import of these cases – the determination of what the statute actually

criminalizes.  Section 231(a)(3)'s applications to conduct, rather than protected speech, present

no First Amendment concerns.  And even where applying the statute to particular forms of

conduct might incidentally implicate speech, "it has never been deemed an abridgment of

freedom of speech or press to make a course of conduct illegal merely because the conduct was

in part initiated, evidenced, or carried out by means of language, either spoken, written, or

printed."  *Giboney v. Empire Storage & Ice Co*., 336 U.S. 490, 502 (1949).  The Ninth Circuit

recently affirmed this principal in *Rundo,* when it recognized that the anti-riot statute, 18 U.S.C.

2101, permissibly criminalized both acts and unprotected speech that incites instigates a riot or

that constitutes a true threat.  2021 WL 821938 at *7, 9.

To the extent Section 231(a)(3) might apply to speech, such speech is unprotected

because it is integral to the criminal conduct of obstructing police or firefighters.  *See Williams*,

553 U.S. at 298 ("Many long established criminal proscriptions – such as laws against

conspiracy, incitement, and solicitation – criminalize speech (commercial or not) that is intended

to induce or commence illegal activities.");  *United States v. Stevens*, 559 U.S. 460, 468-469

(2010) (including "speech integral to criminal conduct" as a class of speech "'which ha[s] never been thought to raise any Constitutional problem'") (citation omitted); *Giboney*, 336 U.S. at 498 ("[T]he constitutional freedom for speech and press" does not "extend[] its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute.").  Contrary to Phomma's argument (Motion at 21), the statute does not apply to protected speech such as criticizing police through yelling or gestures, and the defendant cites no cases where the statute has been applied to conduct that merely annoys or offends officers.

Section 231(a)(3)'s context and purpose confirm the statute's focus on conduct, not protected speech.  Congress designed the civil disorder statute to provide federal support when people "agitate and incite such violence by the use of facilities in interstate commerce."  90th Congress, 1st Session, House Report No. 472, at 2-3.  Recognizing the need to support local law enforcement, Congress believed the federal government should lend a hand.  Senate Congressional Record, March 6, 1968, at 5537.  This help included not only sending federal law enforcement to assist, but also criminalizing violent acts that are directed at local partners. Construing the statute to cover only intentional conduct, rather than as a sweeping prohibition on protected speech, is consistent with Congress' basic objective in passing the civil disorder statute.  *See Rundo,* 2021 WL 821938 at *2 (striking down portions of the riot statute and preserving others, noting that invalidation for overbreadth is "strong medicine that is not to be causally employed"); *United States v. Miselis,* 972 F.3d 518, 543 (4th Cir. 2020) (severing portions of the Anti-Riot Act that violate First Amendment was consistent with Congress' intention in passing statute to criminalize "unprotected speech and conduct that both relates to a riot and involves the use of interstate commerce.").

### 2.   Section § 231(a)(3) requires intent.

Section 231(a)(3) requires intent, which narrows its scope.  *See Williams*, 553 U.S. at 294 (focusing on scienter requirement in finding that a statute was not overbroad).  The requirement that a defendant who violates Section 231(a)(3) act with the intent to obstruct, interfere or impede is critical to the First Amendment analysis.  *See United States v. Gilbert*, 813 F.2d 1523, 1529 (9th Cir. 1987) (intent requirement prevents application of statute to protected speech).

The statute requires proof that the "act" was done "to obstruct, impede, or interfere" with a firefighter or police officer, *i.e.* the defendant's purpose or intent in performing the "act" must be to obstruct, impede, or interfere.  *See Mechanic*, 854 F.2d at 854 (construing Section 231(a)(3) to include an intent requirement).  And even if the statute lacked an express scienter requirement, courts "generally interpret [] criminal statutes to include broadly applicable scienter requirements, even where the statute by its terms does not contain them." *Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015) (citation omitted); *see also United States v. Cassel*, 408 F.3d 622, 634 (9th Cir. 2005) ("[E]xcept in unusual circumstances, we construe a criminal statute to include a mens rea element even when none appears on the face of the statute.").

