Gerald M. Needham, OSB #963746
Assistant Federal Public Defender
Email: jerry_needham@fd.org
Stephen R. Sady, OSB #81099
Chief Deputy Federal Defender
Email: steve_sady@fd.org
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204
Tel:     (503) 326-2123

Attorneys for Defendant

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Case No. 3:20-cr-00465-JO** |
| **Plaintiff,** | **REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS INDICTMENT** |
| **v.** | |
| **KEVIN PHOMMA,** | |
| **Defendant.** | |

## TABLE OF CONTENTS

Page

Table of Authorities ........................................................................................................... iii

Introduction ........................................................................................................................ 1

A.  The Legislative History Establishes Suppression Of Civil Rights Advocacy As The
    Purpose Of The Statute. .......................................................................................... 1

B.  The Government's Flawed Account Of The Portland Protests Is Not Only
    Inaccurate But Irrelevant To The Constitutionality Of A Statute That Must Be
    Judged Based On The Facts At The Time Of Enactment And On Its Overbroad And
    Vague Text. ............................................................................................................... 3

    1.  The Government Omits The Role Of The Police In Contributing To
        Violence During Protests. ............................................................................ 4

    2.  The Government Lists Offenses Involving Federal Officers And Federal
        Interests That Do Not Pertain To The Statute Referencing State Law
        Enforcement. ............................................................................................... 6

    3.  The Government's Characterizations Regarding The Protests Do Not
        Address Or Cure The Statute's Unconstitutionality. .................................. 7

C.  The Primary Case Relied Upon By The Government Perfectly Illustrates That Only
    Congress – Not The Courts – Has Authority To Rewrite Statutes To Cure
    Constitutional Defects. ........................................................................................... 10

D.  The Civil Disorder Statute Does Not Directly Implicate Interstate Commerce, So
    The Statutory "In Any Way Or Degree" Cannot Meet The Requirement Of A
    "Substantial" Effect. .............................................................................................. 13

    1.  Section 231(a)(3) Does Not Narrowly Regulate The Channels Or Goods Of
        Interstate Commerce. ................................................................................ 15

    2.  The Unprecedented Attenuation Between The Prohibited Act And The
        Jurisdictional Element Of § 231(a)(3) Fails To Establish The Required
        Federal Nexus. ........................................................................................... 16

    3.  *Raich* Is Inapplicable Because Section 231(a)(3) Does Not Form An
        Essential Part Of Any Comprehensive Regime Of Commercial Regulations.
        ..................................................................................................................... 18

E.    The Civil Disorder Statute Violates The First Amendment Both As Over-Broad And As Motivated To Suppress A Particular Viewpoint ................................................... 22

   1.    Section 231(a)(3) Contains No Mental State Element, And Congress Intended It To Impose Minimal Burdens On Prosecutions. ................................. 23

   2.    Section 231(a)(3) Burdens A Substantial Amount Of Protected Speech, Including Expressive Conduct. ............................................................. 25

   3.    Strict Scrutiny Is Warranted Because § 231(a)(3) Was Intended To Suppress Disfavored Viewpoints Of Civil Rights Leaders ................................... 27

F.    The Statute's Multiple Ill-Defined Terms Fail To Provide Required Notice And To Protect Against Arbitrary And Discriminatory Enforcement. .......................... 28

G.    The Indictment Fails To Comply With The Grand Jury Requirements Of The Fifth Amendment And Rule 7. ................................................................... 31

Appendix A

# TABLE OF AUTHORITIES

**Page**

## SUPREME COURT OPINIONS

*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234 (2002) ......................................................... 1, 11

*Bond v. United States*,
  564 U.S. 211 (2011) ............................................................. 30

*Brandenburg v. Ohio*,
  395 U.S. 444 (1969) ............................................................. 24

*City of Houston, Tex. v. Hill*,
  482 U.S. 451 (1987) ............................................................. 27

*Cohen v. California*,
  403 U.S. 15 (1971) ............................................................... 25

*FDIC v. Meyer*,
  510 U.S. 471 (1994) ............................................................. 29

*Gonzales v. Raich*,
  545 U.S. 1 (2005) ........................................................... 18, 19

*Gozlon-Peretz v. United States*,
  498 U.S. 395 (1991) ............................................................. 23

*Hague v. CIO*,
  307 U.S. 496 (1939) ............................................................... 5

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ................................................................ 30

*Iancu v. Brunetti*,
  139 S. Ct. 2294 (2019) ........................................................... 8

*Johnson v. United States*,
  576 U.S. 591 (2016) .......................................................... 4, 29

*McLain v. Real Estate Bd. of New Orleans, Inc.*,
  444 U.S. 232 (1980) ......................................................... 17, 18

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
  138 S. Ct. 617 (2018) ........................................................... 30

*NLRB v. Jones & Laughlin Steel Corp.*,
   301 U.S. 1 (1937) .......................................................................................... 15

*Puerto Rico v. Franklin Cal. Tax–Free Trust*,
   136 S. Ct. 1938 (2016) .................................................................................. 30

*Reed v. Town of Gilbert, Ariz.*,
   576 U.S. 155 (2015) ...................................................................................... 28

*Reno v. American Civil Liberties Union*,
   521 U.S. 844 (1997) ........................................................................................ 7

*Rivers v. Roadway Express Inc.*,
   511 U.S. 298 (1994) ........................................................................................ 3

*Russello v. United States*,
   464 U.S. 16 (1983) ........................................................................................ 23

*Sessions v. Dimaya*,
   138 S. Ct. 1204 (2018) .................................................................................. 29

*Smith v. Goguen*,
   415 U.S. 566 (1974) ...................................................................................... 30

*Spence v. Washington*,
   418 U.S. 405 (1974) ...................................................................................... 25

*Stirone v. United States*,
   361 U.S. 212 (1960) ................................................................................... 32-33

*Taylor v. United States*,
   136 S. Ct. 2074 (2016) .................................................................................. 16

*Terminiello v. City of Chicago*,
   337 U.S. 1 (1949) ............................................................................................ 5

*Texas v. Johnson*,
   491 U.S. 387 (1989) ...................................................................................... 25

*United States v. Bailey*,
   444 U.S. 394 (1980) ...................................................................................... 23

*United States v. Kozminski*,
   487 U.S. 931 (1988) ...................................................................................... 31

*United States v. Lopez*,
   514 U.S. 549 (2000) ............................................................................... *passim*

*United States v. Miller,*
 471 U.S. 130 (1985) ............................................................. 32

*United States v. Morrison,*
 529 U.S. 598 (2000) ............................................................. 14

*United States v. Stevens,*
 559 U.S. 460 (2010) ............................................. 4, 8, 10, 27, 30

*United States v. Treasury Employees,*
 513 U.S. 454 (1995) ............................................................. 7

*United States v. Williams,*
 553 U.S. 285 (2008) ................................... 1, 10, 12, 13, 30

*Osborne v. Ohio,*
 495 U.S. 103 (1990) ............................................................. 7

*Virginia v. American Booksellers Assn., Inc.,*
 484 U.S. 383 (1988) ............................................................. 7

*Ward v. Rock Against Racism,*
 491 U.S. 781 (1989) ............................................................. 28

## FEDERAL COURT OPINIONS

*Anderson v. City of Hermosa Beach,*
 621 F.3d 1051 (9th Cir. 2010) ............................................... 25

*Don't Shoot Portland v. City of Portland,*
 No. 3:20-CV-00917-HZ, 2020 WL 7049089 (D. Or. Nov. 27, 2020); *imposing*
 *punitive sanctions for contempt,* 2021 WL 982613 (D. Or. Mar. 16, 2021) ............ 4

*Edge v. City of Everett,*
 929 F.3d 657 (9th Cir. 2019) ............................................... 25

*Free Speech Coalition v. Reno,*
 198 F.3d 1083 (9th Cir. 1999) ...................................... 1, 10, 11

*Guerrero v. Whitaker,*
 908 F.3d 541 (9th Cir. 2018) ............................................... 29

*Index Newspapers LLC v. City of Portland,*
 474 F. Supp. 3d 1113 (D. Or. 2020), *granting preliminary injunction,* No. 3:20-CV-
 1035-SI, 2020 WL 4883017 (D. Or. Aug. 20, 2020), *aff'd* 977 F.3d 817, 836 (9th Cir.
 2020) .......................................................................... 4

*Long Beach Area Peace Network v. City of Long Beach,*
 522 F.3d 1010 (9th Cir. 2008) ............................................... 26

*McCoy v. City of Columbia*,
    929 F. Supp. 2d 541 (D.S.C. 2013) ........................................................ 26

