Gerald M. Needham, OSB #963746
Assistant Federal Public Defender
Email: jerry_needham@fd.org
Stephen R. Sady, OSB #81099
Chief Deputy Federal Defender
Email: steve_sady@fd.org
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204
Tel: (503) 326-2123
Fax: (503) 326-5524

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Case No. 3:20-cr-00465-JO |
| **Plaintiff,** | |
| v. | **DEFENDANT'S BRIEF IN RESPONSE TO THE GOVERNMENT'S SUPPLEMENTAL CITATIONS** |
| **KEVIN PHOMMA,** | |
| **Defendant.** | |

**Introduction**

On July 9, 2021, the government provided the Court with supplemental citations to two unpublished district court cases involving subsection (3) of the Civil Obedience Act: *United States v. Rupert*, No. 20-CR-104, 2021 WL 942101 (D. Minn. March 12, 2021), and *United States v. Pugh*, No. 1:20-cr-73-TFM (D. Ala. May 13, 2021). The government failed to point out that the two decisions are contradictory on a fundamental point: the *Rupert* judge found the statute constitutional under the First Amendment by construing the statute as applying "only to violent

physical acts" (*supra* at *9), while the *Pugh* judge explicitly rejected *Rupert*'s construction, holding that the plain language of "any act" includes nonviolent conduct (*supra* at 12-13). Close inspection of the two opinions demonstrates that neither provides adequate protections for the important constitutional interests at stake.

A.     **The *Rupert* Opinion Depends On An Untenable Construction Of The Statute And Did Not Address Arguments Made In This Court.**

The *Rupert* court only briefly addressed a First Amendment challenge by finding that, because only "violent physical acts" were proscribed, the statute "does not purport to reach speech of any kind." *Supra* at 9 (citing *United States v. Mechanic*, 454 F.2d 849, 852 (8th Cir. 1971)). As Mr. Phomma has repeatedly argued, and the district court in *Pugh* agreed, there is no statutory basis for the limiting construction. ECF 18 at 23 n.11; ECF 28 at 29-30.

The *Rupert* theory that 18 U.S.C. § 231(a)(3) does not apply to nonviolent expressive conduct cannot be reconciled with the plain, unlimited terms of the statute: "any act to obstruct, impede, or interfere." *See Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1749 (2020) ("[W]hen the meaning of the statute's terms is plain, our job is at an end."). In contrast to § 231(a)(3), when Congress intends to require force or violence as an element, Congress expressly says so. In 18 U.S.C. § 111(a), Congress used the term "forcibly" to preface an act that "assaults, resists, opposes, impedes, intimidates, or interferes with" federal officers. In contrast, § 231(a)(3) does not similarly require that a person "forcibly" obstruct, impede, or interfere with a state official. *See Gozlon-Peretz v. United States*, 498 U.S. 395, 404 (1991) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). The *Rupert*

opinion on the First Amendment depends on an untenably narrow reading of the overly broad statute.

Further, neither *Rupert* nor *Mechanic*, the Eight Circuit decision from 1971 upon which *Rupert* relied, addressed the array of constitutional challenges presented here, which are supported by Supreme Court authority and extensive evidence from the legislative history. This Court provides de novo review of the constitutional questions with no controlling, or even persuasive, contrary authority: "Constitutional rights are not defined by inferences from opinions which did not address the question at issue." *Texas v. Cobb*, 532 U.S. 162, 169 (2001).

Moreover, the relevant constitutional questions were not fully litigated before the district court judge in *Rupert*. The defendant raised no objection to the magistrate judge's recommendation to deny the constitutional challenges. *United States v. Rupert*, No. 20-CR-104, ECF 77 (D. Minn. Jan. 29, 2021) (objecting only to the unrelated denial of suppression motions). And the defendant in *Rupert* ultimately pleaded guilty, not to civil disorder under § 231(a)(3), but rather to aiding and abetting commercial arson under 18 U.S.C. § 844(i). *Supra* at ECF 86 at 1 (D. Minn. April 8, 2021) (government agreement to dismiss the civil disorder count). The federal statute specific to the offense in *Rupert* provided the basis for accountability. Any dispute regarding the validity of § 231(a)(3) became moot with the plea to the other count.