Phomma's arguments that Section 231(a)(3) applies broadly to protected speech and lacks an intent requirement ignore the clear directive from the Supreme Court that courts should avoid "constitutional problems" by asking whether the statute is "subject to [] a limiting instruction." *Ferber*, 458 U.S. at 769 n.24 (citation omitted); *see Clark v. Martinez*, 543 U.S. 371, 385 (2005) (constitutional avoidance canon "comes into play" if a statute is "susceptible of more than one construction" even after the "application of ordinary textual analysis").  The inclusion of a mens rea element is precisely the kind of limit that the Supreme Court and the Ninth Circuit have endorsed.  As the Ninth Circuit has explained, the "existence of a mens rea is the rule . . . rather than the exception" and "except in unusual circumstances, [the Court]

**Government's Response to Defendant's Motion to Dismiss Indictment**        **Page 19**

construe[s] a criminal statute to include a mens rea element even when none appears on the face of the statute." *Cassel*, 408 F.3d at 634. Reading a statute to lack intent, thereby rendering it unconstitutional, is "untenable in light of the principle that 'every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.'" *Id.* (*citing United States v. Buckland*, 289 F.3d 558, 564 (9th Cir. 2002)). Interpreting § 231(a)(3) "in a constitutionally permissible light" to include intent does not rewrite the statute. *See United States v. Banks*, 368 F. Supp 1245, 1247 (D.S.D. 1973).

In *Williams*, the Supreme Court rejected an overbreadth argument that, like the defendant's argument here, was based on misreading statutory language to ban as much protected speech as possible. 553 U.S. 285. In that case, the Court upheld a law that prohibited, among other things, presenting and promoting child pornography. The Court noted that the words "present" and "promote" could "in isolation" be understood capaciously, to include mere advocacy of child pornography, but the Court rejected that construction based on textual indicators, including the statute's scienter requirement, and the history of similar laws upheld by the Court. *See id.* at 294-97; *see also id.* at 307 (Stevens, J., concurring) (observing that the Court's construction would be "compelled by the principle that 'every reasonable construction must be resorted to, in order to save a statute from unconstitutionality'").

Section 231(a)(3) requires intent; the intent requirement limits the statutory prohibition on "any act" to those acts which are designed to impede or obstruct. *See Mechanic*, 454 F.2d at 854 (§ 231(a)(3) requires intent and indictment alleges intent). This avoids the problem defendant fears – arrests based purely on protected speech. This intent requirement is "the determinative factor separating protected expression from unprotected criminal behavior." *Gilbert*, 813 F.2d at 1529.

Thus, the Ninth Circuit has held that "requirement of intent to intimidate serves to insulate the [provision of the Fair Housing Act] from unconstitutional application to protected speech." *Id.*; *see also Cassel*, 408 F.3d at 634 (rejecting facial challenge to statute criminalizing interference with federal land sale through intimidation by construing statute as requiring intent to threaten); *Virginia v. Black*, 538 U.S. 343, 363 (2003) (holding that a statute that prohibits cross burning with the intent to intimidate can pass constitutional muster). This distinguishes Section 231(a)(3) from similar state statutes that have been found suspect. *See National Mobilization Committee to End War in Vietnam v. Foran*, 411 F.2d 934, at 937-38 (7th Cir. 1969) (concluding that intent requirement makes statute different from other interfering and resisting statutes). And this dooms Phomma's arguments that the Civil Disorder Act violates the First Amendment.

### 3. Section 231(a)(3) has a plainly legitimate sweep and is not overbroad.

At the very least, Phomma cannot show that he is charged with a crime that is "impermissibly overbroad" relative to its "plainly legitimate sweep." *Washington State Grange*, 552 U.S. at 449 n.6. Phomma's own conduct of violently assaulting several police officers illustrates the numerous constitutionally valid applications of the statute to conduct and unprotected speech. And far from showing a "realistic danger" of unconstitutional applications in other cases, *Taxpayers for Vincent*, 466 U.S. at 801, Phomma fails to identify a single example of a prosecution under Section 231(a)(3) based on arguably protected speech. The express terms of Section 231(a)(3) render the possibility of any such prosecution remote at best, and any such case could be the subject of an as-applied challenge. There is no basis for the "strong medicine" of overbreadth invalidation in this case.