*Seattle Affiliate of Oct. 22nd Coal. to Stop Police Brutality, Repression &*
*Criminalization of a Generation v. City of Seattle*,
    550 F.3d 788 (9th Cir. 2008) ............................................................... 26

*United States v. Atcheson*,
    94 F.3d 1237 (9th Cir. 1996) ............................................................... 16

*United States v. Aguilera-Rios*,
    769 F.3d 626 (9th Cir. 2014) ................................................................. 3

*United States v. Bird*,
    124 F.3d 667 (5th Cir. 1997) ............................................................... 21

*United States v. Carrillo*,
    No. 4:20-mj-70785 (N.D. Cal. June 16, 2021) ....................................... 6

*United States v. Dorsey*,
    418 F.3d 1038 (9th Cir. 2005) ......................................................... 13, 14

*United States v. DuBo*,
    186 F.3d 1177 (9th Cir. 1999) ............................................................. 32

*United States v. Jones*,
    231 F.3d 508 (9th Cir. 2000) ......................................................... 16, 17

*United States v. Juvenile Male*,
    118 F.3d 1344 (9th Cir. 1997) ............................................................. 17

*United States v. Keith*,
    605 F.2d 462 (9th Cir. 1979) ......................................................... 31, 32

*United States v. Mechanic*,
    454 F.2d 849 (8th Cir. 1971) ......................................................... 29, 30

*United States v. Morrison*,
    536 F.2d 286 (9th Cir.1976) ............................................................... 32

*United States v. Polanco*,
    93 F.3d 555 (9th Cir. 1996) ............................................................... 16

*United States v. Rivera-Nevarez*,
    418 F.3d 1104 (10th Cir. 2005) ............................................................. 3

*United States v. Rundo*,
    990 F.3d 709 (9th Cir. 2021) ............................................................... 9

## UNITED STATES CODE

18 U.S.C. § 111(a) ................................................................................................... 9

18 U.S.C. § 231(a)(3) ..................................................................................... *passim*

18 U.S.C. § 232(1) ................................................................................................ 18

18 U.S.C. § 1503 ..................................................................................................... 9

18 U.S.C. § 1962 ................................................................................................... 17

18 U.S.C. § 2201-02 ............................................................................................... 9

18 U.S.C. § 922(q)(1) ........................................................................................... 14

26 U.S.C. § 7212 ..................................................................................................... 9

**Introduction**

The words of the legislators establish that racial prejudice and vindictiveness toward civil rights advocacy animated subsection 3 the Civil Obedience Act. The government's response on the factual background is wrong on the legislative history of 18 U.S.C. § 231(a)(3) and wrong and irrelevant on the events that led to the government's revival of this statute after 50 years of well-deserved obscurity. The government's claims regarding events last summer skew the facts through omissions, errors, and irrelevancies. The government's legal arguments depend on cases addressing statutes that were legislatively fixed after judicial invalidation. Section 231(a)(3) has never been fixed. The primary case upon which the government relies – *United States v. Williams*, 553 U.S. 285 (2008) –upheld a rewritten statute after the Ninth Circuit and Supreme Court struck down its predecessor as unconstitutional in *Free Speech Coalition v. Reno*, 198 F.3d 1083 (9th Cir. 1999), *affirmed sub nom. Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002). The unreconstructed § 231(a)(3) violates the Commerce Clause, the First Amendment, and the Due Process Clause. After five decades of the statute's obsolescence, it is long past time to permanently remove this stain from the criminal code.

**A.    The Legislative History Establishes Suppression Of Civil Rights Advocacy As The Purpose Of The Statute.**

The government dismisses the racist and vindictive history of § 231(a)(3) by claiming the extensive legislative history provided by the defense constitutes "stray remarks from a Louisiana senator[.]" Response at 2. Far from being "stray remarks," the comments reflect the views of the proponent and primary sponsor of the statute who repeatedly and explicitly invoked his legislation as a tit-for-tat to target civil rights advocates who might be protected by the "hate crime" protections of the Civil Rights Act. Motion at 4-5. The supposed "stray remarks" provide the only

**Page 1    REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS INDICTMENT**

legislative history, which demonstrates the statute's explicit purpose of targeting civil rights advocacy.

Animus toward civil rights advocacy was not a "stray remarks" glitch, it was the feature in the statute's enactment. In the context of opposition to the "hate crimes" provision of the Civil Rights Act, Senator Long had company. Senator Allen Ellender of Louisiana complained that the hate crime bill would "protect[] anarchists such as [civil rights organizers] Rap Brown and Stokely Carmichael who go about the country stirring up trouble," while imposing a "lengthy sentence" on the "party charged" when "a troublemaker is injured while inflaming the local people." 114 Cong. Rec. 1154 (Jan. 26, 1968).[1] Senator Benjamin Jordan of North Carolina recalled when "a group of Negroes descended on the House Gallery" and hypothesized that "any of those Negroes could have invoked the Federal [hate crime] law against our own policemen right here because of claimed police brutality." 114 Cong. Rec. 1160 (Jan. 26, 1968). Senator Herman ("There will never be mixed schools while I am governor") Talmadge of Georgia worried that the hate crime bill would penalize a person who "hit Rap Brown with an open hand while he was causing people to riot and drew a little blood." ECF 19, Exhibit D at 2.

The government offers nothing to contradict the extensive legislative history provided by the defense in support of the obvious proposition that Senator Long's legislation intended to create means for suppression of civil rights advocacy. The unbounded intent behind the statute matched its thrown-together text to provide a club to beat down civil rights advocates. Perhaps in

---

[1] Senator Ellender's hostility to Dr. King and civil rights advocates is reflected in his opposition to voting rights for Black Americans: "The bill is tailor-made to Martin Luther King's demand for Negro control of the political institutions of the South. Only through such a nefarious piece of legislation could incompetents gain control of the political processes in the South or in the United States." 111 Cong. Rec. 5555 (Mar. 22, 1965).

**Page 2  REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS INDICTMENT**

recognition of its constitutional defects, the statute has been virtually unused for 50 years, and, even the few times it has ever been used, the focus was on acts directed against federal interests. The current use, whether advertently or not, matches the sponsor's intent in being used against civil rights advocates.[2] Regardless of its use in this case, the animus behind the legislation is unequivocal and invalidates the statute.

**B.      The Government's Flawed Account Of The Portland Protests Is Not Only Inaccurate But Irrelevant To The Constitutionality Of A Statute That Must Be Judged Based On The Facts At The Time Of Enactment And On Its Overbroad And Vague Text.**

The government's account of national and local Black Lives Matter demonstrations provides little useful information for determining the constitutionality of the 1968 civil disorder statute. The statute's meaning does not change after enactment based on new facts or considerations. *See United States v. Aguilera-Rios*, 769 F.3d 626, 631 (9th Cir. 2014) ("Decisions of statutory interpretation are fully retroactive because they do not change the law, but rather explain what the law has always meant.") (quoting *United States v. Rivera-Nevarez*, 418 F.3d 1104, 1107 (10th Cir. 2005) (citing *Rivers v. Roadway Express Inc.*, 511 U.S. 298, 312-13 (1994)). And the government's account completely omits the role of law enforcement in committing and contributing to acts of violence. *See* Kim Barker, Mike Baker and Ali Watkins, *In City After City, Police Mishandled Black Lives Matter Protests*. N.Y. Times (March 20, 2021). Instead, the government relies almost entirely on a police chiefs association to characterize demonstrations against police brutality. Response at 2-4. The government also references federal matters where federal statutes already fill any societal need and state matters easily addressed within the state

---

[2] Although the government notes the statute's invocation against Capitol defendants this year, those cases, unlike the Portland cases, all involve a direct federal nexus ("the conduct or performance of any federally protected function") and have not resulted in litigated convictions.

**Page 3   REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS INDICTMENT**

criminal justice system. Response at 3-6. Most basically, the breadth and motivation behind the statute at the time of enactment render it unconstitutional, regardless of whether "there is some conduct that clearly falls within the provision's grasp." *Johnson v. United States*, 576 U.S. 591, 602 (2016); *accord United States v. Stevens*, 559 U.S. 460, 473 (2010) (statute overbroad despite plainly legitimate applications).