**B.    The *Pugh* Opinion Inadequately Addressed The Constitutional Consequences Of Criminalizing "Any Act" To Include Unlimited And Nonviolent Expressive Conduct That Has No Direct And Substantial Effect On Interstate Commerce.**

Once the *Pugh* court determined that § 231(a)(3) applied to nonviolent conduct, the glaring constitutional issues raised by the statute's breadth and legislative history should have resulted in dismissal of the indictment.

1. The *Pugh* Court's Interpretation Of § 231(a)(3) Falls Far Short Of Satisfying The Commerce Clause's Requirement Of A "Substantial" Effect On Interstate Commerce.

The *Pugh* court failed to follow Supreme Court authority requiring a substantial effect on interstate commerce. Under the governing four-factor test, interference with a local police officer does not "substantially" affect interstate commerce. *United States v. Adams*, 343 F.3d 1024, 1028 (9th Cir. 2003) (citing *United States v. Morrison*, 529 U.S. 598, 610-12 (2000)); *see United States v. Lopez*, 514 U.S. 549, 559 (1995) (intrastate non-economic activity only subject to federal regulation where "the activity substantially affected interstate commerce."). The *Pugh* court's analysis deviated from the *Morrison* test in three basic ways.

First, the *Pugh* court disregarded the attenuation between the regulated activity and the separate requirement of a civil disorder. Under the statute, the penalized act need not have any effect on interstate commerce to qualify for federal prosecution. Instead, it is the underlying civil disorder – "incident to or during" – that purports to federalize the otherwise completely local activity. The court cited no precedent for such attenuation meeting the Commerce Clause requirements, nor could it under the *Morrison* four-factor test. And under *Lopez*, the jurisdictional element does nothing to ensure that the particular "any act" affects interstate commerce because only the collateral "civil disorder" must do so. 514 U.S. at 561-62. There is simply no requirement of a substantial effect on interstate commerce.

Second, the *Pugh* court focused on the existence of a "jurisdictional hook" in the civil disorder provision as determinative. *Pugh*, *supra*, at 11. The court upheld the statute because it found "the Government need only show a minimal effect on interstate commerce when the statute contains an explicit jurisdictional element." *Pugh*, *supra*, at 10. That is not how the *Morrison* test

operates: there are four factors that *all* must be considered. Section 231(a)(3) does not satisfy any of the other three factors at all: there are no congressional findings regarding a commercial impact, the statute does not regulate commercial or economic activities, and the statute requires no direct effect on interstate commerce. As to the fourth factor, the supposed "jurisdictional hook," which the *Pugh* court deemed determinative, is insubstantial on its face because the statute requires only that the attendant circumstances in which the regulated activity occurs "in any way or degree" affect interstate commerce. Where one factor out of four is minimally present, the *Pugh* court erred in finding the *Morrison* test satisfied.

Third, the court in *Pugh* ignored the ordinary meaning of "substantial effect," which is the term being defined by the *Morrison* test. The statute's "jurisdictional hook" only requires the predicate civil disorder to affect commerce "in any way or degree." These words require the opposite of a "substantial" impact: "The Supreme Court has recognized that 'substantial' indicates 'considerable' or 'to a large degree.'" *United States v. George*, 949 F.3d 1181, 1184 (9th Cir.), *cert. denied*, 141 S. Ct. 605 (2020) (quoting *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 196 (2002) (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2280 (1976)); s*ee Leocal v. Ashcroft*, 543 U.S. 1, 11 (2004) (when defining "crime of violence," the ordinary meaning of the underlying words informs the definition). By its plain terms, § 231(a) does not require activity that has a substantial effect on interstate commerce because it explicitly references an indirect and de minimis effect.