Despite the clear focus on intentional acts, not speech, Phomma challenges Section 231(a)(a) as being facially overbroad under the First Amendment. The "crucial

**Government's Response to Defendant's Motion to Dismiss Indictment**        **Page 21**

question" here is whether Section 231(a)(3) "sweeps within its prohibitions what may not be punished under the First and Fourteenth Amendments." *Grayned*, 408 U.S. at 114-15. Phomma argues it does and cites hypothetical scenarios that might offend the First Amendment. However, a statute is not invalid "merely because it is possible to conceive of a single impermissible application . . . ." *City of Houston*, 482 U.S. at 458 (quoting *Broadrick*, 413 U.S. at 630) (internal quotation marks omitted).

### 4. The statute's plainly legitimate sweep encompasses violent criminal conduct.

The civil disorder statute punishes intentional conduct that occurs in the context of a civil disorder, which, by definition, requires acts of violence, even if those violent acts only imminently threaten, rather than actually result in, personal injury or property damage. 18 U.S.C. § 232(1). The statute has historically been applied to defendants who have engaged in physical conduct, often violent, against police officers or firefighters who are attempting to protect the public from the dangerous harms flowing from violent civil disorders. *See, e.g., Mechanic,* 454 F.2d at 853 (defendants charged with throwing cherry bombs at police officers protecting firefighters who were battling arson at ROTC building); *Featherston,* 461 F.2d at 1121 (charges against members of group that demonstrated for fellow members how to make explosives for "'the coming revolution'"); *Foran,* 411 F.2d at 936 (various defendants charged with activities during August 1968 Democratic Convention); *Banks,* 368 F. Supp. at 1246 (charges involve the "occupation-siege of the town of Wounded Knee, South Dakota").

These sorts of prosecutions form the core of Section 231(a)(3)'s plainly legitimate sweep. All of them, like Phomma's prosecution, are entirely proper under the First Amendment because they involve only non-expressive conduct. And to the extent that Section 231(a)(3) prohibits the obstruction of officers accomplished partially or entirely through speech, it covers only speech, such as threats or speech integral to criminal conduct, that is unprotected under the First

Amendment.  Thus, although "peaceful demonstrations in public places are protected by the First

Amendment[,] . . . where demonstrations turn violent, they lose their protected quality as

expression under the First Amendment." *Grayned*, 408 U.S. at 116 (footnotes omitted).

Therefore, in the context of a violent civil disorder, acts committed with the intent of interfering,

obstructing, or impeding a firefighter or police officer engaged in lawful performance of his

duties are not protected speech.  *Mechanic*, 454 F.2d at 852 (citation omitted).

### 5.  Phomma's hypotheticals do not justify facially invalidating Section 231(a)(3).

Phomma cites no actual prosecutions that he argues were unconstitutional.  Instead, he

relies on the unfortunate "tendency of [the] overbreadth doctrine to summon forth an endless

stream of fanciful hypotheticals." *Williams*, 553 U.S. at 301.  But facial invalidation is only

warranted when a statute presents a "realistic danger" of chilling the speech of third parties.

*Taxpayers for Vincent*, 466 U.S. at 801.  Phomma has not shown any realistic danger here.  And

the hypothetical scenarios he invents are particularly misplaced because Section 231(a)(3),

properly construed, does not criminalize the speech that the hypotheticals describe.

Section 231(a)(3) is not akin to the municipal statutes that have fallen under First

Amendment scrutiny.  For example, the municipal regulation in the *City of Houston* case made it

"unlawful" to "in any manner oppose, molest, abuse or interrupt any policeman in the execution

of his duty." *City of Houston,* 482 U.S. at 455.  On its face, the municipal ordinance covered

both speech and action, but the assault portions of the statute were preempted leaving the statute

limited to verbal opposition.  *Id.* at 460.  The ordinance also swept broadly, covering "any

manner" of verbal opposition.  *Id.* at 462-64.  The Texas courts had never limited the ordinance's

broad sweep and it had, in fact, been applied to simple verbal confrontations.  *Id.* at 469-70.