### 1.    The Government Omits The Role Of The Police In Contributing To Violence During Protests.

The government's response provides not a hint of the policing failures and violence initiated by the police during last summer's Black Lives Matters protests. Those deficits were plainly part of the Portland experience, as reflected in judicial orders against police officers' improper use of supposedly non-lethal armaments and targeting of journalists and legal observers. *See Index Newspapers LLC v. City of Portland*, 474 F. Supp. 3d 1113, 1121 (D. Or. 2020) (journalists and legal observers temporary restraining order), *granting preliminary injunction*, No. 3:20-CV-1035-SI, 2020 WL 4883017 (D. Or. Aug. 20, 2020), *aff'd* 977 F.3d 817, 836 (9th Cir. 2020); *Don't Shoot Portland v. City of Portland*, No. 3:20-CV-00917-HZ, 2020 WL 7049089, at *9 (D. Or. Nov. 27, 2020) (finding City in contempt of temporary restraining order restricting police usage of "less-lethal" impact munitions), *imposing punitive sanctions for contempt*, 2021 WL 982613, at *1 (D. Or. Mar. 16, 2021). The after-action summary referenced in the above New York Times article for Portland noted pervasive failures of training and professionalism during the course of the summer. *See United States v. City of Portland*, 3:12-cv-02265-SI, ECF 236 (D. Or. Feb. 10, 2021) (Periodic Compliance Assessment Report).

And context matters. The mostly peaceful protests called attention to the Portland Police Bureau's (PPB) longstanding pattern of arbitrary uses of force and racially disproportionate

enforcement. Jonathan Levinson, *Portland Has Fifth Worst Arrest Disparities In The Nation, According To Compiled Data*, Oregon Public Broadcasting, Mar. 26, 2021, https://www.opb.org/article/2021/02/07/portland-has-5th-worst-arrest-disparities-in-the-nation-according-to-data/; Leanne C. Serbulo and Karen J. Gibson, *Black and Blue: Police-Community Relations in Portland's Albina District*, 1964-1985, 114 Oregon Historical Quarterly, at 6-37 (Spring 2013). The government's account of the Black Lives Matters protests echoes the last Administration's mischaracterization of Portland, which President Biden recently rejected by executive order. Exec. Order No. 14,016, 86 Fed. Reg. 11,089 (Feb. 17, 2021) (revoking Memorandum of September 2, 2020) (Reviewing Funding to State and Local Government Recipients of Federal Funds That Are Permitting Anarchy, Violence, and Destruction in American Cities).

The government's response betrays no concern for the chilling effect of federal intervention into state protests with poorly defined parameters, leaving police officers and prosecutors to determine whether to sweep in speech and expressive conduct along with state-covered criminal activity. "Under our system of government," the First Amendment may "serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949); *see Hague v. CIO*, 307 U.S. 496, 515 (1939) (noting historic role of streets for protest). The Portland protests were largely peaceful, and the militarized response by the police contributed to the incidents of violence, none of which justifies the vindictive and discriminatory statute enacted in 1968 to target civil rights advocacy.

2.    **The Government Lists Offenses Involving Federal Officers And Federal Interests That Do Not Pertain To The Statute Referencing State Law Enforcement.**

The government's list of horribles from the summer of Black Lives Matter protests provides no relevant information because the incidents involve clear federal statutory jurisdiction or easily prosecutable crimes under state law. As reflected by its 50-year dormancy, § 231(a)(3) has no critical, or even minimal, function that is already not covered by applicable state and federal laws.

For example, the government's references the killing of a federal security officer in Oakland during a protest. Response at 4. What the government omits is that the government has accused two men associated with the right-wing Boogaloo movement of the murder. Mario Dinzeo, *Two Charged in Murder of Oakland Federal Officer During Protests*, Courthouse News (June 16, 2020); Katie Shepherd, *An Officer Was Gunned Down. The Killer Was A 'Boogaloo Boy' Using Nearby Peaceful Protests As Cover, Feds Say*, Washington Post (June 17, 2020). The government here falls directly into the intended trap by alleged right-wing murderers of trying to smear the Black Lives Matter movement: the government asks the Court to consider a right-wing murder of a Black federal contract security officer as something negative about the summer's Black Lives Matter protests. *See United States v. Carrillo*, No. 4:20-mj-70785, Complaint at 14-16 (N.D. Cal. June 16, 2021) (setting out evidence linking the alleged murderer to the "Boogaloo" movement).

The government alleged payments for protesting, but the government provides no evidence that any protester in Portland received payment to participate in protests. The government may be recycling debunked conspiracy theories or counting police informants. *See Fact Check: False*

*claims about George Soros*, Reuters (Sep. 29, 2020) (describing false claims about George Soros including that he funds protests); Sahil Singhvi, *Police Infiltration of Protests Undermines the First Amendment, Brennan Center for Justice* (Aug. 4, 2020) (describing officers posing as Black Lives Matter protesters)*.* Contrary to the government's suggestion, the massive outrage at another Black man killed by police needed no compensation to bring people to the streets. The criminal codes fully address any crimes occurring during the protests; nothing of what the government presents demonstrates a gap in coverage by the state and federal governments. Indeed, the looting and destruction referenced by the government describe quintessentially state crimes.

### 3. The Government's Characterizations Regarding The Protests Do Not Address Or Cure The Statute's Unconstitutionality.

Although claiming that the statute must be construed, the government fails to provide a meaningful summary of how the multiple vague and general terms in the statute can be narrowed without judicial legislation. *Compare* Motion at 20-23, 30-31 (challenging multiple statutory terms as vague and overbroad) *with* Response at 19 (asserting that § 231(a)(3)'s overbreadth can be narrowed within constitutional bounds by reading in an intent requirement). The face of the statute applies broadly to speech and expressive conduct during demonstrations against police conduct. The Supreme Court has been unequivocal that Congress, and not the courts, is responsible for rewriting unconstitutional statutes:

> "[T]his Court may impose a limiting construction on a statute only if it is 'readily susceptible' to such a construction." *Reno v. American Civil Liberties Union*, 521 U.S. 844, 884 (1997). We "'will not rewrite a ... law to conform it to constitutional requirements,'" *id*., at 884-885 (quoting *Virginia v. American Booksellers Assn., Inc.*, 484 U.S. 383, 397 (1988), for doing so would constitute a "serious invasion of the legislative domain," *United States v. Treasury Employees*, 513 U.S. 454, 479, n. 26 (1995), and sharply diminish Congress's "incentive to draft a narrowly tailored law in the first place," Osborne [v. Ohio, 495 U.S. 103 (1990). To read § 48 as the Government desires requires rewriting, not just reinterpretation.

*Stevens*, 559 U.S. at 481 (parallel citations and signals omitted); *see Iancu v. Brunetti*, 139 S. Ct. 2294, 2301 (2019) ("[E]ven assuming the Government's reading would eliminate First Amendment problems, we may adopt it only if we can see it in the statutory language."). Nothing in the statute provides bases for narrowing through construction, and the statute's sponsors indicated no limiting intention.

The Court has also been clear that the government does not allay concerns regarding a statute's constitutionality by assuring that it will be used wisely:

> But the First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.

*United States v. Stevens*, 559 U.S. 460, 480 (2010). The government claims to only use the statute for assaultive conduct. Response at 6. But that is not what the statute says: Unlike the federal obstruction statute, there is no element requiring force. Further, the government can provide no basis for assurances when, after 50 years of warranted disuse, the last administration trotted out the statute to federalize state crimes for seeming political purposes during a time it was using Portland as a law-and-order foil. *See* Michael Kunzelman, Michael Balsamo, Gillian Flaccus, *Lawyer: FBI enlisted Proud Boys leader to inform on antifa*, Associated Press (March 31, 2021) ("Antifa was the Trump administration's villainous scapegoat for much of last year's social unrest following the death of George Floyd.").

The many terms that are undefined and extremely broad by their dictionary terms foreclose judicial rewrite by construction without violating the separation of powers. Motion at 30-31. Regardless, the government does not offer a coherent interpretation of the statute that is consistent with its text. For example, in its introduction, the government uses "assault" or variations on

"violence" six times, Response at 1-2, but then offers no requirement of such conduct in its interpretation of the statute. Nor could the statute support such a construction given the breadth of "any act," which, by its plain meaning, covers speech, expressive conduct, and criminal violence. The statute's plain text covers a world of activity protected by the First Amendment.

And an interpretation adding "force" as an element of the "any acts" would be impossible because Congress uses the word "forcibly" when it intends to qualify the term "impedes" in the context of federal officers, and also accompanies the term with the contextual "assaults," as in 18 U.S.C. § 111(a). But the government cites to a series of statutes, each time omitting that they include "forcibly" or "force." Response at 1 (citing 18 U.S.C. §§ 1503 and 2237 and 26 U.S.C. § 7212). This includes the "act of violence" language in the surviving parts after severance of the unconstitutional sections of 18 U.S.C. § 2201-02 addressed in *United States v. Rundo*, 990 F.3d 709 (9th Cir. 2021). The court cannot add a qualifier that Congress intentionally omitted. Nevertheless, the government throughout its brief uses terms like "concrete acts" and examples of actual violence as describing the statute's coverage, without finding any such limiting language in the statute itself. Response at 25.