The *Pugh* court cited to cases purportedly supporting federal jurisdiction based on a minimal interstate impact. *Pugh*, *supra*, at 9-10. As previously briefed, § 231(a)(3) goes beyond any precedent in requiring neither direct impact by the criminal conduct, nor use of channels or

instrumentalities of interstate commerce, nor a heavily regulated area of federal law. ECF 18 at 14-16; ECF 28 14-21. The statutes from the cases relied on in *Pugh* add nothing to the analysis:

- Hobbs Act robbery premises federal jurisdiction on a direct act relating to interstate commerce that, through repetition or in aggregate, creates a sufficient nexus (ECF 14 at 16 n.10);

- The felon-in-possession of a firearm statute (18 U.S.C. § 922(g)) premises federal jurisdiction on the express requirement that the firearm have moved in interstate commerce under *Lopez*'s first "use of the channels" factor (*United States v. Scott*, 263 F.3d 1270, 1272 (11th Cir. 2001)); and

- SORNA "fits comfortably within the first two *Lopez* prongs," which relate to channels and instrumentalities of interstate commerce (*United States v. Coleman*, 675 F.3d 615, 620 (6th Cir. 2012)).

Unlike these examples, § 231(a)(3) does not require a direct effect on interstate commerce, movement in a channel of interstate commerce, an instrumentality of interstate commerce, or heavily regulated federal activity. The statute's attempt to expand federal precedent to purely local conduct based on the minimal and attenuated "jurisdictional hook" fails under established Supreme Court precedent.

This Court should follow the methodology provided by the Supreme Court in *Lopez* and *Morrison* to maintain federal criminal jurisdiction only when the regulated local conduct *substantially* affects interstate commerce. It is the States that are generally responsible for enforcing criminal law. *Morrison*, 529 U.S. at 618 ("The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate

commerce has always been the province of the States."). The *Pugh* court's position approves an unprecedented federalization of conduct during confrontations with local law enforcement, permitting federal jurisdiction over local acts whenever a disturbance with three or more people "in any way or degree" impacts interstate commerce. The court's reasoning violates basic principles of federalism, comity, and limited federal police power.

> 2. The *Pugh* Court Failed To Follow Supreme Court Guidance Regarding Overbreadth In The First Amendment Context.

In addressing the statute's overbreadth under the First Amendment, the *Pugh* court failed to recognize the true scope of expressive conduct covered by the statute. Instead, the *Pugh* court improperly narrowed the statute through a tautology: unlawful conduct is not protected by the First Amendment; the statute makes "any act" unlawful if it obstructs, impedes, or interferes with local police; therefore, the "any act" is not protected by the First Amendment. *Pugh*, *supra*, at 13 (citing *United States v. Huff*, 630 F. App'x 471, 485 (6th Cir. 2015)). This circular reasoning contradicts the abundant authority supporting dismissal for First Amendment overbreadth.

The *Pugh* court's reliance on *Huff* to claim that § 231(a)(3) does not greatly restrict expressive conduct fails because the *Huff* statute addresses narrow and non-communicative conduct: "transportation in [interstate] commerce. . . [of] any firearm, or explosive or incendiary device, knowing or having reason to know or intending that the same will be used unlawfully in furtherance of a civil disorder." 18 U.S.C. § 231(a)(2). By contrast, it takes little imagination to posit that § 231(a)(3)'s inclusion of "any acts" criminalizes expressive conduct and speech directed at officers during a demonstration: shouting harsh or derogatory words; failing to move out of the way; waving signs that block sight lines; picketing in front of law enforcement buildings; recording police conduct; advocating for the police to be defunded.