Section 231(a)(3) is different in several critical respects.  First, it covers intentional acts

of interference, not mere verbal opposition.  If the municipal ordinance had included a similar

intent provision, it could have narrowed the scope of the statute and potentially rendered it constitutional.  *See id.* at 474 (Powell, J., concurring in part, dissenting in part) (reasoning that if the statute required proof that person "intended to interfere with the officer's performance of his duties," it would "narrow substantially the scope of the ordinance, and possibly resolve the overbreadth question").  The civil disorder statute also lacks the core offending language – "in any manner oppose" – found in the municipal ordinance.  To the extent the civil disorder statute could be read to sweep more broadly, every court to have considered it has narrowed it to cover only unprotected conduct.  *See, e.g.*, *Mechanic*, 454 F.2d 849 (§ 231(a)(3) covers intentional conduct); *Foran*, 411 F.2d 934 (same).  And, of course, in this case the charges were directed at acts, not speech.

### 6.   Strict scrutiny does not apply because Section 231(a)(1) does not cover protected speech.

Phomma argues that strict scrutiny review applies here because Section 231(a)(3) is a content- and viewpoint-based restriction on speech.  That argument fails at the outset because Section 231(a)(3) prohibits only obstructive conduct and unprotected speech, such as threats.  In any event, even assuming the statute regulates speech such that a level of scrutiny applies, the court should apply intermediate scrutiny under *United States v. O'Brien*, 391 U.S. 367 (1968), because the statute regulates conduct that only incidentally affects speech and applies irrespective of any expressive content.  Section 231(a)(3) easily survives such scrutiny because it is narrowly tailored to advance important governmental interests in enabling first responders to protect the public from violent civil disorders.  Phomma's reliance on isolated statements of one particular Senator does not transform a statute – that on its face, applies neutrally regardless of the viewpoint underlying a defendant's obstructive conduct – into impermissible viewpoint discrimination.

In sum, statutes criminalizing obstructive conduct in the context of violent civil disorders do not violate the free speech protections of the First Amendment. *Mechanic,* 454 F.2d at 852. Interpreting the statute to criminalize those violent acts – and not protected speech – is consistent with Congress' intent and dooms defendant's overbreadth claims. *See Banks,* 368 F. Supp. at 1247 (interpreting statute "in constitutionally permissible light" did not rewrite the statute).

### 7.  Section 231(a)(3) is not vague.

The civil disorder statute criminalizes the intentional interference with the lawful activities of police and firefighters during a civil disorder. It prohibits not the presence at a civil disorder, but rather, "an act committed during the course of such disorder." *Mechanic,* 454 F.2d at 853. Yet, Phomma argues that the statute is vague and, therefore, unconstitutional because of the lack of mens rea. This argument ignores the requirement that a defendant act with the intent to impede or interfere, which saves the statute for a claim of vagueness. *Cf. Cassel,* 408 F.3d at 634 (reading intent requirement into statue to save it from constitutional challenge). That express scienter requirement addresses any vagueness concerns.

A statute is impermissibly vague if it either (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado,* 530 U.S. at 732 (*citing City of Chicago v. Morales,* 527 U.S. 41, 56-57 (1999)); *see also United States v. Wunsch,* 84 F.3d 1110, 1119 (9th Cir. 1996). The civil disorder statute punishes intentional conduct directed against firefighters and law enforcement officers working to protect the public during violent protests. The statute prohibits only concrete "act[s]" that are performed with the specific purpose to "obstruct, impede, or interfere" with firefighters or law enforcement. Contrary to Phomma's argument, those terms are quite different from statutory terms that courts

**Government's Response to Defendant's Motion to Dismiss Indictment**          **Page 25**

have found to be vague, such as statutes that turn on subjective judgments of whether the defendant's conduct was "annoying" or "indecent." *See Williams*, 553 U.S. at 306.

The statute's intent is plain and provides ample notice; no one could credibly claim to believe that he could lawfully cover several on-duty police officers with bear spray. Section 231(a)(3) is "sufficiently clear that a normally intelligent person could ascertain its meaning and would be given fair notice of whether or not his conduct is forbidden." *Mechanic*, 454 F.2d at 854.