As with the lack of "violence," "force" or "forcibly," no language in the statute describes the mental element, the scope of "obstruct, impede, or interfere," the knowledge and relationship between the "any acts" and the attenuated "in any way or degree" commerce language. The hopelessly ill-defined "any act," the lack of a mental element, and other nebulous internal language in the statute all leave the statute open to the widest interpretation for the purposes of all constitutional analyses. Unlike the surviving part of *Rundo*, there is no surviving part of "any act" that can be severed or can be considered "readily susceptible" to construction without judicially

law-writing far beyond what the words and expressed intentions of the legislators permits. *Supra*

(quoting *Stevens*, 559 U.S. at 481).

## C.    The Primary Case Relied Upon By The Government Perfectly Illustrates That Only Congress – Not The Courts – Has Authority To Rewrite Statutes To Cure Constitutional Defects.

The government places primary reliance on *Williams*, citing the case repeatedly throughout

its brief. Response at 14, 15, 17, 19, 20, 23, 26. In doing so, the government fails to note that the

Court upheld the statute in *Williams* only after its predecessor statute had been invalidated as

unconstitutional, and after Congress had engaged in a thorough rewrite addressing and curing the

statute's constitutional defects. Section 231(a)(3) is directly analogous to the statute invalidated

*prior* to *Williams*, so the case perfectly illustrates that Congress, not the courts, provides the

appropriate forum for the statutory rewrite needed to cure constitutional defects.

In *Free Speech Coalition v. Reno*, the Ninth Circuit held that the Child Pornography

Prevention Act of 1996 violated the First Amendment for content-based discrimination and was

also void for vagueness under the Due Process Clause for failing to clearly define what images

were criminalized. 198 F.3d 1083 (9th Cir. 1999). The overbreadth of the statutory language

rendered the statute unconstitutional:

> The language of the statute questioned here can criminalize the use of fictional images that involve no human being, whether that fictional person is over the statutory age and looks younger, or indeed, a fictional person under the prohibited age. Images that are, or can be, entirely the product of the mind are criminalized. The CPPA's definition of child pornography extends to drawings or images that "appear" to be minors or visual depictions that "convey" the impression that a minor is engaging in sexually explicit conduct, whether an actual minor is involved or not. The constitutionality of this definition is not supported by existing case law.

*Free Speech*, 198 F.3d at 1092. Despite the much greater public interest in suppressing child pornography than anything articulated about the present statute, the Ninth Circuit found that Congress had not established a compelling need for the restriction. *Id*. at 1094.

Similarly, the Ninth Circuit held that the statute violated the Due Process Clause requirement that criminal statutes not be vague. *Id.* at 1094-95. The statutory phrases did not establish reasonable certainty "about whose perspective defines the appearance of a minor, or whose impression that a minor is involved leads to criminal prosecution." *Id*. The Court found the phrases in question "highly subjective," and that, with "no explicit standard as to what the phrases mean," the statute provided insufficient notice of prohibited conduct and invited arbitrary and discriminatory enforcement. *Id*. The same type of vagueness infects the present statute. Motion at 30-31.

The Supreme Court affirmed based on First Amendment overbreadth without reaching vagueness. *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 258 (2002). The Court determined that the reach of the CPPA was overbroad in extending to virtual images. *Id.* at 250-51.

> *The Government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter.* The Constitution requires the reverse. "[T]he possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted ...." *Broadrick v. Oklahoma*, 413 U.S. [601, 612(1973)]. *The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process*.

*Free Speech*, 535 U.S. at 255 (emphases added). Applying the same analysis to this case, it is clear that the overbreadth of "any act" in § 231(a)(3) is much more spacious and covers a wider scope of expressive conduct and speech than did the CPPA.

**Page 11 REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS INDICTMENT**

The Court in *Free Speech* also held that the provision banning depictions of sexually explicit conduct that are "advertised, promoted, presented, described, or distributed in such a manner that conveys the impression that the material is or contains a visual depiction of a minor engaging in sexually explicit conduct" is substantially overbroad in violation of the First Amendment. *Id.* at 257-58. The overbroad "conveys the impression" language suffers the same defect as § 231(a)(3), which places the officer in the position of deciding whether the subjective standard of the statute – "obstruct, impede, or interfere with" the officer who decides whether "any act" has done those things – has been met. Motion at 31-33.

In *Williams*, after *Free Speech*, the Court upheld Congress's replacement statute against First Amendment and vagueness challenges. In doing so, the Court described the narrowing and specificity that saved the statute from vagueness, especially the definitional section explaining the meaning of the term "sexually *explicit* conduct" and the "commonsense canon of noscitur a sociis." *Williams*, 553 U.S. at 294-97 (emphasis in original). In contrast to the specificity required in *Williams* to uphold the statute, § 231(a)(3) remains in a far worse form than the CPPA invalidated in *Free Speech* and has never received a congressional make-over to bring it within constitutional bounds.

The unreconstructed civil disorder statute bears all the markers of unconstitutionality with none of the remedial steps illustrated by *Williams* as necessary for the statute to be valid. As the main case upon which the government relies, *Williams* fully supports the present statute's invalidation under the First Amendment and Due Process Clause and forecloses judicial rewriting of the statute.

**D.    The Civil Disorder Statute Does Not Directly Implicate Interstate Commerce, So The Statutory "In Any Way Or Degree" Cannot Meet The Requirement Of A "Substantial" Effect.**

The Supreme Court limits the categories of permissible regulation under the Commerce Clause to (1) "the use of the channels of interstate commerce;" (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce;" and (3) "those activities that substantially affect interstate commerce." *United States v. Lopez*, 514 U.S. 549, 558 (2000). In the absence of any language in § 231(a)(3) meeting the first two conditions, the government claims the statute meets all three, placing primary reliance on *United States v. Dorsey*, 418 F.3d 1038 (9th Cir. 2005). Response 8-11. As with *Williams*, the *Dorsey* court addressed a previously invalidated statute after Congress addressed the issues rendering it unconstitutional and, by amending the statute, established Commerce Clause compliance. By contrast with the present case, *Dorsey* perfectly illustrates the invalidity of § 231(a)(3), which has had none of the congressional repair work addressed in *Dorsey*.

After *Lopez* invalidated the Gun-Free School Zones Act under the Commerce Clause, Congress amended the statute's language to require actual use of the channels of interstate commerce and made detailed congressional findings establishing bases for federal action. In *Dorsey*, the court addressed the new language that narrowed the offense to possession of a firearm that has "moved in or that otherwise affects interstate or foreign commerce" 418 F.3d at 1045. This jurisdictional element, the Ninth Circuit recognized, established a "concrete tie to interstate commerce" by requiring, "through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Dorsey*, 418 F.3d at 1046. Section 231(a)(3) has no equivalent requirement.

Page 13 **REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS INDICTMENT**

Further, the amended statute reviewed in *Dorsey* included extensive and detailed finding to establish a substantial effect on commerce. Unlike the general platitudes in the previous statute, and in § 231(a)(3), Congress considered and listed eight express and detailed findings establishing the effects on interstate commerce of guns in schools. 18 U.S.C. § 922(q)(1).[3] Nothing remotely similarly to such findings can be gleaned from what the government calls the "stray remarks" of § 231(a)(3)'s sponsor or any other part of the legislative history.

The government provides no basis for finding the kind of federal interest required by the Constitution as a limitation on federal power. *See United States v. Morrison*, 529 U.S. 598, 618 n.8 (2000) ("With its careful enumeration of federal powers and explicit statement that all powers not granted to the Federal Government are reserved, the Constitution cannot realistically be interpreted as granting the Federal Government an unlimited license to regulate."). The Commerce Clause's limitation on federal legislative authority, and reservation to the States of general police power, depends on "the distinction between what is truly national and what is truly local." *Id.* at 617-618 (citing *Lopez*, 514 U.S. at 568). A federal statute that criminalizes "any act" that interferes with a state officer, incident to a disturbance involving three or more people, that "in any way or degree" affects commerce, addresses a quintessentially local crime and unconstitutionally accretes to the federal government state police authority.