Thus, contrary to the *Pugh* court's reasoning, § 231(a)(3)'s criminalization of "any act" falls directly within the scope of protected "verbal criticism and challenge directed at police officers," which would permit officers to make arrests "on the basis of the content of the speech." *McCoy v. City of Columbia*, 929 F. Supp. 2d 541, 551 (D.S.C. 2013) (citing *City of Houston v. Hill*, 482 U.S. 451, 461, 461 (1987)). In *McCoy*, the court found unconstitutional a statute making it "unlawful for any person to interfere with or molest an police officer"; in *Hill*, the Court held that a conviction violated the First Amendment for shouting at officers to distract them during an arrest under a statute making it a crime to "in any manner oppose, molest, abuse or interrupt any policeman." While the *Pugh* court only "could conjure some hypothetical scenario of prosecutorial overreach," *supra* at 13, this Court need look no farther than *McCoy* and *Hill* to see that § 231(a)(3) criminalizes a substantial amount of protected speech. *See also Frasier v. Evans*, 992 F.3d 1003, 1018-19 (10th Cir. 2021) (qualified immunity protected officers who detained citizen because he videotaped police activity).

By recognizing that nonviolence is included in "any act," the *Pugh* court interpreted the statute to apply to speech and expressive conduct, triggering the Supreme Court's full First Amendment protections: "The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs." *United States v. Stevens*, 559 U.S. 460, 470 (2010). The cases referenced in the *Pugh* court's quotation from *Stevens* omits the critical distinction (*supra* at 14): neither *United States v. Salerno*, 481 U.S. 739, 745 (1987), nor *Washington v. Glucksberg*, 521 U.S. 702, 740 n. 7 (1997) (Stevens, J. concurring), "is a speech case." *Stevens*, 559 U.S. at 472. The present case emphatically involves protected First Amendment conduct within the scope of "any act."

Page 8   DEFENDANT'S BRIEF IN RESPONSE TO THE GOVERNMENT'S SUPPLEMENTAL CITATIONS

Similarly, the court's reliance on *Virginia v. Hicks*, 539 U.S. 113 (2003), takes inapplicable language out of context. *Hicks* involved a regulatory policy limiting access to a housing development by specific notification prior to potential trespass actions. The Court reiterated its expansive facial remedy that protects against deterrence or "chill" of constitutionally-protected speech. Upon a "showing that a law punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep,'" that "suffices to invalidate all enforcement of that law, 'until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression[.]" *Hicks*, 539 U.S. at 118-19 (citations omitted). "Overbreadth adjudication, by suspending all enforcement of an overinclusive law, reduces these social costs caused by the withholding of protected speech." *Id*. at 119.

In *Hicks*, the regulation had sharp limits. The purported limit on "demonstrating and leafleting" was pursuant to an "unwritten" rule; the trespass authority only applied after a barment notice. *Id*. at 122. Hicks failed to demonstrate that any First Amendment activity falls outside permissible "legitimate business or social purposes," and, "until one receives a barment notice, entering for a First Amendment purpose is not a trespass." *Id*. at 122-23. In contrast, "any act" that interferes, as punished by § 231(a)(3), includes no limiting principle that protects the wide range of expressive activity that an officer could decide warrants arrest and a prosecutor could decide to pursue.

Finally, the *Pugh* court referenced "reasonable time, place and manner regulations on speech[.]" *Supra* at 14. That is not a valid description of § 231(a)(3). The statute here broadly criminalizes free expression and expressive conduct against police. The statute's prohibition

Page 9   DEFENDANT'S BRIEF IN RESPONSE TO THE GOVERNMENT'S SUPPLEMENTAL CITATIONS

n/a

against expression covers only speech in opposition to police activity, not speech supportive of the police. The statute contains no objective standard to distinguish between expressive conduct and purely criminal activity. Under well-established First Amendment law, the statute's overbreadth renders it unconstitutional.