Phomma argues (Motion at 32) that the statute is vague because certain hypothetical applications of the statute might chill third parties from engaging in constitutionally protected speech. But that argument improperly "incorporate[s] elements of First Amendment overbreadth doctrine" into the Fifth Amendment vagueness analysis. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010). A defendant "who engages in some conduct that is clearly proscribed," such as attacking a police officer, "cannot complain of the vagueness of the law as applied to the conduct of others." *Id.* at 20.

**C.  The Indictment Is Properly Framed and Constitutionally Adequate.**

An indictment is sufficient if it contains the elements of the charged offense and enough detail to allow a defendant to prepare a defense and invoke the Double Jeopardy Clause if necessary. *Hamling v. United States*, 418 U.S. 87, 117-119 (1974); *United States v. Resendiz-Ponce*, 549 U.S. 102, 108-10 (2007); *United States v. Rodriguez*, 360 F.3d 949, 958 (9th Cir. 2004). Beyond that, the Federal Rules of Criminal Procedure simply require an indictment to "be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ." Fed. R. Crim. P. 7(c). An indictment "should be read in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied."

*United States v. Berger,* 473 F.3d 1080, 1103 (9th Cir. 2007) (citing *United States v. King,* 200 F.3d 1207, 1217 (9th Cir. 1999)).

Following his citations to general Fifth Amendment and due process principles, Phomma's only authority for his attack on the format of the indictment is *United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999). But *Du Bo* is inapposite because its indictment failed to allege all elements of the offense. *Id.* at 1179-80 (concluding Hobbs Act charge was fatally flawed where it failed to "properly allege an offense"). That omission explains the Ninth Circuit's concern for whether the defendant was convicted on the basis of facts "perhaps not even presented to [] the grand jury that indicted him." *Id.* at 1179 (internal quotations omitted). But there is no reason to examine what facts the grand jury received in this case, or what facts could have been added to the indictment, because the indictment properly alleges all elements of a Section 231(a) charge. Indeed, Phomma does not claim otherwise.

The charging instruments and disclosures in this case make clear what Phomma is charged with doing, which is likely why he did not seek a bill of particulars within the required 14 days of his arraignment last September. The criminal complaint (ECF No. 1) describes his conduct at around 11:00 p.m. on August 26, 2020, near the ICE facility. The police reports and surveillance video provided in discovery clarify Phomma's role in deploying bear spray against the officers during the civil disorder that night. The indictment properly charges him with committing a violent act on August 26, 2020, during a civil disorder in violation of Section 231(a)(3).

Nothing further need be included, despite Phomma's characterization of his "assembly line" indictment. (ECF No. 18 at 43.) Multiple Section 231(a)(3) civil disorder cases were presented to the grand jury last September because Portland suffered a spate of those crimes.

**Government's Response to Defendant's Motion to Dismiss Indictment          Page 27**

Similarly, a spree of bank robberies by multiple, individual offenders would generate nearly identical bank robbery indictments, none of which would need to describe the specific ways in which the robbers compelled tellers to relinquish bank funds.  Those indictments, like the one at issue here, would simply have to contain the elements of the charged offense, and enough detail to allow the defendants to prepare their defense and invoke the Double Jeopardy Clause.

Taken together, the complaint, indictment and discovery fully apprise Phomma of the charges and satisfy Rule 7(c).

## CONCLUSION

This Court should deny Phomma's motion to dismiss his indictment.

Dated: March 12, 2021

Respectfully submitted,

SCOTT ERIK ASPHAUG
Acting United States Attorney

*/s/Kelly A. Zusman*
KELLY A. ZUSMAN
Criminal Division Chief

*/s/Amy E. Potter*
AMY E. POTTER
Deputy Criminal Chief, Criminal Appeals

*/s/Thomas S. Ratcliffe*
THOMAS S. RATCLIFFE
Assistant United States Attorney

**Government's Response to Defendant's Motion to Dismiss Indictment**          **Page 28**