The government's position that the Commerce Clause encompasses individual acts to interfere with police and firefighters, as described under § 231(a)(3), "would effectually obliterate the distinction between what is national and what is local and create a complete centralized form

---

[3] The subsection of the statute setting out the congressional findings is attached as Appendix A.

**Page 14 REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS INDICTMENT**

of government." *Lopez*, 514 U.S. at 557 (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37 (1937)). In order to preserve the federalist separation of powers enshrined in the Constitution and in the American form of government, the Court should invalidate the commercial means of committing § 231(a)(3) under the Commerce Clause.

1.    **Section 231(a)(3) Does Not Narrowly Regulate The Channels Or Goods Of Interstate Commerce.**

The government claims that § 231(a)(3) is not only a regulation on "activity that substantially affects commerce," but it also regulates "the channels of interstate commerce, including the roads and highways" and serves "to protect the flow of things in interstate commerce" within the meaning of *Lopez*. Response at 8-11. The government's position finds no support in § 231(a)(3)'s plain language. Section 231(a)(3) is not narrowly drafted as to apply only to activities impacting the channels of commerce or the flow of goods in commerce. Neither the substantive offense of interfering with a police officer's duties, nor the incidental occurrence of a civil disorder that "in any way or degree" affects commerce, can reduce application of § 231(a)(3) to only those activities that impact the channels or goods pertaining to interstate commerce. The "in any way or degree" statutory language cannot reasonably be narrowed to fit the government's interpretation of civil disorders "that cut off through-fares or prevent use of significant commercial or government buildings for an extended period of time." Response at 10. Because § 231(a)(3) prohibits intrastate, noneconomic activity that need not itself cause any impact to interstate commerce, the first two *Lopez* categories, which require direct impacts to commerce, cannot apply.

**2.  The Unprecedented Attenuation Between The Prohibited Act And The Jurisdictional Element Of § 231(a)(3) Fails To Establish The Required Federal Nexus.**

The degree of attenuation between the substantive offense element and jurisdictional element of § 231(a)(3) is unprecedented: the government points to no other federal felony replicating this unique structure. By its own terms, the jurisdictional element of § 231(a)(3) contains no requirement "that a defendant's actions implicate interstate commerce" to any degree at all. Instead, it is the civil disorder, and not the defendant's offense conduct, that must be shown to have affected commerce.

Federal laws that regulate "forms of conduct that, even in the aggregate, may not substantially affect commerce" must contain a jurisdictional element so that their "applications . . . do not exceed Congress's authority." *Taylor v. United States*, 136 S. Ct. 2074, 2081 (2016). "[T]he jurisdictional element 'insures, on a case-by-case basis, that a defendant's actions implicate interstate commerce to a constitutionally adequate degree.'" *United States v. Jones*, 231 F.3d 508, 514 (9th Cir. 2000) (quoting *United States v. Polanco*, 93 F.3d 555, 563 (9th Cir. 1996)). All of the statutes that the government uses for comparison are distinguishable because, unlike § 231(a)(3), the crimes referenced all require that a defendant's activity directly impacted commerce or involved a commercial good.

First, the Ninth Circuit's decision in *United States v. Atcheson*, 94 F.3d 1237 (9th Cir. 1996), demonstrates that the jurisdictional elements of § 231(a)(3) and Hobbs Act robbery contrast sharply. Motion at 16 n.10. In *Atcheson*, the Ninth Circuit upheld Hobbs Act robbery following the Supreme Court's decision in *Lopez*. The court determined "that *Lopez*'s 'substantially affects' test is not applicable" because "the Hobbs Act is concerned solely with *inter* state, rather than *intra*

state, activities." *Atcheson*, 94 F.3d at 1242 (emphasis in original). Rather than requiring a substantial effect "the Hobbs Act speaks to one who 'affects commerce' by robbery or extortion," implying "a *direct* impact on interstate commerce." *Id.* (emphasis added). "In contrast to the Gun-Free School Zones Act, which was aimed at purely local, noneconomic activities, the Hobbs Act is directly aimed at economic activities which 'in any way or degree . . . affects commerce." *Id.* While robbery under the Hobbs Act can only be carried out by "affect[ing] commerce," § 231(a)(3) contains no requirement that an individual "affect commerce" by interfering with the duties of police officer.

Second, the jurisdictional element in the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, also provides no help to the government's arguments. Response at 12. Unlike § 231(a)(3), RICO can apply criminal liability to any enterprise "engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. §§ 1962(a), 1962(b), and 1962(c). The Ninth Circuit therefore upheld the constitutional validity of RICO under the Commerce Clause because, "[l]ike the Hobbs Act," RICO requires that a defendant's activities impact commerce directly, and that such direct effects "in the aggregate, have a substantial effect on interstate commerce." *United States v. Juvenile Male*, 118 F.3d 1344, 1348 (9th Cir. 1997). While both RICO and the Hobbs Act require direct impacts to interstate commerce that cause a substantial effect in the aggregate, § 231(a)(3) imposes no requirement "that a defendant's actions implicate interstate commerce to a constitutionally adequate degree." *Jones*, 231 F.3d at 514.

Finally, the government's reference to the Supreme Court's decision in *McLain v. Real Estate Bd. of New Orleans, Inc*., 444 U.S. 232, 246 (1980), which addressed the Sherman Anti-Trust Act's jurisdictional element, is also unavailing. Response at 7. The Court in *McLain* held that an

**Page 17 REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS INDICTMENT**

indictment under the Sherman Act must indicate that, "as a matter of practical economics," the defendant's offense had "a not insubstantial effect on the interstate commerce involved." 444 U.S. at 246. As with the other offenses, the Sherman Act also requires some showing that the defendant's offense conduct itself affected commerce. While recognizing the Commerce Clause to "extend beyond activities actually in interstate commerce to reach other activities that, while wholly local in nature, nevertheless substantially affect interstate commerce," the Court in *McLain* added, "it is not sufficient merely to rely on identification of a relevant local activity and to presume an interrelationship with some unspecified aspect of interstate commerce." *Id.* at 242.

The express terms of § 231(a)(3) – "in any way or degree" – require exactly such a nebulous connection to commerce and are not susceptible to construction that could resolve the gap between the offense of interfering with police or firefighters and a civil disorder's commercial impacts. "Civil disorders," as 18 U.S.C. § 232(1) defines them, can occur in any situation, in any place, at any time, so long as three individuals are engaged in actions of violence threatening danger to property. Given such breadth, the law has vast potential to sweep up individuals who, while interfering with the duties of police, are utterly lacking in culpability with respect to the civil disorder that affected commerce. Nothing in the language of § 231(a)(3) can safeguard such individuals from liability for a federal felony conviction because the statutory language simply cannot be contorted to require that any commercial effect at all result from a defendant's actual acts.

3.    ***Raich* Is Inapplicable Because Section 231(a)(3) Does Not Form An Essential Part Of Any Comprehensive Regime Of Commercial Regulations.**

The government misplaces reliance on *Gonzales v. Raich*, 545 U.S. 1, 13 (2005). Response at 11-12. The Supreme Court's decision in *Lopez* relied in part on the fact that the Gun-Free School

Zones Act was "not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Lopez*, 514 U.S. at 561. In *Raich*, the Court upheld a regulation on intrastate marijuana cultivation for personal use because such a regulation was necessary to effectuate the commercial aims of the Controlled Substances Act (CSA) and therefor served "a larger regulation of economic activity." 545 U.S. at 13. Because the CSA's purpose was "to control the supply and demand of controlled substances in both lawful and unlawful drug markets," the "failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA." *Raich*, 545 U.S. at 19, 22. By contrast, enforcement of § 231(a)(3) is not necessary to effectuate any commercial regulation, nor to advance the goals of any federal regulatory scheme.

While the regulation of intrastate marijuana cultivation in *Raich* was part of a "comprehensive regime to combat the international and interstate traffic in illicit drugs," the Civil Obedience Act cannot be described as "comprehensive" in any way. *Raich*, 545 U.S. at 19. The clearest illustration of the relative "comprehensiveness" of the statutory schemes is simple numbers. Since the early 1970s, the drug enforcement under the CSA has been massively regulated in federal courts, while § 231(a)(3) has been in almost complete hibernation:

- Controlled Substances Act: over 970,000 convictions.[4]

- The commerce prong of § 231(a)(3): 0 convictions or very close thereto.