    3.    *The Civil Obedience Act's Legislative History Establishes Viewpoint-Discrimination Under The Supreme Court's <u>Reed</u> Test.*

The *Pugh* court acknowledged that it must consider congressional intent to resolve a First Amendment viewpoint-discrimination challenge. *Supra* at 15. However, the court ultimately failed to recognize the damning evidence that the law was directed toward silencing voices of the civil rights movement. The court dismissed the legislative history evidence as the "negative intentions of a single senator," but, in fact, Senator Russell Long was one of several segregationist senators who chimed in regarding their hostility to the civil rights movement related to the Civil Obedience Act. ECF 28 at 2-3. In addition, the *Pugh* court never mentioned that Senator Long was the author and primary proponent of the statute, not just a bit player in the legislative process. He was the central driver behind the legislation and made no secret of his discriminatory intention.

The *Pugh* court found it relevant that Senator Long ultimately voted against the legislation. *Supra* at 15. But that was the point: because his hostility to the civil rights movement provided the motivation for the Civil Obedience Act, Senator Long intended subsection (3) to be a "poison pill" that would derail enactment of the Civil Rights Act's hate crime law. Neil Weare, *Equally American: Amending the Constitution to Provide Voting Rights in U.S. Territories and the District of Columbia*, 46 STETSON L. REV. 259, 285 (2017) ("Senate rules also allow Senators to use the legislative amendment process to try and delay legislation once it reaches the floor or include an unfavorable 'poison pills' amendment that might ensure a bill's defeat."). It is unsurprising that

Page 10   DEFENDANT'S BRIEF IN RESPONSE TO THE GOVERNMENT'S SUPPLEMENTAL CITATIONS

Senator Long voted against the civil rights law in its ultimate incarnation; his introduction of § 231(a)(3) was meant to provide a means of attacking civil rights advocacy and imprisoning activists and leaders, not to further equal rights for all Americans. His vote does not change the discriminatory underlying purpose of his amendment to muffle civil rights advocacy.

The *Pugh* court stated that, because § 231(a)(3) is "content-neutral on its face" and applies to a "limited category of expressive conduct," the vast evidence of discriminatory intent in its legislative history need not be given due weight or consideration. *Supra* at 15. But the statute cannot be considered content neutral when its proponents named it the Civil *Obedience* Act, highlighting its opposition to civil rights groups for whom civil *disobedience* was the defining tactic. Exhibit A at 11; Exhibit B at 2 ("Title II contains the substantive provisions of the proposed amendment and is entitled 'Civil Obedience Act of 1968.'"). "'[T]he title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute." *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998). The legislative history provides a direct connection to the suppression of civil rights activities: three pages after Senator Long claimed that urban riots "have their origins in the less destructive but morally corroding 'civil disobedience' demonstrations of a few years ago," then compared civil rights demonstrations to the "single diseased cell" that develops into a "killing cancer," "Civil Obedience" appears as the title of his amendment. Exhibit A at 8 and 11.

The *Pugh* court's dismissive approach to the legislative history runs directly counter to the Supreme Court's instruction that, even for content-neutral laws, the statute "will be considered content-based regulations of speech" by virtue of having been "adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Reed v. Town of Gilbert, Ariz.*,

576 U.S. 155, 164 (2015). The title of the legislation and its context leaves no question of its motivating hostility to civil rights advocacy and its overbreadth intended to provide maximum authority to suppress civil rights demonstrations.

> 4. The *Pugh* Court Never Addressed § 231(a)(3)'s Vagueness Because It Erroneously Held That The Defendant Lacked Standing To Raise The Challenge.

The *Pugh* court declined to reach the question whether § 231(a)(3) is unconstitutionally void for vagueness based on the defendant's purported lack of standing, claiming that Ms. Pugh had to show that the statute was vague as applied to her. *Supra* at 16-17. On the contrary, the Supreme Court has made clear that "a vague provision is [not] constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Johnson v. United States*, 576 U.S. 591, 602 (2016). If a criminal law is "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement," then the law is void, and any prosecution under that law is invalid. *Id.* at 595. Thus, the question of unconstitutional vagueness is a legal question regarding the statutory terms, not a fact-based question involving the particular defendant's case. The Ninth Circuit recently expanded on this aspect of *Johnson*: "Specifically, the Court [in *Johnson*] rejected the legal standard that 'a statute is void for vagueness only if it is vague in all its applications.'" *Guerrero v. Whitaker*, 908 F.3d 541, 544 (9th Cir. 2018) (quoting *Johnson*, 576 U.S. at 603).