For offenses under the CSA, the Sentencing Guidelines determine offense severity in direct proportion to the marketable quantity of the illicit contraband at issue. U.S.S.G. § 2D1.1. By

---

[4] Compiled from data available in the Annual Statistical Reports of the Offices of the United States Attorney, 1970-2019. https://www.justice.gov/usao/resources/annual-statistical-reports

**Page 19 REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS INDICTMENT**

contrast, § 231(a)(3) has so little connection to federal regulation that the offense, for 50 years, has not warranted prosecutions, nor has a guideline been promulgated to address the offense. The government can point to no "larger regulation of economic activity" involving this moribund statute.

The legislative history confirms the statute as a mere vestige of opposition to civil rights for Black Americans rather than a good faith effort to regulate commercial activity. The Senate rejected a majority of the provisions that Senator Long had originally included in his amendment, and, in the end, Senator Long said, "little is left." ECF 19, Exhibit B at 15. Whereas the Senate voted to adopt §§ 231(a)(1) and (a)(2) together in a single vote, § 231(a)(3) was approved on its own after a voice vote. Although both § 231(a)(1) and (a)(2) concern firearms and explosives, nothing suggests that § 231(a)(3) forms an "essential part" of any scheme of firearms and explosives regulation.[5] Because § 231(a)(3) was adopted in isolation after the Senate had rejected a majority of the Civil Obedience Act, it is "not an essential part of a larger regulation of economic activity." *Lopez*, 514 U.S. at 561. The provisions of the Civil Obedience Act are a far cry from the CSA's pervasive regime of drug regulations.

With only the slightest reference to its legislative history, the government simply asks the Court to assume that Congress's enactment of § 231(a)(3) was founded on adequate findings and pure motives. Response at 18. The opposite is true. The legislative history behind § 231(a)(3)

---

[5] Although Senator Long mentioned snipers to appeal to gun control advocates, ECF 19, Exhibit B at 9, § 231(a)(3) as passed includes no reference to firearms. Furthermore, accounts of "black snipers" during the 1967 uprisings were later shown to be false and based in racial anxiety. James Ridgeway and Jean Casella, *Newark to New Orleans: The Myth of the Black Sniper*, Mother Jones (July 16, 2007), https://www.motherjones.com/politics/2007/07/newark-new-orleans-myth-black-sniper/.

**Page 20 REPLY TO GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS INDICTMENT**

shows that the law was intended to silence civil rights leaders, not to help regulate interstate commerce. In offering § 231(a)(3), Senator Long sought "to pass a law . . . to do something to keep people like Stokely Carmichael and Rap Brown from going around accusing all the American people of being a bunch of murderers and assassins, which we are not, accusing us of being international criminals, which we are not." ECF 19, Exhibit D at 1. Accordingly, the law's commercial element was worded to not "leave available to Rap Brown or Stokely Carmichael the technical defense that they did not cross the State boundary with the intent to create a riot." ECF 19, Exhibit B at 3. Congress therefore intended that § 231(a)(3) be used to suppress and chill activists' support for civil rights and criticism of the government, only including a token commercial element to accomplish its non-commercial purpose. *See United States v. Bird*, 124 F.3d 667, 682 n.15) (5th Cir. 1997) ("Surely, it would be a perversion of congressional authority to uphold as constitutional a federal statute that purported to be an exercise of Commerce Clause power but was for the sole purpose of reaching intrastate activity without regard to whether or how that activity would actually affect interstate commerce.")

The government suggests that, in voting to adopt § 231(a)(3), Congress recognized "the need to support local law enforcement" based on the belief that "the federal government should lend a hand." Response at 18. On the contrary, the bill's proponent and supporters vehemently *opposed* federal involvement in state law under the Civil Rights Act. In proposing § 231(a)(3), Senator Long sought not to expand federal authority, but rather to diminish and to counteract the federal government's authority to police hate crimes against Black citizens. Motion at 12. Indeed, in the process of proposing § 231(a)(3) for the first time in the Senate, Senator Long criticized the hate crime law as "inimical to proper Federal-State relations" and dubbed it "a legal club" by which

the Attorney General "can browbeat State and local officials into submission to his will and thus assume control of what are essentially State or local government matters." ECF 19, Exhibit A at 2. The plain statements contradict the government's assertion that § 231(a)(3) sought to facilitate federal intervention into the States' law enforcement powers.

As in *Lopez*, the government here asks the Court "to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States." *Lopez*, 514 U.S. at 567. If the Commerce Clause is to carry any force at all to maintain our federal form of government, then the commercial prong of § 231(a)(3) must be struck down.

**E.    The Civil Disorder Statute Violates The First Amendment Both As Over-Broad And As Motivated To Suppress A Particular Viewpoint.**

Section 231(a)(3) reaches a substantial amount of protected expression beyond its legitimate sweep, and the provision's enactment was motivated by the impermissible purpose of punishing and chilling viewpoints of the civil rights movement. The government contends that any potential First Amendment infirmities of § 231(a)(3) can be resolved by grafting a mens rea element into the provision for the purpose of confining its application to "those acts which are designed to impede or obstruct." Response at 20. To the contrary, the wording of § 231(a)(3) is fatally afflicted with ambiguous, imprecise, and overbroad terms that work together to extend the law's application to a broad spectrum of expressive activity entitled to protection under the First Amendment. Moreover, although the government suggests that Congress intended for § 231(a)(3) to apply only to unprotected criminal acts, the legislative history of the Civil Obedience Act in fact shows that the law's proponents intended precisely to criminalize protected forms of political expression that derived from certain viewpoints and specific speakers.

1.    **Section 231(a)(3) Contains No Mental State Element, And Congress Intended It To Impose Minimal Burdens On Prosecutions.**

Section 231(a)(3) contains no mens rea element. The government focuses on "any act to obstruct, impede, or interfere" – language that offers no clarity as to the degree of mental culpability the provision requires as a matter of law. The government does not point to any federal felony statute that expresses a mental state requirement with the word "to" alone. This single word lacks specificity to connote the degree of mental knowledge and intent required for conviction.

The fact that § 231(a)(3)'s text itself requires no culpable mental state is confirmed by comparing its wording with the mental state requirements under §§ 231(a)(1) and (a)(2). A person can be found guilty under § 231(a)(1) for teaching the use of weapons or explosives while "knowing or having reason to know or intending that the same will be unlawfully employed for use in, or in furtherance of, a civil disorder." A conviction under § 231(a)(2) requires that a defendant transports or manufactures firearms or explosives while "knowing or having reason to know or intending that the same will be used unlawfully in furtherance of a civil disorder." "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Gozlon-Peretz v. United States*, 498 U.S. 395, 404 (1991) (citing to *Russello v. United States*, 464 U.S. 16, 23 (1983)). Congress rejected the mental element the government now attempts to incorporate into subsection (3) of § 231(a).

Without an expressed mens rea element, the Court "must follow Congress' intent as to the required level of culpability for any particular offense." *United States v. Bailey*, 444 U.S. 394, 406 (1980). The legislative history behind § 231(a)(3) contains significant evidence that, contrary to the government's assertions, Congress intended the language of § 231(a)(3) to relieve prosecutors

of the burden of proving the defendant's culpable mental state. In adopting the statute, Congress was "desirous of avoiding the problems of proof attendant upon establishing the intent of persons who crossed State lines." ECF 19, Exhibit F at 48. Senator Long regarded such a burden as "insurmountable" and "irrelevant." ECF 19, Exhibit B at 3. He complained that it would "leave available to Rap Brown or Stokely Carmichael the technical defense that they did not cross the State boundary with the intent to create a riot." *Id*. In place of a mental state requirement in § 231(a)(3), Congress included only a commercial element also devoid of an explicit mens rea. Senator Long explained that, under this standard, a prosecutor would be required to "prove merely that commerce was interrupted," and having established that fact, "the one who started the riot can then be held responsible for interfering with it." ECF 19, Exhibit B at 3.    The text, context, and purpose of § 231(a)(3) therefore contradict the government's interpretation of a narrowly drawn intent requirement.

In any event, the claimed mental element does not limit the statute's application to speech and expressive conduct. A person can use language, gestures, and other conduct in the hope of impeding police that is protected under the exacting standards of the First Amendment under *Brandenburg v. Ohio*, 395 U.S. 444, 448 (1969). Motion at 27-28. Accordingly, the government's suggestion of a limiting construction to avoid constitutional problems, Response at 19, is misplaced because such an interpretation would conflict with legislators' clearly expressed purpose to deprive defendants of factual defenses related to their mental state and because it would still encompass protected activity.