In fact, the Supreme Court has never held that a facial challenge, as opposed to a particular application, "cannot be brought under any otherwise enforceable provision of the Constitution." *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 415 (2015). In providing examples in support of this principle, the Court in *Patel* cited as an example one of the cases on due process vagueness upon which Mr. Phomma relies. *Id.* (citing *Chicago v. Morales*, 527 U.S. 41 (1999)); *see also*

*Stevens*, 559 U.S. at 473 (invalidating a statute as overly broad under the First Amendment despite legitimate applications). The *Pugh* court's ruling based on standing is contrary to controlling Supreme Court authority.

The idea that an individual charged under a vague law would lack standing to challenge the law's constitutionality makes no sense given the rule's due process rationale. The constitutional danger of vague statutes includes giving inappropriate discretionary lawmaking power to police and prosecutors, in addition to providing fair notice and protecting against chilling lawful activities. Judicial determination of a statute's vagueness accomplishes these societal benefits at the same time that it vindicates the "personal right not to be convicted under a constitutionally invalid law." *Bond v. United States*, 564 U.S. 221, 226 (2011).

The *Pugh* court's discussion of *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), *supra* at 16-17, misses a critical aspect of the case: as in *Williams v. United States*, 553 U.S. 285 (2008), the Court only upheld those statutes after Congress engaged in extensive definitional legislation to narrow the potential applications of the statutes. *Humanitarian Law*, 561 U.S. at 11-13; ECF 28 at 10-12, 30-31. This point is critical because, in *Humanitarian Law*, the plaintiffs did not argue that "the material-support statute grants too much enforcement discretion to the Government." 561 U.S. at 20. That is exactly what is at issue in this case. ECF 18 at 30-31 (the statute encourages arbitrary and discriminatory enforcement); ECF 28 at 29 ("The ordinary meaning of the statute's terms are dangerously broad and depend on the reactions of the particular officer."). The Court in *Humanitarian Law* also carefully distinguished vague statutes that, like § 231(a)(3), rely on "wholly subjective judgments without statutory definitions, narrowing

context, or settled legal meanings." *Id*. at 20-21 (quoting *Williams*, 553 U.S. at 306); *compare* ECF 18 at 29-30.

As with *Williams*, Congress "took care to add narrowing definitions to the material-support statute over time." *Humanitarian Law*, 561 U.S. at 21. In contrast, § 231(a)(3) was unconstitutionally vague when enacted, and Congress has never narrowed or defined the terms to cure the vagueness and overbreadth. As a result, governing Ninth Circuit authority approves the facial attack on pre-narrowing vagueness. *Free Speech Coalition v. Reno*, 198 F.3d 1083 (9th Cir. 1999), *affirmed sub nom. Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002). The *Pugh* court's contention that only "as applied" vagueness challenges are available is squarely contradicted by controlling precedent.

The *Pugh* court's refusal to address § 231(a)(3)'s unconstitutional vagueness based on standing violates controlling Supreme Court and Ninth Circuit precedent. This Court should reach the statute's dangerous vagueness and the unbounded discretion that the unlimited scope of "any act" and the other poorly defined statutory terms confer on arresting officers and prosecutors.

**Conclusion**

For the foregoing reasons and those stated in the previous briefing, the Court should dismiss the indictment.

Respectfully submitted this 30th day of July, 2021.

       */s/ Gerald M. Needham*
       Gerald M. Needham

       */s/ Stephen R. Sady*
       Stephen R. Sady

       Attorneys for Defendant