2.      **Section 231(a)(3) Burdens A Substantial Amount Of Protected Speech, Including Expressive Conduct.**

By contending that § 231(a)(3)'s "applications to conduct, rather than protected speech, present no First Amendment concerns," Response at 17, the government ignores the Supreme Court's protection of an array of "conduct" that falls under the speech protections of the First Amendment. Motion at 28. The Constitution's speech protections extend to "symbolic conduct that, 'on its face, does not necessarily convey a message.'" *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061 (9th Cir. 2010) (quoting *Cohen v. California*, 403 U.S. 15, 18 (1971)). The government's label of "conduct" is unhelpful for the legal determination at issue because conduct and speech are not mutually exclusive. *Id.* ("The tattoo *itself,* the *process* of tattooing, and even the *business* of tattooing are not expressive conduct but purely expressive activity fully protected by the First Amendment.) (emphases in original). The question is not whether the terms of § 231(a)(3) apply to conduct rather than speech. Instead, the relevant overbreadth inquiry is whether a substantial amount of the activities prohibited under § 231(a)(3) are "'sufficiently imbued with the elements of communication' to receive First Amendment protection." *Id.* at 1058 (quoting *Spence v. Washington*, 418 U.S. 405, 409 (1974)).

"Expressive conduct is characterized by two requirements: (1) 'an intent to convey a particularized message' and (2) a 'great' 'likelihood ... that the message would be understood by those who viewed it.'" *Edge v. City of Everett*, 929 F.3d 657, 668 (9th Cir. 2019) (quoting *Texas v. Johnson*, 491 U.S. 387, 404 (1989)). Accordingly, so long as § 231(a)(3) burdens a substantial amount of activities intended to convey a message to an audience who would understand it, the provision is facially overbroad under the First Amendment.

Section 231(a)(3) burdens a substantial amount of speech and conduct imbued with communicative elements. Motion at 20-23. The provision criminalizes "any act" that could "interfere with" the "duties" of police and firefighters incident to a civil disorder involving three or more people. 18 U.S.C. § 231(a)(3). The term "interfere" is left undefined, as is "impede" and obstruct," permitting an expansive application to any form of expression that tends to interfere with, that is, to interrupt, a police officer's duties during a civil disorder. *See McCoy v. City of Columbia*, 929 F. Supp. 2d 541, 550 (D.S.C. 2013) ("the terms of the Ordinance undefined, it is not clear whether the Columbia City Council intended the Ordinance to apply to physical conduct alone, and the court cannot say that the Ordinance is valid."). Section 231(a)(3) is not restricted by time or place, extending broadly across all venues including traditional public fora. *See Seattle Affiliate of Oct. 22nd Coal. to Stop Police Brutality, Repression & Criminalization of a Generation v. City of Seattle*, 550 F.3d 788, 797 (9th Cir. 2008) ("When the government seeks to regulate access to the streets, 'First Amendment protections are at their strongest and regulation is most suspect.'") (quoting *Long Beach Area Peace Network v. City of Long Beach*, 522 F.3d 1010, 1027 (9th Cir. 2008)). Rather than narrowing § 231(a)(3)'s application, the requirement of a contemporaneous "civil disorder" only ensures that the provision will be invoked to quell political demonstrations, both large and small, that are infused with a communicative purpose. For these reasons, § 231(a)(3) not only applies to pure speech, but the provision also places severe burdens on a substantial amount of protected conduct.

Section 231(a)(3) applies to non-violent speech and actions intended to communicate ideas. The government never contests the fact that the terms of § 231(a)(3) reach nonviolent protected expression. Although the government correctly asserts that § 231(a)(3)'s "plainly legitimate sweep

encompasses violent criminal conduct," Response at 22, this does not overshadow the fact that "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U.S. at 473. While some of the activities under § 231(a)(3) can be classified as violent and unprotected, "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 461 (1987). Section 231(a)(3) is susceptible to no interpretation that could prevent its application to "a significant amount of verbal criticism and challenge directed at police officers," and the Court should invalidate it on this basis.

### 3. Strict Scrutiny Is Warranted Because § 231(a)(3) Was Intended To Suppress Disfavored Viewpoints Of Civil Rights Leaders

The overbroad terms of § 231(a)(3) only serve to advance the impermissible goal, articulated repeatedly throughout underlying legislative history, of suppressing disfavored viewpoints in support of civil rights and against white supremacy. The government offers little to contest this claim, contending only that the "isolated statements of one particular Senator does not transform a statute – that on its face, applies neutrally regardless of the viewpoint underlying a defendant's obstructive conduct – into impermissible viewpoint discrimination." Response at 24. However, even if § 231(a)(3) were content-neutral on its face, which it is not, the Supreme Court has recognized that "[b]ecause strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based, a court must evaluate each question before it concludes that the law is content neutral and thus subject to a lower level of scrutiny." *Id.* at 166.

The Supreme Court teaches that, contrary to the government's position, a law may be held to be impermissibly viewpoint-based where evidence shows the law was "adopted by the

government 'because of disagreement with the message [the speech] conveys." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 164 (2015) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Although the government references "isolated statements," Response at 24, the legislative background behind § 231(a)(3) is replete with evidence of a purpose to silence particular viewpoints. *See* Motion at 4-8, 26-28; *see also supra* at 2-5. Section 231(a)(3) was enacted in response to certain legislators' fear that Black civil rights activists would gain legal protections under the hate crime law that would "help" them to "carry on their conduct and to stir up hatred and ill will among people of their race." ECF 19, Exhibit A at 4. Senator Long expressed hostility to specific speeches, writings, and communications, including Dr. King's *Letter From A Birmingham Jail*, as reasons for the legislation. *Id.* at 8. In response to a legislative record rife with illicit targeting, one Senator complained that, by enacting provisions of the Civil Obedience Act, Congress would "not be legislating . . . out of prudence," but rather would "be legislating in retaliation against Carmichael and Brown." ECF 19, Exhibit B at 10.

The impermissible viewpoint-discriminatory purpose behind § 231(a)(3) is evident from the unambiguous and repeated statements of legislators during its adoption. Therefore, § 231(a)(3) can be categorized among "additional category of laws that, though facially content neutral, will be considered content-based regulations of speech." *Reed*, 576 U.S. at 164.

## F.    The Statute's Multiple Ill-Defined Terms Fail To Provide Required Notice And To Protect Against Arbitrary And Discriminatory Enforcement.

The government provides only a passing defense of the statute under the void for vagueness provision of the Due Process Clause. *Compare* Motion at 29-34 *with* Response at 25-26. The lack of certainty throughout the statute shifts the enforcement definitions from the legislature to police and prosecutors. While the government calls the prohibition as limited to "only concrete 'act[s],'"

Response at 25, what does that mean? And where does "only concrete" come in to replace "any"? And where does the language of "intent" come from in the statute? Section 231(a)(3) provides no textual basis to limit the statute and no reason for the general public know citizens cannot be subjected to arbitrary and discriminatory enforcement. Because the statute does not define its terms, the terms must be read "in accordance with [their] ordinary or natural meaning." *FDIC v. Meyer*, 510 U.S. 471, 476 (1994). The ordinary meaning of the statute's terms are dangerously broad and depend on the reactions of the particular officer.

The government relies on out-of-Circuit cases to contend that the statute's vagueness can be saved by construction. Response at 25 (citing *United States v. Mechanic*, 454 F.2d 849 (8th Cir. 1971). Most critically, *Mechanic* has long since been superseded by Supreme Court authority limiting judicial ability to rewrite statutes and requiring certainty to protect against the evils of vagueness articulated after those cases were issued. Motion at 23 n.11. In *Mechanic*, the Eighth Circuit rejected the defendant's void-for-vagueness argument by determining that, under the law at that time, "defendants may not challenge [criminal statutes] as vague or overly broad if their own conduct may be constitutionally prohibited." *Mechanic*, 454 F.2d at 853.

Since *Mechanic* was decided, the Supreme Court has embraced facial vagueness challenges that may not apply to the specific case. *See Johnson*, 576 U.S. at 603 (rejecting the proposition that "a statute is void for vagueness only if it is vague in all its applications."); *Guerrero v. Whitaker*, 908 F.3d 541, 544 (9th Cir. 2018) ("*Johnson* and [*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018)] expressly rejected the notion that a statutory provision survives a facial vagueness challenge merely because some conduct clearly falls within the statute's scope."). The decision in

*Mechanic* is also at odds with the Supreme Court's later recognition of a "personal right not to be convicted under a constitutionally invalid law." *Bond v. United States*, 564 U.S. 211, 226 (2011).

Finally, the decision of the *Mechanic* court to append a requirement of "violence" to the acts prohibited under § 231(a)(3) finds no support in the statutory language and is inconsistent with later Supreme Court directives foreclosing judicial rewriting of a statute's plain terms. *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 629 (2018) ("Of course, those are not the words that Congress wrote, and this Court is not free to 'rewrite the statute' to the Government's liking.") (citing *Puerto Rico v. Franklin Cal. Tax–Free Trust*, 136 S. Ct. 1938, 1949 (2016) ("[O]ur constitutional structure does not permit this Court to rewrite the statute that Congress has enacted."); *Stevens*, 559 U.S. at 481 (same). The government does not appear to even offer such an indefensible interpretation of the statute.

The government also claims that the First Amendment considerations do not apply to Due Process vagueness, citing to *Holder v. Humanitarian Law Project*, 561 U.S. 1, 21 (2010). Response at 26. Not so. Where, as here, "a statute's literal scope [reaches] expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974). Unlike the statute banning "expert advice or assistance" to foreign terrorist organizations upheld in *Humanitarian Law Project*, Congress has *not* taken care to add narrowing definitions to § 231(a)(3) that increase "the clarity of the statute's terms." 561 at 21. Section 231(a)(3) does *not* rely on "statutory definitions, narrowing context, or settled legal meanings" like the material-support statute but instead depends on "untethered, subjective judgments." 561 U.S. at 20-21 (quoting *Williams*, 553 U.S. at 306). In context, the Court appropriately considers other constitutional rights in evaluating § 231(a)(3)'s vagueness on.

The statute leaves individuals uncertain regarding criminalized conduct and "would delegate to prosecutors and juries the inherently legislative task of determining what type of . . . activities are so morally reprehensible that they should be punished as crimes." *United States v. Kozminski*, 487 U.S. 931, 949 (1988). By doing so, the statute unconstitutionally invites "arbitrary or discriminatory prosecution and conviction." *Id*.

**G.    The Indictment Fails To Comply With The Grand Jury Requirements Of The Fifth Amendment And Rule 7.**

The government's defense of its "assembly line" indictment misapprehends the grounds for dismissal. Response at 26-28. The indictment fails in two ways: the indictment fails to incorporate the government's interpretive overlays required to describe the elements of the offense; and the indictment does not describe the facts that constitute the offense.

Section 231(3) is not amenable to judicial rescue by rewrite of its provisions to meet minimum constitutional standards. *Supra* at 7-8, 10-12. But even taking just one of the missing elements, controlling Ninth Circuit authority requires dismissal. The government, in the face of statutory silence on mens rea, asks the Court to read into the statute that a defendant's acts must be "*designed to* impede or obstruct." Response at 20 (emphasis added). But the grand jury never found such a mens rea – or any intent to commit the offense. In *United States v. Keith*, 605 F.2d 462, 464 (9th Cir. 1979), the Ninth Circuit required specificity from the indictment to assure that the grand jury had found all the facts necessary to constitute an offense. Motion at 35.

As in the present case, the indictment in *Keith* simply parroted the statutory language, which in that case tracked the language of the involuntary manslaughter statute describing the commission of a lawful act "without due caution and circumspection." 605 F.2d at 463. By construction, the courts had interpreted the language of negligence in the statute to require "gross

negligence" or recklessness. *Id*. at 464. The language of the statute did not convey all of what the grand jury needed to find to constitute an offense because it did not include the judicial gloss on the phrase. Therefore, the indictment deprived the defendant "of a basic protection that the grand jury was designed to secure, because a defendant could then be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury that indicted him." *Keith*, 605 F.2d at 464 (citations omitted).

Here, the Fifth Amendment violation is worse. The statute's text includes no mental element; the indictment includes no mental element. Yet the government claims that the Court should read in a mental element. Response at 19. The indictment quotes the statute, so the grand jury did not need to find that the defendant acted with mens rea, the same defect recognized in *Keith* and expanded upon in *United States v. DuBo*, 186 F.3d 1177, 1180 (9th Cir. 1999) ("Du Bo's conviction also must be overturned because his indictment lacks a necessary allegation of criminal intent, and as such does not "properly allege an offense against the United States.") (quoting *United States v. Morrison*, 536 F.2d 286, 289 (9th Cir.1976)). The basic protection included in the Fifth Amendment becomes meaningless when the grand jury essentially acts as a rubber stamp, without being required to find all the elements of a statute – especially the mental component – that are not apparent from the text.

To the same effect, the "any acts" that the government are not specified, leaving the government free to vary from the theory of the case presented to the grand jury. While notice can be provided by alternative means, the grand jury itself limits the case the prosecution can present to the petit jury. "[A]fter an indictment has been returned its charges may not be broadened," although they may be narrowed. *United States v. Miller*, 471 U.S. 130, 143 (1985) (quoting *Stirone*

*v. United States*, 361 U.S. 212, 215-16 (1960)). Thus, only by providing at least some specificity of the conduct alleged are the Fifth Amendment rights of defendants protected from expansion to any other behavior not presented to the grand jury that the prosecution could present at trial as a basis for conviction.

The indictment in the present case provides neither required notice nor protection of the interceding role of the grand jury of defining the offense to which a defendant must answer and limiting the prosecutor's presentation at trial.

**Conclusion**

For the foregoing reasons and those stated in the motion to dismiss, the Court should dismiss the indictment.

Respectfully submitted on March 31, 2021.

  */s/ Gerald M. Needham*  
Gerald M. Needham

  */s/ Stephen R. Sady*  
Attorneys for Defendant

Jacob Sweet  
Research and Writing Attorney

## 18 U.S.C. § 922(q)

(q)(1) The Congress finds and declares that--

(A) crime, particularly crime involving drugs and guns, is a pervasive, nationwide problem;

(B) crime at the local level is exacerbated by the interstate movement of drugs, guns, and criminal gangs;

(C) firearms and ammunition move easily in interstate commerce and have been found in increasing numbers in and around schools, as documented in numerous hearings in both the Committee on the Judiciary of the House of Representatives and the Committee on the Judiciary of the Senate;

(D) in fact, even before the sale of a firearm, the gun, its component parts, ammunition, and the raw materials from which they are made have considerably moved in interstate commerce;

(E) while criminals freely move from State to State, ordinary citizens and foreign visitors may fear to travel to or through certain parts of the country due to concern about violent crime and gun violence, and parents may decline to send their children to school for the same reason;

(F) the occurrence of violent crime in school zones has resulted in a decline in the quality of education in our country;

(G) this decline in the quality of education has an adverse impact on interstate commerce and the foreign commerce of the United States;

(H) States, localities, and school systems find it almost impossible to handle gun-related crime by themselves--even States, localities, and school systems that have made strong efforts to prevent, detect, and punish gun-related crime find their efforts unavailing due in part to the failure or inability of other States or localities to take strong measures; and

(I) the Congress has the power, under the interstate commerce clause and other provisions of the Constitution, to enact measures to ensure the integrity and safety of the Nation's schools by enactment of this subsection.

(2)(A) It shall be unlawful for any individual knowingly to possess a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the individual knows, or has reasonable cause to believe, is a school zone.

(B) Subparagraph (A) does not apply to the possession of a firearm--

(i) on private property not part of school grounds;

(ii) if the individual possessing the firearm is licensed to do so by the State in which the school zone is located or a political subdivision of the State, and the law of the State or political subdivision requires that, before an individual obtains such a license, the law enforcement authorities of the State or political subdivision verify that the individual is qualified under law to receive the license;

(iii) that is--

(I) not loaded; and

(II) in a locked container, or a locked firearms rack that is on a motor vehicle;

(iv) by an individual for use in a program approved by a school in the school zone;

(v) by an individual in accordance with a contract entered into between a school in the school zone and the individual or an employer of the individual;

(vi) by a law enforcement officer acting in his or her official capacity; or

(vii) that is unloaded and is possessed by an individual while traversing school premises for the purpose of gaining access to public or private lands open to hunting, if the entry on school premises is authorized by school authorities.

(3)(A) Except as provided in subparagraph (B), it shall be unlawful for any person, knowingly or with reckless disregard for the safety of another, to discharge or attempt to discharge a firearm that has moved in or that otherwise affects interstate or foreign commerce at a place that the person knows is a school zone.

(B) Subparagraph (A) does not apply to the discharge of a firearm--

(i) on private property not part of school grounds;

(ii) as part of a program approved by a school in the school zone, by an individual who is participating in the program;

(iii) by an individual in accordance with a contract entered into between a school in a school zone and the individual or an employer of the individual; or

(iv) by a law enforcement officer acting in his or her official capacity.

(4) Nothing in this subsection shall be construed as preempting or preventing a State or local government from enacting a statute establishing gun free school zones as provided in this subsection.